1  Martha Boersch (Cal. Bar No. 126569)
   Lara Kollios (Cal. Bar No. 235395)
2  JONES DAY
   555 California Street, 26th Floor
3  San Francisco, CA  94104-1500
   Telephone:      (415) 626-3939
4  Facsimile:      (415) 875-5700
   Email:    mboersch@jonesday.com
5            lkollios@jonesday.com

6  Attorneys for Defendant
   JUDY YEUNG aka MIU WAN YEUNG
7

8                 UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                  SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,          | **Case No. 09-376 SI**

12            Plaintiff,               | **DEFENDANT JUDY YEUNG'S MOTION**
                                       | **FOR A DIRECTED VERDICT OF**
13        v.                           | **ACQUITTAL AND A NEW TRIAL**

14  JUDY YEUNG aka MIU WAN YEUNG,      | Date:        April 16, 2010
                                       | Time:        11:00 am
15            Defendant.               | Courtroom: 10
                                       | Judge:       Honorable Susan  Illston
16

17

18

19

20

21

22

23

24

25

26

27

28

SFI-631642v1

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ............................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................... 1

I.      INTRODUCTION ............................................................................ 1

II.     BACKGROUND ............................................................................... 2

    A.      The Superseding Indictment ............................................... 2

        1.      Counts 1-9, Conspiracy and Wire Fraud Scheme ...................................... 2

        2.      Counts 10-12, Witness Tampering ................................................. 3

    B.      Trial ................................................................................... 3

        1.      Evidence Relating to the Mortgage Loan Transactions .............................. 3

            (a)      Refinance of 261 San Fernando Way, San Francisco .................... 4

            (b)      Mr. Louie's Purchase of 1351 Third Street, Gilroy ....................... 5

            (c)      Mr. Ferrari's Purchase of 1351 Third Street, Gilroy...................... 6

            (d)      Mr. Phung's Purchase of 7187 Pitlochry Street, Gilroy ................ 8

            (e)      Mr. Lam's Purchase of 261 San Fernando Way, San Francisco ................................................................. 9

        2.      Alex Yee's Testimony................................................... 10

        3.      Evidence Relating to Witness Tampering of Mr. Louie .......................... 13

III.    ARGUMENT ................................................................................... 13

    A.      The Court Must Grant a Judgment of Acquittal on the Conspiracy and Wire Fraud Counts Because the Government Did Not Prove the Single Conspiracy and Scheme to Defraud Alleged in the Superseding Indictment ....... 13

        1.      The Evidence at Trial Varied from the Superseding Indictment .............. 13

            (a)      There was no Overall Agreement ................................................. 15

            (b)      The Benefits of Each Transaction Were Not Interdependent ....... 16

            (c)      The Government Did Not Prove the Wire Fraud Scheme ........... 17

        2.      Ms. Yeung was Prejudiced by the Variance ............................. 17

    B.      The Court Should Grant a New Trial on the Conspiracy and Wire Fraud Counts Because the Verdict is Against the Weight of the Evidence .................. 19

    C.      The Evidence of the Alleged Louie Witness Tampering is Insufficient.............. 21

    D.      The Evidence Relating to Ms. Yeung's Legal Refinancing of 261 San Fernando Way was Inadmissible and Prejudicial ................................ 23

IV.     CONCLUSION ................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

CASES

*D'Last Corp. v. Ugent*,
863 F. Supp. 763 (N.D. Ill. 1994) ........................................................................ 16

*Jackson v. Virginia*,
443 U.S. 307 (1979)................................................................................................ 13

*Kotteakos v. United States*,
328 U.S. 750 (1946) .......................................................................................... 14, 16

*United States v. Alston*,
974 F.2d 1206 (9th Cir. 1992)................................................................................ 19

*United States v. Bradley*,
5 F.3d 1317 (9th Cir. 1993)............................................................................... 24, 25

*United States v. Cruz*,
554 F.3d 840 (9th Cir. 2009)................................................................................. 13

*United States v. Davis*,
183 F.3d 231 (3d Cir. 1999) *as amended by* 197 F.3d 662 (3d Cir. 1999)........... 21

*United States v. Durades*,
607 F.2d 818 (9th Cir. 1979).................................................................................. 14

*United States v. Duran*,
189 F.3d 1071 (9th Cir. 1999).................................................................... 14, 15, 16

*United States v. Farrell*,
126 F.3d 484 (3d Cir. 1997)................................................................................... 21

*United States v. Fernandez*,
388 F.3d 1199 (9th Cir. 2004)................................................................................ 14

*United States v. Hill*,
953 F.2d 452 (9th Cir. 1991).................................................................................. 24

*United States v. Hodges*,
770 F.2d 1475 (9th Cir. 1985)................................................................................ 24

*United States v. Kellington*,
217 F.3d 1084 (9th Cir. 2000)........................................................................... 19, 20

*United States v. Khatami*,
280 F.3d 907 (9th Cir. 2002).................................................................................. 21

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3
*United States v. Makham,*........................................................................................ 21, 23
4
    2005 W.L. 3533263, (D. Or. Dec. 23, 2005)

5
*United States v. Masteotto,*
    717 F.2d 1238 (9th Cir. 1983)........................................................................ 14, 17
6

7
*United States v. Miller*,
    471 U.S. 130 (1985)....................................................................................... 14

8
*United States v. Molt*,
    615 F.2d 141 (3d Cir. 1980)........................................................................... 16
9

10
*United States v. Nevils*,
    548 F.3d 802 (9th Cir. 2008).......................................................................... 13

11
*United States v. Reyna*,
    148 F.3d 540 (5th Cir. 1998).......................................................................... 13
12

13
*United States v. Swafford*,
    512 F.3d 833 (11th Cir. 2008)........................................................................ 16, 18
14

15
*United States v. Vizcarra-Martinez*,
    66 F.3d 1006 (9th Cir. 1995).......................................................................... 25

16
*United States v. Woods*,
    335 F.3d 993 (9th Cir. 2003).......................................................................... 24
17

18
**STATUTES**

19
18 U.S.C. § 1512(b)(3)...................................................................................... 3, 21, 23

20
**RULES**

21
Fed. R. Crim. P. 29.......................................................................................... 1, 13, 23

22
Fed. R. Crim. P. 33.......................................................................................... 1

23
Fed. R. Evid. 401 ............................................................................................ 23

24
Fed. R. Evid. 402 ............................................................................................ 23, 24

25
Fed. R. Evid. 403 ............................................................................................ 23, 24

26
Fed. R. Evid. 404(b).......................................................................................... 23, 24, 25

27

28

SFI-631642v1

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on April 16, 2010 at 11:00 am before the Honorable Susan Illston, United States District Judge of the Northern District of California, in the above-entitled court located at 450 Golden Gate Avenue, San Francisco, California 94102, defendant JUDY YEUNG, aka Miu Wan Yeung, will move the Court under Federal Rules of Criminal Procedure 29 and 33 and the Fifth and Sixth Amendments to the Constitution for a judgment of acquittal, or in the alternative, for a new trial on each of the twelve counts in the Superseding Indictment.

The Motion is based on this Notice, the Memorandum of Points and Authorities, the file of this case, including the trial record and all admitted exhibits and such further arguments, authorities, and evidence as may be presented to the Court at or before the hearing on this motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION.**

The defendant Judy Yeung moves for a judgment of acquittal or a new trial on all elements of all Counts.  In this memorandum Ms. Yeung focuses particularly on several deficiencies of the Government's case.  Ms. Yeung moves for an acquittal and new trial on Counts 1-9 because the Government failed to prove the single conspiracy alleged in the Superseding Indictment.  The Government presented no evidence of any overarching agreement between the alleged conspirators – Ms. Yeung, Mr. Yee, and Mr. Mesler – relating to all five loan transactions charged.  Instead, the evidence showed, at best, five separate transactions, two of which did not involve the alleged coconspirators and were simply unrelated to the other three transactions.

Ms. Yeung also moves for acquittal and for a new trial on Count 10 because the Government failed to prove that Ms. Yeung "threatened, intimidated, or corruptly persuaded" Mr. Louie to lie to the FBI.

Lastly, Ms. Yeung moves for a new trial because the evidence of Ms. Yeung's other refinancing of 261 San Fernando—offered by the Government as supposed overt acts in furtherance of the conspiracy—was inadmissible and prejudicial.

1

II.     **BACKGROUND.**

2

      A.     **The Superseding Indictment.**

3

            1.     **Counts 1-9, Conspiracy and Wire Fraud Scheme.**

4

      In the Superseding Indictment returned on July 30, 2009, the Government alleged that the

5

defendant Judy Yeung "was the leader of a fraudulent real estate scheme" and engaged in a

6

conspiracy to commit wire fraud and wire fraud by soliciting straw buyers to refinance or

7

purchase properties using false information.  Sup. Indictment ("SI"), ¶¶ 1-8.  The alleged scheme

8

focused on five charged mortgage transactions:

9

         1.     Kenneth Zhang's ("Straw Buyer 1") refinance of Ms. Yeung's home, 261

10

              San Fernando Way, San Francisco in March 2005 (SI, ¶ 8(a)-(g));

11

         2.     Andy Louie's ("Straw Buyer 2") purchase of 1351 Third Street, Gilory in

12

              October 2005 (SI, ¶ 8(h)-(k));

13

         3.     Kenneth Ferrari's ("Straw Buyer 3") purchase of 1351 Third Street, Gilroy

14

              in December 2005 (SI, ¶ 8(l)-(o));

15

         4.     Lawrence Phung's ("Straw Buyer 4") purchase of 7187 Pitlochry Drive,

16

              Gilroy in March 2006 (SI, ¶ 8(p)-(s)); and

17

         5.     Dinh Lam's ("Straw Buyer 5") purchase of Ms. Yeung's home, 261 San

18

              Fernando Way, San Francisco in January 2007 (SI, ¶ 8(t)-(w)).

19

      The Government alleged that Ms. Yeung conspired with two others.  Alex Yee ("CC1"),

20

who was a mortgage broker, allegedly "helped [Ms. Yeung] obtain a loan in the name of" Mr.

21

Louie and Mr. Ferrari for the purchases of 1351 Third Street in October and December 2005

22

respectively, and Mr. Phung for the purchase of 7187 Pitlochry in March 2006.  SI, ¶ 8(i), (l) and

23

(r).  Rick Mesler ("CC2"), another mortgage broker, allegedly assisted in the Mr. Ferrari and Mr.

24

Phung transactions.  SI, ¶ 8(n), (r).  No other coconspirators were alleged, and neither Mr. Yee

25

nor Mr. Mesler was alleged to have aided in Mr. Zhang's refinance or Mr. Lam's later purchase

26

of 261 San Fernando Way.  *See* SI, ¶ 8(a)-(g), (t)-(w).

27

      The Government alleged that Ms. Yeung herself recruited the straw buyers (SI, ¶ 3), that

28

she misled and falsely represented to the mortgage brokers about the intent and assets of the straw

SFI-631642v1

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1   buyers (SI ¶ 4), and that she prepared and transmitted loan applications and other documents to

2   the mortgage lenders (SI, ¶ 5).

3             **2.**        **Counts 10-12, Witness Tampering.**

4          The Government summarily alleged three counts of witness tampering pursuant to 18

5   U.S.C. § 1512(b)(3), stating that on three occasions, Ms. Yeung "did knowingly use intimidation

6   and threats, and did corruptly persuade another person, and attempt to do so," with the intent to

7   hinder a federal investigation.  SI, ¶¶ 11-16.  The Government provided no factual allegations to

8   support the witness tampering charges other than to provide the alleged date of the tampering, and

9   opposed Ms. Yeung's request for a bill of particulars on the grounds, in part, that the defendant

10  could discern the alleged tampering from the discovery provided.  Dkt. # 66.

11       **B.**      **Trial.**

12            **1.**        **Evidence Relating to the Mortgage Loan Transactions.**

13         The evidence presented at trial, even viewed in the light most favorable to the

14  Government, did not prove the conspiracy alleged in the indictment.  Instead, the evidence proved

15  several conspiracies between the Government's own witnesses and others to buy houses using

16  false information submitted to mortgage lenders.

17         Each of the witnesses called by the Government who purported to have any personal

18  knowledge of the conduct alleged in the indictment had an agreement with the Government that

19  either gave them immunity from prosecution – Mr. Zhang, Mr. Louie, and Mr. Phung – or, in Mr.

20  Yee's case, an agreement that allowed him to plead guilty to only a fraction of the wrongs he

21  actually committed.  Two of the people alleged to have participated in the scheme – Mr. Mesler

22  and Mr. Lam – were not called to testify at all.  For each individual loan transaction, the

23  Government presented testimony from the alleged straw buyer; testimony from an escrow officer

24  familiar with the relevant title company's documents; testimony from an underwriter with no

25  personal knowledge of the underlying transaction; and admitted several documents within

26  mortgage loan and title company files.  Each transaction is addressed in turn.

27

28

SFI-631642v1

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1

**(a)      Refinance of 261 San Fernando Way, San Francisco.**

2      Mr. Zhang was the only witness with personal knowledge regarding the refinance of 261

3   San Fernando Way who testified at trial.  According to Mr. Zhang, Ms. Yeung approached Mr.

4   Zhang and asked for his assistance in refinancing her home "so that she [would] be able to avoid

5   foreclosure and [] be able to pay for monthly mortgage."  TR 295:7-14, 293:9-94:4.  Mr. Zhang

6   agreed to help and signed a grant deed.  TR 298:7-11; Govt. Ex. 1100.  Ms. Yeung explained that

7   his name needed to be on the property to help refinance through Washington Mutual.  *Id.*

8      After signing the grant deed, Mr. Zhang and Ms. Yeung went to Washington Mutual and

9   met with a loan broker by the name of Eliza Wu.  TR 299:4-301:8.  Ms. Wu asked some

10  questions regarding Mr. Zhang's finances.  *Id.*  Mr. Zhang informed Ms. Wu that he worked at his

11  father's restaurant and that he made $40,000 per month at the time.  TR. 423:2-16, 2296:3-22.

12  Ms. Wu denied Mr. Zhang's loan application, but hinted that the result may be different if he had

13  "some sort of asset in the bank."  TR 299:4-301:8.  Mr. Zhang testified that at some point after

14  that meeting, he, Andy Louie and Ms. Yeung created a fake bank letter from Hang Seng Bank to

15  show "Washington Mutual that [Mr. Zhang and Ms. Yeung] do have enough monies in order to

16  pay for the home mortgage."  TR 301:9-03:11; Govt. Ex. 100-6.  Mr. Louie, however, denied that

17  Mr. Zhang had any involvement in the creation of the 261 Hang Seng letter.  TR 1247:2-11.  Mr.

18  Zhang nevertheless testified that he knew the letter contained false information and knew the

19  letter would be submitted to Washington Mutual for the refinance.  TR 304:5-13.

20     Mr. Zhang testified that he signed many loan documents at Ms. Yeung's house that

21  contained false information, including Mr. Zhang's income, place of residence, job title, etc.  TR

22  305:5-13:19.  Although Ms. Wu signed the loan applications, the information within the

23  applications was inconsistent with the information Mr. Zhang provided to Ms. Wu in their first

24  meeting.  *Compare* TR. 423:2-16, 2296:3-22 *with* Govt. Ex. 100-15.  Mr. Zhang's testimony that

25  he signed the loan documents at Ms. Yeung's house was impeached by the Government's title

26  company witness, who testified repeatedly that all loan documents would have been signed at the

27  escrow office and in the presence of an escrow officer or escrow assistant.  TR 533:12-34:10.

28

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1    While at Washington Mutual, Mr. Zhang "did not try to hide the fact that [he was] helping

2    Ms. Yeung refinance her house at 261," and "did not hide the fact from Washington Mutual that

3    Judy Yeung was using [his] credit to get a refinance loan." TR. 432:6-12.  In fact, many of the

4    title company and Washington Mutual documents made clear the both Ms. Yeung and Mr. Zhang

5    were the borrowers. *See, e.g.,* Govt. Exs. 101-3, 101-24.

6    Mr. Zhang had no knowledge of the four other transactions charged in the conspiracy and

7    wire fraud scheme – the three Gilroy transactions or Mr. Lam's 2007 purchase of 261 San

8    Fernando.  TR 360:18-61:18.  Nor did Mr. Zhang know Mr. Yee, the only alleged co-conspirator

9    who testified at trial.  TR 359:3-18.  In fact, neither Mr. Yee, Mr. Mesler, Mr. Phung, Mr. Lam,

10   nor Mr. Ferrari had any involvement in the refinance of 261 San Fernando, and, except for Mr.

11   Zhang's statement that Andy Louie helped him create a false bank letter, there is no evidence that

12   Mr. Louie had any involvement in this loan transaction.  Nor is there any evidence that any of the

13   proceeds from the refinance were used for any purpose related to the other charged transactions or

14   that the successful refinance of 261 San Fernando contributed to the other transactions.

15   More than two years after the refinance, and after Mr. Zhang agreed to cooperate with the

16   Government, Mr. Zhang went to Ms. Yeung's house wearing a wire.  *See* Govt. Exs. 601, 603.

17   The FBI instructed Mr. Zhang "to try to get Judy to talk about the refinancing of 261 San

18   Fernando Way during their meeting."  TR 2298:6-9.  Mr. Zhang was the first person to bring up

19   the refinance and repeatedly asked Ms. Yeung how he should respond to the FBI if questioned.

20   TR 399:17-400:8.  Although Ms. Yeung discussed the fake Hang Seng Bank letter during the

21   wired conversations, Mr. Louie had already informed Ms. Yeung that he had created a fake letter,

22   and Mr. Zhang had spoken to Ms. Yeung about this case prior to wearing the wire.  TR 33:10-

23   34:2; Govt. Exs. 601 at 76, 603 at 21-22.  Ms. Yeung did not make any recorded statements about

24   the letter that she could not have learned at an earlier date from Mr. Louie or Mr. Zhang.

25                    **(b)      Mr. Louie's Purchase of 1351 Third Street, Gilroy.**

26   Sometime in the fall of 2005, Mike Farrell, Ms. Yeung's husband at the time, approached

27   Mr. Louie and asked him to purchase 1351 Third Street in Gilroy, California.  TR 1262:24-63:14.

28   Mr. Farrell had originally planned to purchase the house, but his credit score was too low.  *Id.*;

SFI-631642v1

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1   TR 1017:24-18:4.  When Mr. Farrell discovered his credit was no good, Alex Yee, a loan broker

2   at BayCal Financial, ran Mr. Louie's credit and determined his credit was good enough for the

3   purchase.  *Id.*, TR 557:11-13.  Janet Gong, a real estate agent and Mr. Louie's CPA, completed a

4   purchase contract for the transaction.  TR. 1256:7-15; Govt. Ex. 200-19.

5          To complete the transaction, Mr. Louie signed several loan documents containing false

6   information relating to his income, assets, employment, place of residence and intent to occupy

7   1351 Third Street.  TR 1175:15-80:17.  Mr. Louie's loan application stated he had a Hang Seng

8   bank account, and although Mr. Louie testified that he created a fake Hang Seng letter for this

9   transaction, no such letter was submitted to the lender.  TR 1181:20-24, 1816:19-22; Govt. Ex.

10  200-1.  In order to close the transaction, Janet Gong lent Mr. Louie approximately $4000, and Mr.

11  Louie used the sale proceeds to repay Ms. Gong.  TR 1265:25-66:5; Def. Ex. J.

12         Mr. Yee and Mr. Mesler made the material decisions relating to this transaction and

13  submitted the false information and documents to the lender, Long Beach Mortgage:  Mr. Yee

14  decided the false income amount that was included in Mr. Louie's application (TR 620:17-24);

15  Mr. Yee filled in most of the fraudulent information on the loan applications (with Mr. Louie

16  completing the rest) (TR 626:4-27:19); Mr. Yee prepared the false verification of rent, which Mr.

17  Farrell signed (TR 690:1-11; 693:24-94:19; Govt. Ex. 200-9); Mr. Mesler suggested that they

18  obtain the loans from Long Beach Mortgage (TR 1027:16-23); and Mr. Yee submitted the loan

19  applications to Long Beach Mortgage.  TR 624:3-8.

20         Ms. Yeung's name was not on any of the documents and there is no documentary

21  evidence that she communicated with Mr. Yee or anyone else about the purchase of this property.

22  Moreover, Ms. Yeung did not receive any money at the close of this transaction.  Many other

23  people, however, did:  Mr. Yee received a portion of BayCal's $24,000 commission; Ms. Gong

24  received a $6000 commission; Ms. Gong's sibling received $497,521.98 in sales proceeds, and

25  Mr. Louie received between $500 and $1000.  TR 1296:4-12; Govt. Ex. 201-8.

26                   **(c)       Mr. Ferrari's Purchase of 1351 Third Street, Gilroy.**

27         Less than three months after Mr. Louie purchased 1351 Third Street, he sold it to Mr.

28  Ferrari for $30,000 more than Mr. Louie's purchase price.  Govt. Ex. 300-1.  Mr. Louie did not

1   want to own the house anymore and had Ms. Yeung call Mr. Yee "to find someone to take over

2   my home." TR 1195:5-15.  At that point Mr. Mesler, another licensed loan broker at BayCal, was

3   going to purchase the property.  TR 1458:19-21.  When that fell though, Mr. Yee and Mr. Mesler

4   recruited Ken Ferrari, a co-worker at BayCal, to purchase the property.  TR 1050:7-9, 1318:1-

5   21:12.  Mr. Yee told Mr. Ferrari that he would receive $20,000 upon the completion of the deal.

6   TR 1321:24-25.  Mr. Yee and Mr. Mesler called Mr. Farrell, not Ms. Yeung, to report that Mr.

7   Ferrari would be purchasing 1351 Third Street and that they intended to use Mr. Farrell's

8   business, Vector Shooting Services, as Mr. Ferrari's false employer.  TR 1018:9-21.

9          Just as with Mr. Louie's purchase, Mr. Yee made the substantive decisions regarding this

10  transaction and Mr. Mesler was also "100 percent" involved.  TR 721:13-17.  In addition to

11  recruiting Mr. Ferrari, Mr. Yee submitted all of the false loan applications to the lender (TR

12  171:16-25); Mr. Yee, Mr. Farrell and Mr. Mesler made-up Mr. Ferrari' false employment

13  information—that Mr. Ferrari was the co-owner of Mike Farrell's business, Vector Shooting

14  Services (TR 722:4-14, 842:9-12); Mr. Yee backed into both the false income and false rental

15  amount appearing on Mr. Ferrari's loan applications (TR 730:11-23, 731:25-32:20); Mr. Yee and

16  Mr. Mesler created fake letters of explanation that were submitted to the lender (TR 742:7-22,

17  746:5-12); Mr. Mesler obtained a fake CPA letter from a person named Marcos Rodriguez to

18  submit to the lender (TR 1031:4-6); and Mr. Yee, not Ms. Yeung, paid Mr. Rodriguez $350 or

19  $500 dollars for the letter.  TR 1031:7-10.  Mr. Ferrari discussed his true income and rental

20  payments with both Mr. Yee and Mr. Mesler, and was aware that false information would

21  ultimately be submitted to the lender.  TR 1347:24-49:10.

22         Evidence of Ms. Yeung's involvement was minimal, consisting only of Mr. Yee's self-

23  serving testimony that he kept her informed.  In fact, Mr. Ferrari had no substantive conversations

24  with Ms. Yeung prior to the transaction and had only met her once at a holiday party.  TR 1374:8-

25  12.  Mr. Ferrari testified that he did not have any conversations with Judy Yeung about

26  information that would be submitted to the lender in order to qualify Ferrari for a loan.  TR

27  1358:1-17.  Rather, Mr. Ferrari took his direction from Mr. Yee and Mr. Mesler.  TR 1459:4-8.

28

SFI-631642v1

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1    At closing, Mr. Yee again received a cut of the $12,900 commission to BayCal (along

2    with Mr. Mesler and their boss, Alden Wong).  TR 1056:11-13; Govt. Ex. 301-1.  Ms. Yeung

3    received no money at closing, although Mr. Ferrari did write her a $377 check which included the

4    closing proceeds.  Govt. Ex. 1018.

5                 **(d)      Mr. Phung's Purchase of 7187 Pitlochry Street, Gilroy.**

6        In late 2006, Ms. Gong called Mr. Phung and asked if he "wanted to make some money

7    buying properties."  TR 1626:24-27:1.  Mr. Phung had been friends with Ms. Gong since 1999.

8    TR 1626:8-16.  Mr. Phung's wife worked for Ms. Gong and Ms. Gong did the Phungs' taxes.  *Id.*

9    Mr. Phung agreed to Ms. Gong's proposal to make money, and attended a meeting at Ms. Gong's

10   office with Mr. Yee, Mr. Farrell, Ms. Gong and Ms. Yeung.  TR 1553:6-12, 1624:7-20.  Mr.

11   Phung testified that during this meeting, Ms. Yeung told him that "she wanted to find someone to

12   buy a property because her credit was not good enough."  TR 1554:10-14, 1555:22-23.  Ms. Gong

13   loaned Mr. Phung $6000 for closing costs and Mr. Phung viewed himself as one of the owners of

14   the property.  TR 1629:4-6, 1637:8-9.

15       In November 2005, Mr. Phung signed a purchase contract drafted by Ms. Gong for

16   Pitlochry for the sale price of $1.3 million.  TR 1561:9-24; Gov. Ex. 401-9.  Again, Mr. Yee and

17   Mr. Mesler made all of the material decisions regarding the false information to be included on

18   Mr. Phung's loan documents:  Mr. Yee backed into a qualifying income figure (TR 808:20-24);

19   Mr. Yee overstated Mr. Phung's rent as $6,500, and had a colleague at BayCal falsely verify that

20   he was Mr. Phung's landlord (TR 852:16-53:24; Gov. Ex. 400-12);  Mr. Yee and Mr. Mesler

21   came up with the idea to include the Hang Seng bank account on Mr. Phung's application[1] (TR

22   812:9-13); Mr. Yee paid a colleague to forge Mr. Phung's verification of rent (TR 1058:21-25);

23   Mr. Yee instructed Janet Gong on how Mr. Phung should complete the loan applications (TR

24   1059:20-62:12; Def. Ex. F); and Mr. Yee was responsible for filling out Mr. Phung's

25   employment, occupancy, and asset information (TR 1078:10-22).  Mr. Yee "mainly spoke to

26

27       [1]  Mr. Yee testified that the fake Hang Seng letter, created by Andy Louie, was necessary
to verify the asset provided for on the loan application.  TR 848:8-13.  There is no evidence,
28   however, that a Hang Seng letter was submitted to the lender, Silver State.

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1   Mike Farrell about the Pitlochry transaction." TR 1019:13-15.  Mr. Farrell signed the original

2   fake verification of rent for Mr. Phung, at Mr. Yee's direction.  TR 1021:17-20; Def. Ex. B.

3          Before submission of the loan application in February 2006, Mr. Phung and Ms. Yeung

4   entered a notarized agreement regarding the purchase of Pitlochry.  Govt. Ex. 406.  This

5   agreement mirrored an agreement Mr. Phung entered with Mr. Farrell regarding the purchase of a

6   separate property, 37 Junipero Road, San Francisco.  TR 1627:21-28:2.  The agreement for 7187

7   Pitlochry was originally in Mr. Farrell's name but was later changed to Ms. Yeung.  TR 1634:22-

8   36:5.  "The agreement was switched to Judy Yeung because Mr. Farrell did not show up for the

9   meeting" when the agreement was signed.  TR 1635:25-36:5.  Ms. Yeung initially refused to sign

10  the agreement, but later acquiesced.  TR 1635:4-8.  This was around the time period that Mr.

11  Farrell and Ms. Yeung were separating.  TR 1636:15-16, Def. Ex. CC.

12         Just as with the other transactions, Ms. Yeung did not make any money at closing.  Govt.

13  Ex. 401-1.  Mr. Yee and Mr. Mesler received 30% each of the $32,500 commission, Mr. Yee

14  received a portion of the $3,200 yield spread premium, and Ms. Gong received a $45,375

15  commission at closing.  *Id*.; TR 1065:19-66:2.

16                    **(e)      Mr. Lam's Purchase of 261 San Fernando Way, San Francisco.**

17         There is very little evidence regarding Mr. Lam's January 2007 purchase of 261 San

18  Fernando Way because Mr. Lam did not testify at trial.  Nor did any loan broker, real estate agent

19  or any other witness with personal knowledge of the transaction.  Mr. Yee testified that he

20  submitted a purchase contract to Marble Stone Mortgage company in August 2006,

21  approximately 5 months before Mr. Lam purchased 261 San Fernando, but that transaction never

22  came to fruition.  TR 931:15-33:22.  Mr. Yee did not work with Mr. Lam after this point and was

23  not involved in his eventual purchase of 261 San Fernando.  TR 972:9-19.  The Government did

24  not offer any evidence of direct or indirect communications between Mr. Lam and Ms. Yeung

25  relating to Mr. Lam's purchase of 261 San Fernando.  Instead, the Government relied on

26  circumstantial evidence that Mr. Lam's loan application included information relating to the Hang

27  Seng bank account number used in the Zhang, Louie and Phung transactions.  Govt. Ex. 501-8.

28

SFI-631642v1

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

The proceeds from Ms. Yeung's sale to Mr. Lam largely went to pay-off prior loans on the property.  Govt. Ex. 1028.  Ms. Yeung received sale proceeds of approximately $60,000.  *Id.*

### 2.    Alex Yee' Testimony.

The Government's case relied heavily on the testimony of Alex Yee, the licensed loan broker responsible for the Gilroy transactions.  Mr. Yee testified for over 2 days, making up nearly one-quarter of the Government's evidence.  His testimony, however, was unreliable and should not be given weight commensurate with its presentation.  As his testimony showed, Mr. Yee was a broker skilled at fraud, submitting countless fraudulent loans having nothing to do with Ms. Yeung, and he pinned the blame on Ms. Yeung to satisfy the Government and stay out of jail.

Mr. Yee testified that Ms. Yeung directed his every action with respect to the Gilroy transactions.  *See, e.g.*, TR 647:3-8; 695:9-96:8.  According to Mr. Yee, Ms. Yeung, who had no real estate license and no real estate experience, was consulted at every turn.  However, the Government made no effort to corroborate Mr. Yee's testimony nor did it offer any corroborating evidence – no phone records, no emails, no documents, and no testimony from other witnesses.  On those occasions during his testimony when Mr. Yee was not following the Government's theme, the Government prodded Mr. Yee to place blame on Ms. Yeung.  For example, when addressing the Dinh Lam's purchase of 200 Darien Way, a transaction that did not go through, Mr. Yee gave the following testimony:

> *Q.* How -- to what extent, if any, did you discuss with Judy Yeung what you were going to need to show for Dinh Lam's income?
> *A.* I told her.
> *Q.* What did you tell her?
> *A.* I told her the amount.
> *Q.* You told her the amount?
> *A.* Yes.
> *Q.* Okay.
> And what do you recall about her reaction to that?
> *A.* No reaction.
> *Q.* Okay.
> Well, did she --
> *A.* She okayed it.
> *Q.* Okay.
> *A.* She said "okay."

1   TR 928:1-16; *see also, e.g.,* TR 722:13-23:10; TR 730:19-31:18.  Mr. Yee continually blamed

2   Ms. Yeung to stay out of trouble because the Government made clear from the outset that it was

3   focusing it's investigation on Ms. Yeung.  TR 990:17-20.

4         But the idea that Mr. Yee was acting only at Ms. Yeung's direction is not only

5   unsubstantiated – it makes no sense.  Ms. Yeung never paid or promised Mr. Yee any money or

6   anything else of value, and there was no employment contract.  TR 1074:8-21.  Mr. Yee finally

7   admitted on cross that he was doing the fraudulent loans "to make a living."  TR 1074:22-24.  As

8   Mr. Yee admitted, "the more loans [he] closed, the more commission [he] made," and it was "in

9   [his] interest to do whatever it [took] to make sure the loan fund[ed]."  TR 1015:9-15.

10        In addition to being nonsensical, Mr. Yee's testimony is also not credible.  Although

11  pleading guilty to wire fraud and conspiracy, Mr. Yee continues to act as a loan broker.  TR

12  987:24-89:8.  He has failed to inform his employer, his clients, or the California Department of

13  Real Estate that he is guilty of two felonies because he defrauded mortgage lenders.  *Id*.  All this

14  despite his knowledge that he is required to make such a disclosure and that his license will be

15  suspended once he complies with that obligation.  *Id*.

16        Mr. Yee submitted countless fraudulent loans while he was a broker that had absolutely

17  nothing to do with Ms. Yeung.  TR 550:19-51:15.  Approximately 50 percent of the loans Mr.

18  Yee submitted were fraudulent.  TR 999:5-10.  Mr. Yee and his boss, Alden Wong, made

19  commissions off these fraudulent loans.  *See, e.g.*, TR 1003:11-16.  According to Mr. Yee,

20  submitting false loans was "just the way business was done."  TR 1006:22-07:5.  Mr. Yee,

21  however, failed to inform the Government of his extensive fraud until November 2009, nearly a

22  year after his plea agreement and after several meetings with the FBI.  TR 993:12-14, 994:3-16.

23  His delay is particularly troubling given that he knew he was under an obligation to tell the

24  Government of any other criminal activity with which he was involved, but chose not to until

25  faced with loan documents produced by Ms. Yeung herself during discovery.  TR 994:20-95:2.

26  His excuse was that the FBI had only interviewed him with respect to Ms Yeung, further

27  demonstrating that Mr. Yee knew that all the Government was interested in was incriminating

28  information regarding Ms. Yeung.  TR 995:5-7.

SFI-631642v1

- 11 -

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

During the relevant time period, Mr. Yee was working with Alden Wong and Rick Mesler.  TR 1010:23-24.  The three of them would share commission checks from completed loans, including the fraudulent loans that had nothing to do with Ms. Yeung.  TR 1011:11-12:5. Mr. Yee worked out of Alden Wong's house, routinely doing cocaine with Mr. Mesler and Mr. Wong, cocaine that was supplied by Mr. Wong.  TR 1013:2-14:19.

Mr. Yee's testimony was also inconsistent other evidence presented at trial.  After Mr. Ken Ferrari agreed to purchase 1351 Third Street, Gilroy, and after Mr. Ferrari's mortgage payments were late, Mr. Ferrari testified that he threatened to call the Department of Real Estate to report Mr. Yee's fraud.  TR 1390:4-19.  This threat was corroborated by taped conversations between Mr. Ferrari and Ms. Yeung.  Govt. Ex. 604 at Bates # 007285.  Mr. Yee, however, denied that he was ever so threatened.  TR 990:3-10.

### 3.     Evidence Relating to Witness Tampering of Mr. Louie.

In May, 2007, the FBI first approached Mr. Louie regarding his purchase of 1351 Third Street.  TR 1219:6-10.  During that first meeting, Mr. Louie said untruthful things.  TR 1220:18-21.  The lies Mr. Louie told during this first meeting were his idea and he was "not influenced by anyone."  TR 1289:14-17.

During the first meeting, Mr. Louie told the FBI that "[he] didn't know about the letters. [He] den[ied] knowing about them," referring to the Hang Seng letters that he fraudulently created.[2]  TR 1220:21-21:1.  This was a lie.  1220:18-21:1.  Mr. Louie also stated that it was Mr. Farrell that first approached him about purchasing the property in Gilroy.  TR 1263:4-10.

*After* his first meeting with the FBI, Mr. Louie contacted Ms. Yeung because he "wanted to talk to her for some advice."  TR 1222:14-23:13.  Specifically, Mr. Louie "ask[ed] [Ms. Yeung] for advice, you know, what should I say when [the FBI] ask [sic] me about the Hang Seng Bank letter."  TR 1226:7-9.  Mr. Louie testified that during his meeting with Ms. Yeung, that "if the Hang Seng Bank letters were brought up, we decided to say, you know, we didn't know anything about it."  TR 1224:19-23.  Mr. Louie also testified that during his meeting with

---
[2]   After this testimony, Mr. Louie waffled and stated that he said these lies at either the first or second meeting with the FBI.  TR 1220:20-21:8.

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1   Ms. Yeung, Ms. Yeung stated that she did not want her name brought up to the FBI and that she

2   told Mr. Louie "to be short and just to answer the question in short and sweet [sic].  Don't ask to

3   much or say too much."  TR 1229:11-24.

4          The Government's witness tampering charge relating to Mr. Louie (Count 10) relates

5   solely to the above described meeting between Mr. Louie and Ms. Yeung.  It was only after

6   repeated FBI interviews and only after receiving immunity for his fraudulent acts that Mr. Louie

7   informed the Government that Ms. Yeung had asked him to lie to the FBI.  TR 1252:11-22.

8   **III.    ARGUMENT.**

9          The evidence presented by the Government was insufficient for each element of each

10  count of the Superseding Indictment, and Ms. Yeung moves for a judgment of acquittal on all

11  counts.  In this memorandum, however, the defendant will focus on a few of the more egregious

12  deficiencies.

13         **A.    The Court Must Grant a Judgment of Acquittal on the Conspiracy and Wire
               Fraud Counts Because the Government Did Not Prove the Single Conspiracy**

14             **and Scheme to Defraud Alleged in the Superseding Indictment.**

15         A court must grant judgment of acquittal when, "'after viewing the evidence in the light

16  most favorable to the prosecution, [no] rational trier of fact could have found the essential

17  elements of the crime beyond a reasonable doubt.'"  *United States v. Cruz*, 554 F.3d 840, 844 (9th

18  Cir. 2009) (reversing conviction for insufficient evidence) (quoting *Jackson v. Virginia*, 443 U.S.

19  307, 319 (1979)); Fed. R. Crim. P. 29; *see, e.g., United States v. Nevils*, 548 F.3d 802, 805 (9th

20  Cir. 2008) (reversing conviction for insufficient evidence).  As the Fifth Circuit has stated:

21  "[W]hen circumstantial evidence and the reasonable inferences to be drawn from it permit

22  conclusions of both guilt and innocence that are essentially in balance, there has to be reasonable

23  doubt.  When that is the case, we have no choice but to reverse the conviction."  *United States v.*

24  *Reyna*, 148 F.3d 540, 547 (5th Cir. 1998).

25         **1.    The Evidence at Trial Varied from the Superseding Indictment.**

26         The Government did not prove the single wire fraud conspiracy and scheme to defraud

27  that it alleged against Ms. Yeung in the Superseding Indictment.  SI, ¶¶ 1-9.  At best, the

28  Government presented evidence of three separate wire fraud conspiracies or schemes involving

SFI-631642v1

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1  its own witnesses in 2004-2007.  Because the Government's proof varied from the conspiracy and

2  scheme alleged, i.e., a single conspiracy and scheme to defraud mortgage lenders led by Ms.

3  Yeung from 2004 through 2007, a judgment of acquittal on Counts 1-9 should be entered.

4       When a defendant is charged with an overarching conspiracy, but the evidence presented

5  at trial demonstrates the existence of unconnected multiple schemes, the proof is insufficient as a

6  matter of law to convict on the single conspiracy.  *Kotteakos v. United States*, 328 U.S. 750, 767-

7  68 (1946); *see also United States v. Durades*, 607 F.2d 818 (9th Cir. 1979) (reversing conviction

8  because government's proof established two distinct drug conspiracies, not the single conspiracy

9  alleged in the indictment).  The requirement of proof of a single conspiracy where one is charged

10  applies equally where a single scheme is charged in the wire fraud context.  *United States v.*

11  *Masteotto*, 717 F.2d 1238, 1247 (9th Cir. 1983) *overruled on other grounds in United States v.*

12  *Miller*, 471 U.S. 130 (1985).

13       In *Kotteakos*, several defendants were convicted of a conspiracy to cause the Federal

14  Housing Administration to issue credit on the basis of false information.  328 U.S. at 753.

15  Kotteakos and other defendants separately obtained financing through a common loan broker.  *Id*.

16  In general, the only common association among the defendants was the loan broker.  *Id*.  "[T]he

17  pattern was 'that of separate spokes meeting at a common center,'" though there was no "rim of

18  the wheel to enclose the spokes."  *Id*. at 755.  On these facts, the Supreme Court noted that the

19  proof "made out a case, not of a single conspiracy, but of several, notwithstanding that only one

20  was charged in the indictment."  *Id*.  The Court reversed the conviction, finding that "[t]he jury

21  could not possibly have found, upon the evidence, that there was one conspiracy."  *Id*. at 768.

22       "Whether a single conspiracy has been proved is a question of sufficiency of the

23  evidence."  *United States v. Fernandez*, 388 F.3d 1199, 1226 (9th Cir. 2004).  To prove a single

24  conspiracy, the evidence must demonstrate: (1) that "an overall agreement existed among the

25  coconspirators," and (2) "that each defendant knew, or had reason to know, that his benefits were

26  probably dependent upon the success of the entire operation."  *United States v. Duran*, 189 F.3d

27  1071, 1080 (9th Cir. 1999).  Applying these standards to the Government's proof at trial

28  demonstrates that the Government did not establish the single, three-year conspiracy it alleged.

SFI-631642v1

- 14 -

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1

### (a)    There was no Overall Agreement.

2        The Government did not produce any evidence "that an overall agreement existed among

3    the conspirators." *Duran*, 189 F.3d at 1080. "Typically, the inference of an overall agreement is

4    drawn from proof of a single objective . . . or from proof that the key participants and the method

5    of operation remained constant throughout the conspiracy." *Id*. The Government proved neither.

6        Only Mr. Zhang and Ms. Yeung were involved in the March 2005 refinance of 261 San

7    Fernando Way. Mr. Zhang testified that Mr. Louie helped create the fake Hang Seng letter

8    (which Mr. Louie denied during his testimony), but he did not offer any testimony relating to an

9    overall agreement with Mr. Louie that had a single objective. TR 439:6-41:1. There was no

10   testimony that Mr. Zhang was involved in any of the other four transactions that were part of the

11   alleged conspiracy. Mr. Zhang never met or spoke with alleged coconspirator Alex Yee, or any

12   other alleged co-conspirator. TR 359:3-18, 598:25-600:20. In short, Mr. Zhang's refinance of

13   261 is in no way related to the other four transactions that are part of the alleged conspiracy.

14       Mr. Lam's January 2007 purchase is equally unconnected to any other transaction charged

15   in the conspiracy. Mr. Lam did not testify so it is impossible to determine what, if any,

16   connection Ms. Yeung had to the false information Mr. Lam placed on his loan application.

17   Regardless of Ms. Yeung's involvement, however, there was no evidence that Mr. Lam

18   participated in or had knowledge of the other four transactions. Moreover, Mr. Yee was not

19   involved in Mr. Lam's purchase and did not complete the documents used to obtain the loan.

20   Govt. Ex. 500-3.

21       With respect to the three Gilroy transactions—Mr. Louie's and Mr. Ferrari's purchases of

22   1351 Third Street and Mr. Phung's purchase of 7187 Pitlochry—there was simply no evidence

23   that the Gilroy purchases were connected to 261 San Fernando Way. There was no evidence that

24   Mr. Yee, Mr. Ferrari, Mr. Louie or Mr. Phung knew of or participated in the 261 San Fernando

25   Way transactions, much less had a common objective associated with them.

26       The Government also failed to produce any evidence that the "key participants" remained

27   constant throughout the conspiracy. Taking the evidence in the light most favorable to the

28   Government, the only possible common denominator in all five transactions is Ms. Yeung

SFI-631642v1

- 15 -

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1    herself—and that is only if one believes Mr. Yee's uncorroborated testimony that he informed

2    Ms. Yeung about the Gilroy transactions every step of the way.  But even if Ms. Yeung

3    participated in each of the five loans, that does not establish the conspiracy alleged because Ms.

4    Yeung cannot conspire with herself.  *United States v. Molt*, 615 F.2d 141, 146 (3d Cir. 1980) ("To

5    establish a conspiracy there must be more than one coconspirator."); *see also D'Last Corp. v.*

6    *Ugent*, 863 F. Supp. 763, (N.D. Ill. 1994) ("a conspiracy with oneself is conceptually impossible,

7    like the sound of one hand clapping").  At best, the Government proved individual fraudulent

8    transactions, each representing a spoke, with Ms. Yeung as the hub of a rimless wheel.  *Kotteakos*

9    328 U.S. at 755; *see also United States v. Swafford*, 512 F.3d 833, (11th Cir. 2008) ("the

10   government's metaphorical argument that this was a 'wheel conspiracy' (or 'hub-and-spoke

11   conspiracy) – wherein the defendant served as the hub connected to each of the customers via a

12   spoke [] – fails because no common goal or enterprise existed.")  This is not enough to prove the

13   conspiracy alleged.

14        Because Ms. Yeung was the only person possibly common to all five transactions, the

15   Government did not prove "a single objective" or "that the key participants and the method of

16   operation remained constant throughout the conspiracy."  *Duran*, 189 F.3d at 1080.  Rather, the

17   Government proved the opposite—that there was no single objective, only five distinct

18   transactions, with varying and inconsistent participants and objectives  in each.

19            **(b)       The Benefits of Each Transaction Were Not Interdependent.**

20        The Government did not offer any evidence at trial that "the benefits [of the alleged

21   conspiracy] were probably dependent upon the success of the entire operation."  *Duran*, 189 F.3d

22   at 1080.  "The inference that a defendant had reason to believe that his benefits were dependant

23   upon the success of the entire venture may be drawn from proof that the coconspirators knew of

24   each other's participation or actually benefited from the activities of his co-conspirators."  *Id.*

25        Here, the Government offered no evidence that the participants knew of each other's

26   involvement in the five charged loan transactions.  Mr. Zhang did not know Mr. Yee, and there

27   was no evidence that he knew of Mr. Lam, Mr. Phung, Mr. Ferrari, or the details of their

28   transactions.  TR 359:3-18, 598:25-600:20.  Mr. Ferrari met Mr. Louie at a holiday party, but did

SFI-631642v1
                                                  - 16 -

1   not know he was the owner of 1351 Third Street.  TR 1336:19-37:8.  And, there was no evidence

2   that Mr. Ferrari had any knowledge of the other 261 transactions or Mr. Phung's purchase of

3   7187 Pitlochry.  Similarly, there was no evidence that Mr. Phung knew anyone other than Mr.

4   Yee, Ms. Gong, Mr. Farrell and Ms. Yeung, and no evidence that he had knowledge of the other

5   four charged transactions.  Finally, with no testimony from Mr. Lam, the Government has no

6   proof that he knew of the other transactions or participated in or benefited from them in any way.

7         Nor is there any evidence that Ms. Yeung or anyone other than Mr. Yee, Mr. Mesler and

8   Ms. Gong "actually benefited from the activities" of the alleged 3-year conspiracy.  *Duran*, 189

9   F.3d at 1080.  Ms. Yeung did not received any money from the Gilroy transactions and she did

10   not receive title to those properties.  Conversely, Mr. Yee, Mr. Mesler and Ms. Gong received a

11   total of over $100,000 in commissions and Mr. Louie, Mr. Phung, and Mr. Ferrari each had title

12   to the properties.  While Ms. Yeung did receive proceeds from the refinance and sale of her

13   home, 261 San Fernando Way, there was no evidence that those benefits were connected to the

14   three Gilroy transactions.  None of the proceeds from those transactions was used for the Gilroy

15   transactions and none of the participants in the Gilroy transactions received any proceeds from

16   the 261 transactions.

17         Given the absence of proof of a common goal, any interdependence among the various

18   loan transactions, or any benefit to Ms. Yeung from all of the transactions, the Government

19   simply did not prove the single 3-year conspiracy alleged in the Superseding Indictment.

20             **(c)**     **The Government Did Not Prove the Wire Fraud Scheme.**

21         The same analysis holds true for the Government's wire fraud charges, which focus

22   entirely on a scheme lasting from 2004-2007.  *Masteotto*, 717 F.2d at 1247.  As shown, the

23   Government's evidence did not prove a single scheme.  At best, it established that there were five

24   separate and distinct loan transactions involving loan documents containing false information.

25             **2.**     **Ms. Yeung was Prejudiced by the Variance.**

26         Ms. Yeung was prejudiced by the Government's failure of proof for at least three reasons.

27   First, it is doubtful that the jury would have convicted her of wire fraud as to each of the

28   transactions if they were charged, as they should have been (if at all), as distinct crimes separate

1   from any conspiracy or scheme.  "The appearance of coordinated criminal activity appears more

2   culpable than individual [transactions], implicating the Supreme Court's longstanding admonition

3   that 'charges of conspiracy are not to be made by piling inference upon inference, thus fashioning

4   . . . a dragnet to draw on all substantive crimes.'"  *Swafford*, 512 F.3d 833, 843 (6th Cir. 2008)

5   (reversing conviction of conspiracy charge because defendant was prejudiced by variance of

6   proof of multiple conspiracies when only one conspiracy was alleged).  (citations omitted)

7        Evidence for some of the loan transactions was much less substantial than for others.  For

8   example, the only evidence relating to Mr. Lam's transaction was testimony from Mr. Yee that

9   Ms. Yeung wanted to use Mr. Lam to refinance her house, that Mr. Yee completed a purchase

10  contract for 261 San Fernando Way five months before the actual transaction occurred, and the

11  loan documents that some unidentified person completed and sent to Chase to obtain the loan.

12  TR 934:7-36:19; Govt. Ex. 900-1.  This compared to days of Mr. Yee's self-serving testimony

13  that Ms. Yeung was responsible for all decisions relating to the Gilroy transactions.  If the

14  Government properly charged the separate schemes, at best the "jury might have concluded that

15  conspiracies existed between [Ms. Yeung] and certain [straw buyers] but not others."  *Swafford*,

16  512 F.3d at 843.  By charging one overarching conspiracy, the "jury could simply seize upon the

17  most significant [loan transactions] and the most suspicious behavior exhibited by [Ms. Yeung]

18  and then apply that evidence against [Ms. Yeung] *vis-à-vis* each of the alleged co-conspirators" or

19  straw buyers.  *Id*.  This "distributive application of the evidence diminishes the level of proof

20  necessary for conviction" and prejudiced Ms. Yeung.  *Id.*

21        Second, Ms. Yeung is prejudiced because the there was a serious danger that the jury

22  convicted Ms. Yeung on the conspiracy and wire fraud counts without reaching a unanimous

23  verdict on what crime, if any, Ms. Yeung committed.  As noted, Both the wire fraud and

24  conspiracy charges related to an alleged continuous three-year scheme to defraud mortgage

25  lenders.  There was no coherent scheme, but rather several different, unrelated transactions.

26  Based on the variance, and the lengthy testimony of Mr. Yee, some jurors may have thought Ms.

27  Yeung was guilty with respect to the Gilroy properties.  Others, may have thought there was

28  enough on Mr. Zhang's refinance of 261 San Fernando Way due to the wired conversations but

SFI-631642v1

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1    had reasonable doubt as to the other transactions.  But, given the jury instruction (TR 2310:8-12)

2    that the jury must convict on the crimes charged, the jury could have convicted on the conspiracy

3    and scheme charged based on the belief that Ms. Yeung committed at least some wrongdoing

4    with respect to at least one transaction.  Such a verdict is impermissible and is against the

5    evidence offered at trial.

6         Third, Ms. Yeung was further prejudiced because the Court admitted evidence that would

7    have been inadmissible if the Government had charged the transactions properly as individual

8    conspiracies or schemes.  For example, based on its allegation (Dkt. #29, ¶ 8(g)) that Ms. Yeung

9    secured loans using 261 San Fernando Way as collateral between the time of the Zhang refinance

10   and Lam purchase —none of which were fraudulent— in furtherance of the conspiracy, the Court

11   admitted hours of testimony relating to those uncharged loans.  *See, e.g.,* TR 1950:1-22, 2321:6-

12   11.  But, as shown above, there was no coherent conspiracy between the two 261 San Fernando

13   Way transactions.  Mr. Zhang did not know Mr. Lam and did not know of Mr. Lam's purchase,

14   and vice versa.  Admitting this evidence was prejudicial to Ms. Yeung because it allowed the jury

15   to infer that there was some wrongdoing associated with the perfectly legal loans that one

16   obtained.

17        The variance of multiple conspiracies from the charged single conspiracy appearing in the

18   Superseding Indictment prejudiced Ms. Yeung and the Court should enter a judgment of acquittal

19   on Counts 1-9.

20   **B.    The Court Should Grant a New Trial on the Conspiracy and Wire Fraud
           Counts Because the Verdict is Against the Weight of the Evidence.**

21

22        A court must grant a motion for a new trial when the evidence adduced at trial weighs

23   against the verdict.  *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000); Fed. R.

24   Crim. P. 33.  "A district court's power to grant a motion for a new trial is much broader than its

25   power to grant a motion for judgment of acquittal."  *United States v. Alston*, 974 F.2d 1206, 1211

26   (9th Cir. 1992) (affirming grant of motion for new trial).  In evaluating a defendant's motion for

27   new trial, "[t]he court is not obliged to view the evidence in the light most favorable to the

28   verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the

SFI-631642v1

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1    witnesses." *Kellington*, 217 F.2d at 1097.  Thus, "'[i]f the court concludes that, despite the

2    abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently

3    heavily against the verdict that a serious miscarriage of justice may have occurred, it may set

4    aside the verdict, grant a new trial, and submit the issues for determination by another jury.'"  *Id*.

5    (citations omitted).

6          For all of the reasons detailed in the factual section above (*supra*, pp. 3-12) the verdict

7    here goes against the weight of the evidence.  The Government's star witness, Alex Yee, gave

8    self-serving testimony, pinning blame on Ms. Yeung at every turn, even when doing so was

9    nonsensical.  *Supra*, pp. 9-12.  The Government made no effort to corroborate Mr. Yee's

10   testimony and introduced no evidence to confirm that Mr. Yee in fact consulted with Ms. Yeung

11   at every turn.  Mr. Yee completed countless fraudulent loans having nothing to do with Ms.

12   Yeung—many more than the three he allegedly obtained on behalf of Ms. Yeung—knowing that

13   all he had to do was testify against Ms. Yeung and his plea agreement with the Government

14   would save him from being prosecuted on these countless instances of fraud.

15         The Government also spent considerable time on the Hang Seng letters.  The testimony

16   regarding the creation of those letters, however, was entirely inconsistent and not credible.  Mr.

17   Zhang testified that he created the letters with Mr. Louie.  *Supra*, p. 4.  Mr. Louie, however,

18   denied that Mr. Zhang had any involvement.  *Id*.  Moreover, despite having immunity, Mr. Louie

19   waited until two days before trial to admit to the Government that he created the Hang Seng letter

20   for Mr. Phung's purchase of 7187 Pitlochry.

21         When you put Mr. Yee's testimony aside, the evidence even connecting Ms. Yeung to the

22   three Gilroy transactions is almost non-existent, and there is no evidence that she was "the leader"

23   of a scheme to defraud lenders on those properties.  *Supra*, pp. 5-9.  Mr. Louie was approached by

24   Mr. Farrell to purchase 1351 Third Street and communicated primarily with Mr. Yee.  Mr. Ferrari

25   dealt primarily with Mr. Yee, Mr. Mesler and Mr. Farrell when purchasing 1351 Third Street.  He

26   never substantively addressed the transaction with Ms. Yeung until nearly a year after the

27   purchase, and only after Mr. Farrell abused Ms. Yeung and was out of the picture.  TR 2299:5-

28   2301:5; Govt. Ex. 606 at Bates # 007335.  Similarly, Mr. Phung had one meeting with Ms. Yeung

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1    relating to the properties, but Mr. Farrell and Ms. Gong were also present, and even Mr. Yee

2    admitted that he dealt primarily with Mr. Farrell on Mr. Phung's purchase of 7187 Pitlochry.

3    Moreover, there was no evidence that Ms. Yeung benefited from the Gilroy transactions at all.

4            The verdict is against the weight of the evidence for the additional reason that the

5    Government did not present enough evidence to prove its claims.  It chose not to call Mr. Mesler,

6    despite his close involvement in all the Gilroy transactions.  *Supra*, pp. 5-9.  The Government

7    also chose not to call Mr. Lam, so there was not a single witness with personal knowledge who

8    testified to Mr. Lam's purchase of 261 San Fernando Way, that was allegedly directed by Ms.

9    Yeung.  *Supra*, p. 9.  And, despite that all of the transactions occurred in the Northern District, the

10   Government did not call a single lender or underwriter with personal knowledge of any

11   transaction.  In the face of this deficient proof, the guilty verdict was against the weight of the

12   evidence and the Court should grant a new trial.

13           C.      **The Evidence of the Alleged Louie Witness Tampering is Insufficient.**

14           The jury's conviction of Ms. Yeung for witness tampering pursuant to 18 U.S.C. §

15   1512(b)(3) with respect to Mr. Louie is insufficient and against the weight of the evidence.  There

16   is a circuit split as to "whether non-coercive attempts to persuade a witness not to disclose

17   information to law enforcement officials" amounts to corrupt persuasion in violation of section

18   1512(b)(3).  *United States v. Khatami*, 280 F.3d 907, 914 (9th Cir. 2002).  Although the Ninth

19   Circuit has yet to reach this issue, the only district court to decide the question within the Ninth

20   Circuit found "that 'more culpability is required for a statutory violation [under 1512(b)] than that

21   involved in the act of attempting to discourage disclosure in order to hinder an investigation.'"

22   *United States v. Makham*, 2005 W.L. 3533263, at *7 (D. Or. Dec. 23, 2005) (citing *United States*

23   *v. Davis*, 183 F.3d 231, 249-50 (3d Cir. 1999) *as amended by* 197 F.3d 662 (3d Cir. 1999) and

24   *United States v. Farrell*, 126 F.3d 484, 488 (3d Cir. 1997)).  In *Makham*, the District Court of

25   Oregon found that defendant's instructions to a witness of "You know nothing" and "they can't

26   prove anything if you don't admit it," were insufficient grounds to find that defendant "corruptly

27   persuaded" a witness beyond a reasonable doubt.  *Id*. at *7-8.  Thus, to violate section 1512(b)(3)

28

1   there must be an affirmative direction to a witness to lie. The Government did not offer sufficient

2   proof that Ms. Yeung instructed Mr. Louie to lie.

3       Mr. Louie testified that Ms. Yeung instructed him to tell the FBI that he had no

4   knowledge of the Hang Seng bank letters. TR 1224:19-23. This is the single "lie" that the

5   Government can rely on to prove witness tampering occurred. Mr. Louie's testimony concerning

6   Ms. Yeung's instruction, however, is inconsistent and not credible.

7       The alleged witness tampering occurred between the FBI's first and second meeting with

8   Mr. Louie. Mr. Louie admitted lying to the FBI during the first meeting on his own volition, and

9   testified that when he lied during the first meeting, it was his idea and he was not influence by

10  anyone. TR 1220:18-21, 1289:14-17. Mr. Louie went on to testify that during the first meeting,

11  he told the FBI that "[he] didn't know about the [Hang Seng] letters, and he] den[ied] knowing

12  about them." TR 1220:21-21:1. Mr. Louie knew this was a lie because he created the fake

13  letters. 1220:18-21:1. After this testimony, and some prodding from the Government, Mr. Louie

14  waffled and stated that he said this lie at **either** the first or second meeting. TR 1220:20-21:8.

15      As to what occurred during his meeting with Ms, Yeung between his first and second FBI

16  interviews, Mr. Louie testified that after soliciting advice from Ms. Yeung regarding how to

17  respond to the FBI about the Hang Seng letters, he and Ms. Yeung **mutually agreed** that "if the

18  Hang Seng Bank letters were brought up, we decided to say, you know, we didn't know anything

19  about it." TR 1224:19-23, 1226:7-9. Moreover, Mr. Louie testified that during his meeting with

20  Ms. Yeung, Ms. Yeung stated that she did not want her name brought up to the FBI and that she

21  told Mr. Louie "to be short and just to answer the question in short and sweet [sic]. Don't ask to

22  much or say too much." TR 1229:11-24. Finally, it was only after repeated FBI interviews and

23  after receiving immunity for his fraudulent acts that Mr. Louie informed the Government that Ms.

24  Yeung had asked him to lie to the FBI during his meeting with Ms. Yeung. TR 1252:11-22.

25      To convict Ms. Yeung for witness tampering on this proof goes against the weight of the

26  evidence, and at a minimum, the Court should order a new trial on this charge. It is unclear,

27  however, whether the jury convicted Ms. Yeung based on Mr. Louie's testimony that he and Ms.

28  Yeung agreed to tell the FBI that Mr. Louie knew nothing of the Hang Seng letters (the "lie"), or

1    whether the jury's verdict was based on Ms. Yeung's instruction that Mr. Louie should keep his

2    answers short.  If the latter, then the proof is insufficient as a matter of law to support the verdict

3    because merely telling a witness to withhold information from investigators is not enough to

4    support a conviction of section 1512(b)(3).  *Makham*, 2005 W.L. 3533263, at *7.  On this basis,

5    the Court should acquit on Count 10 pursuant to Rule 29.

6              **D.      The Evidence Relating to Ms. Yeung's Legal Refinancing of 261 San
                        Fernando Way was Inadmissible and Prejudicial.**

7

8              The Government presented hours of testimony relating to three legitimate loans issued

9    with 261 San Fernando Way as collateral—the Saxe Mortgage loan, the Cal State 9 loan with Mr.

10   Farrell, and the Nishen Fu loan (collectively, "Other 261 Loans").  TR 2011:17-14:22.  This

11   evidence was introduced through summary witness Mr. Villanueva, a financial fraud investigator

12   with the U.S. Attorney's Office, and through Mr. Vaughn, an escrow witness with Alliance and

13   Financial Title.  *See, e.g,* TR 1990:17-91:16; 2096:17-21.  This evidence was admitted, over Ms.

14   Yeung's repeated objection, based on the Government's representation that these transactions

15   were relevant as "overt acts to accomplish the object of the conspiracy."  TR 2012:3-4; TR

16   1949:17-50:22; TR 2011:17-24; *see also* SI, ¶ 8(g).  But these loans were not acts in furtherance

17   of the conspiracy and had no relation to the alleged conspiracy, making the evidence irrelevant,

18   prejudicial and inadmissible under Rules of Evidence 401, 402, 403, and 404(b).

19             An act is in furtherance of a conspiracy only if it is an act committed in an intentional

20   effort to accomplish some object or purpose of the alleged conspiracy.  Ninth Cir. Model Crim.

21   Jury Instr. 8.16.  Here, there is no evidence that the Other 261 Loans had anything to do with the

22   alleged conspiracy, much less that those loans advanced, furthered or accomplished the alleged

23   goals of the conspiracy.  First, the Other 261 Loans do not involve any of the alleged co-

24   conspirators or straw buyers or any of the alleged conspiratorial conduct.  Rather, Ms. Yeung

25   obtained these loans in her own name.  TR 2124:6-25:5 (detailing how the Other 261 Loans were

26   "taken out in the name of Judy Yeung"); Gov. Ex. 1028.  Moreover, there was no allegation or

27   evidence that any false information was used or that any false representations were made to the

28   lenders.

SFI-631642v1

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

1    Second, the proceeds from the Other 261 Loans did not further the alleged conspiracy's

2    goals or purposes, since none of the proceeds was used in any way to consummate the charged

3    transactions, to compensate any of the coconspirators or straw buyers, or to otherwise achieve the

4    success of the alleged conspiracy.  The Government's summary witness Mr. Villanueva created a

5    chart detailing the flow of funds from the charged 261 San Fernando transactions and the Other

6    261 Loans.  Govt. Ex. 1028.  Mr. Villaneuva testified that none of the proceeds generated from

7    these loans were used to purchase any of the Gilroy properties.  TR 2126:7-16.  Absent a showing

8    that the Other 261 Loans' proceeds funded the charged transactions, or that the coconspirators

9    and straw buyers were involved, or that they contributed to the success of the charged

10   transactions, the Other 261 Loans were not overt acts in furtherance of the alleged conspiracy.

11   For the same reasons the Other 261 Loans are similarly irrelevant to the charged wire

12   fraud transactions because the loans shared no connections with the alleged scheme to defraud.

13   Moreover, evidence relating to the Other 261 Loans do not tend to prove that Ms. Yeung

14   knowingly engaged in a scheme to defraud, by soliciting straw buyers to submit false information

15   to lenders, as those loans were perfectly legal.  *See United States v. Woods*, 335 F.3d 993, 997

16   (9th Cir. 2003).

17   Because the Other 261 Loans are not acts in furtherance of the conspiracy, they are

18   irrelevant, and the evidence should have been excluded under both 402 and 403.  Admission of

19   the evidence of the other loans was a waste of time and potentially confusing to the jury.

20   Moreover, the evidence was used by the Government as improper prior act evidence.  Fed. R.

21   Evid. 404(b).  Prior act "evidence 'is not looked upon with favor.'"  *United States v. Bradley*, 5

22   F.3d 1317, 1320 (9th Cir. 1993) (citing *United States v. Hodges*, 770 F.2d 1475, 1479 (9th Cir.

23   1985).  "Rule 404(b) 'is designed to avoid a danger that the jury will punish the defendant for

24   offenses other than those charged, or at least that it will convict when unsure of guilt, because it is

25   convinced that the defendant is a bad man deserving of punishment.'"  *Id.* at 1321 (citing *United*

26   *States v. Hill*, 953 F.2d 452, 457 (9th Cir. 1991).  To protect these polices, prior act evidence may

27   be admitted only if:

28

SFI-631642v1

MOTION FOR ACQUITTAL AND NEW TRIAL
CASE NO. CR 09-376 SI

- 24 -

1
2
3

(1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged.

4  *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013 (9th Cir. 1995).

5     Although refinancing one's property is legal (*see, e.g.,* TR 2122: 9-11), the Government

6  used the Other 261 Loans to accentuate Ms. Yeung's practice of refinancing her home.  By

7  highlighting the frequency with which Ms. Yeung refinanced her home, and presenting these

8  legitimate refinancing transactions in conjunction with the charged transactions (*see* Ex. 1028),

9  the Government used the Other 261 Loans to suggest that Ms. Yeung engaged in a pattern of

10  wrongdoing.  Rule 404(b) was designed to protect against this very type of nefarious implication.

11  *See Bradley*, 5 F.3d  at 1321.  Likewise, the Other 261 Loans share no similarities or connections

12  with the charged offenses.  Absent a logical connection, such evidence is prejudicial.  *See*

13  *Vizcarra-Martinez*, 66 F.3d at 1014 (To admit the prior acts, "the government must prove a

14  logical connection between the knowledge gained as a result of the commission of the [other] act

15  and the knowledge of the charged act.") (quotations and citations omitted).

16     Given that evidence relating to the Other 261 Loans is irrelevant, prejudicial, and was

17  used as improper prior act evidence, and given that the Government never provided notice of its

18  intent to admit this evidence as required under Rule 404(b), a new trial is the only appropriate

19  remedy, short of acquittal.

20  **IV.     CONCLUSION.**

21     For the forgoing reasons and based on the record herein, the Court should grant a

22  judgment of acquittal or a new trial on all Counts.

23  Dated: March 5, 2010                    Respectfully submitted,

24                                           Jones Day

25                                           By:     /s/ Martha A. Boersch
                                                Martha A. Boersch
26
                                             Counsel for Defendant
27

28