JOSEPH P. RUSSONIELLO (CSBN 44332)
United States Attorney

BRIAN J. STRETCH (CSBN 163973)
Chief, Criminal Division

SUSAN E. BADGER (CSBN 124365)
JEFFREY RABKIN (CSBN 189798)
Assistant United States Attorneys

   450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102-3495
   Telephone: (415) 436-7167
   Fax: (415) 436-7234
   e-mail: Susan.Badger@usdoj.gov
            Jeffrey.Rabkin@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>   v.<br><br>JUDY YEUNG,<br>  also known as "Miu Wan Yeung,"<br><br>     Defendant. | Crim. No. 09-376 (SI)<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL AND A NEW TRIAL**<br><br>Date:  April 30, 2010<br>Time:  11:00 a.m.<br>Court: Hon. Susan Illston |

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

# TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. APPLICABLE LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  Legal Standard Applicable to the Rule 29 Motion for Judgment of Acquittal . . . . . . . . 3

    B.  Legal Standard Applicable to the Motion for New Trial . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.  SUMMARY OF THE CHARGES AND THE EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  The Superseding Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.  The Charged Wire Fraud Conspiracy and Wire Fraud Counts . . . . . . . . . . . . . . . . . . 5
        2.  The Witness Tampering Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.  The Government's Proof Relating to Count One (Wire Fraud Conspiracy)
       and Counts Two to Nine (Wire Fraud) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        1.  The First 261 San Fernando Way Straw Buyer Transaction . . . . . . . . . . . . . . . . . . . 8

        2.  The First 1351 Third Street Straw Buyer Transaction . . . . . . . . . . . . . . . . . . . . . 11

        3.  The Second 1351 Third Street Straw Buyer Transaction . . . . . . . . . . . . . . . . . . 13

        4.  The Pitlochry Drive Straw Buyer Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        5.  The Second 261 San Fernando Way Straw Buyer Transaction . . . . . . . . . . . . . 18

        6.  Proof of Defendant's Use of Interstate Wires . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    C.  Counts Ten through Twelve:  Witness Tampering . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

V. THE CHARGED CONSPIRACY WAS PROVEN BY OVERWHELMING
EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

   A. The Evidence Proved Beyond a Reasonable Doubt that Yeung Participated in a
      Single Overall Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     1. The Conspiracy Was Characterized by a Single Common Objective . . . . . . . . . . . 25

     2. Several Key Co-Conspirators Participated in Multiple Transactions in
        Furtherance of the Single Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     3. The Method of Operation Remained Strikingly Consistent
        Throughout Execution of the Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

     4. Yeung Clearly Knew that Her Benefits Were Probably
        Dependent on the Success of the Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     5. Yeung's Variance Argument  Is Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

   B. Yeung Has Failed to Meet Her Burden of Establishing That She Was
      Prejudiced by the Alleged Variance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VI.  A NEW TRIAL ON COUNT TEN IS UNWARRANTED . . . . . . . . . . . . . . . . . . . . . . . . 38

   A. The Court Should Not Second-Guess The Jury's Assessment of
      Louie's Credibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

   B. There Is No Risk The Jury Rendered Its Verdict Based On Evidence Of
      The Defendant's Non-Coercive Attempts To Persuade Louie To
      Withhold Information From The FBI  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

VII.     THE COURT CORRECTLY ADMITTED EVIDENCE OF THE INTERMEDIATE
         261 SAN FERNANDO WAY LOANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    A.   Summary of the Intermediate 261 Loan Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    B.   The Intermediate 261 Loan Evidence Was Properly Admitted . . . . . . . . . . . . . . . . . . . 46

VIII.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

TABLE OF AUTHORITIES

FEDERAL CASES

*Aetna Life Insurance Co. V. Ward*, 140 U.S. 76 (1891) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Berger v. United States*, 295 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Braverman v. United States*, 317 U.S. 49 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Kotteakos v. United States*, 328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-34

*Richardson v. March*, 481 U.S. 200 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Sartor et al. v. Arkansas Natural Gas Corp.*, 321 U.S. 620 (1944) . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Abushi*, 682 F.2d 1289 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Alarcon-Simi*, 300 F.3d 1172 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Anguiano*, 873 F.2d 1314 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Arbelaez*, 719 F.2d 1453 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States v. Bauer*, 84 F.3d 1549 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States v. Bernhardt*, 840 F.2d 1441 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Bibbero*, 749 F.2d 581 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States v. Blitz*, 151 F.3d 1002 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Dreitzler*, 577 F.2d 539 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Duran*, 189 F.3d 1071 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 33, 34

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6-9

*United States v. Figueroa-Paz*, 468 F.2d 1055 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Henson*, 123 F.3d 1226 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 23, 26, 27

*United States v. Kearney*, 560 F.2d 1358 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Moore*, 522 F.2d 1068 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Nelson*, 137 F.3d 1094 (9th Cir.), cert. denied, 525 U.S. 901 (1998) . . . . . 36, 39

*United States v. Nelson*, 419 F.2d 1237 (9th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Pichnarcik*, 427 F.2d 1290 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Pimentel*, 654 F.2d 538 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Reyes-Alvarado*, 963 F.2d 1184 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Rush*, 749 F.2d 1369 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Schoneberg*, 396 F.3d 1036 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 42, 44

*United States v. Zemek*, 634 F.2d 1159 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 22-24

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

FEDERAL RULES

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Crim. P. 33(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

The United States of America, by and through its counsel of record, respectfully submits this opposition to defendant Judy Yeung's motion for a judgment of acquittal and a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33.

## I. INTRODUCTION

On February 2, 2010, a jury found the defendant Judy Yeung, also known as "Miu Wan Yeung," guilty beyond a reasonable doubt of wire fraud conspiracy, in violation of Title 18, United States Code, Section 1349, eight counts of wire fraud, in violation of Title 18, United States Code, Section 1343, and three counts of witness tampering, in violation of Title 18, United States Code, Section 1512(b)(3).   Yeung now moves for a judgment of acquittal and new trial pursuant to Federal Rules of Criminal Procedure 29 and 33.  In support of her motion, Yeung sets forth three primary arguments:  First, the government's proof establishes at most Yeung's involvement in multiple wire fraud conspiracies as opposed to the single charged conspiracy; second, the government's witnesses lacked credibility; and third, the Court improperly admitted evidence proving overt acts alleged in the indictment.  For the reasons set forth in more detail below, the government respectfully submits that Yeung's arguments are without merit and that her motion should be denied.

## II. PROCEDURAL BACKGROUND

The Grand Jury charged Yeung in a Superseding Indictment on July 30, 2009. After the government provided extensive discovery and the parties litigated pretrial issues, a jury was empaneled on January 11, 2010.  Both the government and defense gave opening statements on January 12.  The government then presented its case-in-chief over the course of approximately three weeks.  On February 1, the defense presented a brief case that consisted solely of two stipulations.  After jury instructions, the parties each presented closing arguments.  The jury deliberated approximately one full day and

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

2

found Yeung guilty on all counts.

### III.  APPLICABLE LEGAL STANDARDS

The applicable legal standards concerning Rule 29 (judgment of acquittal) and Rule 33 (new trial) motions are set forth immediately below.

**A.    Legal Standard Applicable to the Rule 29 Motion for Judgment of Acquittal**

When considering a motion for acquittal under Rule 29, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Alarcon-Simi, 300 F.3d 1172, 1176 (9th Cir. 2002) (emphasis in original); see also United States v. Dreitzler, 577 F.2d 539, 545 (9th Cir. 1978) ("It is well settled that a district court does not have unlimited discretion in resolving a Rule 29(c) motion for judgment of acquittal.  Rather, the district court must determine 'whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in light favorable to the government.'" (quoting United States v. Figueroa-Paz, 468 F.2d 1055, 1058 (9th Cir. 1972)).

In ruling on a Rule 29(c) motion, the district court's "function . . . is quite narrow" and it must bear in mind it is the "jury's exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflict and draw reasonable inferences from proven facts."  United States v. Bernhardt, 840 F.2d 1441, 1448 (9th Cir. 1988) (citation omitted).  Circumstantial evidence and reasonable inferences drawn from that evidence alone are sufficient to sustain a conviction.  United States v. Reyes-Alvarado, 963 F.2d 1184, 1188 (9th Cir. 1992); see also United States v. Nelson, 419 F.2d 1237, 1239 (9th Cir. 1969).

///

///

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

3

**B.     Legal Standard Applicable to the Motion for New Trial**

The court has the power to "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  A district court's power to grant a motion for a new trial is broader than its power to grant a motion for judgment of acquittal because the court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses. However, a motion for a new trial should be granted only in exceptional cases.  See United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 2000) ("If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates *sufficiently heavily* against the verdict that a *serious miscarriage of justice* may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.") (emphasis added) (internal citation omitted); see also United States v. Rush, 749 F.2d 1369, 1371 (9th Cir. 1984) (affirming district court's denial of a new trial where the weight of the evidence supported the defendant's conviction for wire fraud based on his scheme to alter a check in the amount of approximately $187,000 and where the court responded to claims of prosecutorial misconduct by forcibly dealing with the defendant's objections and giving appropriate admonitions to the jury); United States v. Pimentel, 654 F.2d 538, 545 (9th Cir. 1981); United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir. 2000) ("Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, 'it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.' . . . .  An example of exceptional circumstances is where testimony is 'patently incredible or defies physical realities.'") (internal citation omitted).

///

///

# IV. SUMMARY OF THE CHARGES AND THE EVIDENCE

## A. The Superseding Indictment

### 1. The Charged Wire Fraud Conspiracy and Wire Fraud Counts

The Superseding Indictment charged Yeung with participating in a wire fraud conspiracy between approximately December 2004 and January 2007 and with eight counts of wire fraud. See Superseding Indictment ("SI") ¶¶ 1-10. The SI alleged that during this time, Yeung conspired with five straw buyers (Kenneth Zhang, Andy Louie, Kenneth Ferrari, Lawrence Phung and Dinh Lam)[1] and two mortgage brokers (Alex Yee and Richard Mesler) to obtain mortgage loans from various lenders in order to purchase and refinance residential properties within the Northern District of California. The fraudulent mortgage loan transactions in question are summarized below:

| Count/Date | Property | Lender(s) | Straw Buyer |
|---|---|---|---|
| Count 2<br>March 22, 2005 | 261 San Fernando Way (San Francisco) | Washington Mutual Bank | Kenneth Zhang ("Straw Buyer 1") |
| Counts 3 & 4<br>October 20, 2005 | 1351 Third Street (Gilroy) | Long Beach Mortgage Company | Andy Louie ("Straw Buyer 2") |
| Counts 5 & 6<br>December 30, 2005 | 1351 Third Street (Gilroy) | Long Beach Mortgage Company | Ken Ferrari ("Straw Buyer 3") |

[1] A "straw buyer" is a person who uses or allows his or her name and credit to be used for the purchase of a property they never intend to pay for, use or control.

| Counts 7 & 8 March 6, 2006 | 7187 Pitlochry Drive (Gilroy) | Silver State Financial Services | Larry Phung ("Straw Buyer 4") |
|---|---|---|---|
| Count 9 January 8, 2007 | 261 San Fernando Way (San Francisco) | Chase Home Finance LLC and Cal State 9 Credit Union | Dinh Lam ("Straw Buyer 5") |

We note that, despite Yeung's efforts to suggest otherwise, the Superseding Indictment repeatedly and expressly alleged that Yeung's wire fraud conspiracy included not only mortgage brokers Yee and Mesler but also straw buyers Zhang, Louie, Ferrari, Phung and Lam. See, e.g., Superseding Indictment ¶¶ 8(e) (alleging that Yeung, Zhang and others sent false loan application to Washington Mutual Bank), 8(j) (alleging that Yeung, Yee and Louie together sent false loan applications to Long Beach Mortgage), 8(l) (alleging that Yeung together with Yee recruited Ferrari to be straw buyer); 8(n) (alleging Yeung, Yee, Mesler and Ferrari together sent false loan applications to Long Beach Mortgage), 8(r) (alleging that Yeung, Yee, Mesler and Phung together sent false loan applications to Silver State Financial Services), 8(u) and (v) (alleging that Yeung together with Dinh Lam and others sent false loan applications to Chase Home Finance LLC and Cal State 9 Credit Union).

The Superseding Indictment further alleges that Yeung, together with Yee, recruited the straw buyers to use their good credit to obtain the loans in their names. SI ¶¶ 3, 8(a), 8(h), 8(l), 8(p) and 8(t). The conspiracy included an agreement between Yeung and the straw buyers that Yeung was the true purchaser, would be the in-fact owner of the property, and would be solely responsible for making the mortgage payments. Id. ¶¶ 3-4. By submitting the loan applications in the names of the straw

buyers, Yeung and her co-conspirators provided misleading and materially false information to the lenders as to the true identity of the borrower.  Id. ¶ 4.  In addition, the Superseding Indictment alleges that Yeung, together with other members of the conspiracy, falsified information on the straw buyers' loan applications.  For example, as Yeung well knew at the time, the straw buyers' loan applications materially overstated their monthly income, falsified their employment information and/or misstated their assets.  SI ¶ 5.

### 2.     The Witness Tampering Charges

The Superseding Indictment also charged Yeung with three counts of witness tampering in violation of Title 18, United States Code, Section 1512(b)(3).   As described in more detail below, these charges related to the defendant's efforts to convince Andy Louie (Count Ten) and Kenneth Zhang (Counts Eleven and Twelve) to lie to the FBI about Yeung's role in the mortgage fraud scheme.

**B.     The Government's Proof Relating to Count One (Wire Fraud Conspiracy) and Counts Two to Nine (Wire Fraud)**

Yeung's participation in the charged wire fraud conspiracy and substantive wire fraud counts was proven by overwhelming evidence.  The government's case-in-chief included testimony from five cooperating witnesses — Zhang, Louie, Ferrari, Phung and Yee — each of whom testified in sum that the defendant was the instigator and leader of the mortgage fraud conspiracy alleged in the Superseding Indictment.  Each of the witnesses testified that mortgage loans were obtained at Yeung's direction by providing false and fraudulent information to lenders.  In addition, the government admitted  a series of consensually-recorded conversations between Yeung and two of the government's witnesses (Kenneth Zhang and Kenneth Ferrari) that corroborated their testimony.  The government also called two lender employees (Shawna Varney and Lavette Armendariz) who testified that they spoke directly to Yeung and that Yeung

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

1    verified the false employment information listed on the Louie and Phung loan

2    applications.  The government's proof also included a written agreement between Phung

3    and Yeung in which they expressly agreed that Yeung would pay Phung in exchange for

4    the use of his good credit to purchase 7187 Pitlochry Drive.  The government also

5    presented evidence showing how the defendant personally earned at least $624,000 from

6    the mortgage fraud scheme.  The government's proof relating to Counts One through

7    Nine is described in more detail below.

8        **1.    The First 261 San Fernando Way Straw Buyer Transaction**

9            At trial, the government presented evidence that between approximately December

10   2004 and March 2005, Yeung together with Zhang and Louie fraudulently obtained a

11   refinance loan for Yeung's residence located at 261 San Fernando Way, San Francisco,

12   California.  At the time, Yeung had two high interest rate mortgage loans totaling

13   approximately $1.2 million with lenders BayMark Financial and Roberts Realty on the

14   property and was having difficulty paying them.  See Trial Transcript ("TT") at 295,

15   2044-53 and Government Exhibits 101-3, 101-4 and 101-16.  By obtaining a refinance

16   loan, Yeung was able to pay off the debt she owed to BayMark Financial and Robert

17   Realty, lower her house payments and obtain $86,586 in cash.  See id.  However, Yeung

18   herself could not have refinanced the house because her credit was bad.  See TT at 292-

19   93, 607-08, 1555.  As a result, Yeung needed a straw buyer with good credit to complete

20   the refinance transaction and recruited Zhang to play that role.

21           Kenneth Zhang testified that he met Yeung in 2004.  At the time, he was working

22   as a waiter in his family's small restaurant.  Shortly after meeting Yeung, he began

23   working for Yeung's non-profit organization, America Education Foundation

24   International ("AEFI").  See id. at 268, 273.  After Zhang began working for Yeung,

25   Yeung persuaded him to lend her money.  See Government Exhibits 103, 104, 106, 107,

26   110, 111 (checks written by Zhang to Yeung).  In addition, Zhang agreed to invest

27   CR 09-376 (SI)
     UNITED STATES' OPPOSITION
28   TO DEFENDANT'S POSTTRIAL MOTION

$10,000 in AEFI.  Zhang also used his credit cards to obtain cash advances that he then loaned to Yeung.  See id. at 274, 275-93.

Zhang testified that at the time, Yeung lived at 261 San Fernando Way, San Francisco, California.  See TT at 270.  Yeung told Zhang that she was unable to pay her monthly mortgage because of high interest rates.  See id. at 293.  As a result, in approximately December 2004, Yeung convinced Zhang to agree to use his name and good credit score to obtain a refinance loan for her primary residence located at 261 San Fernando Way, San Francisco, California.  See id. at 293:9 to 294:10; 296:3-8.  Zhang testified that it was his understanding that Yeung was going to pay the refinance loan, and that Yeung would continue to live there after the refinance loan was obtained.  Yeung also told Zhang that if everything went well, she would be able to pay back to Zhang the money he had loaned to her with the proceeds of the refinance loan.  See id. at 294, 295-96, 306 and 313-14.  Yeung placed Zhang on the deed for this property in December 2004.  See id. at 297:3 to 299:3 and Government Exhibit 1100.  This was necessary for Zhang to obtain a refinance loan in his name for the property.  Id. at 298, 2057.

Zhang testified that, at Yeung's direction, he together with Andy Louie forged a letter from Hang Seng Bank that falsely stated Zhang had significant assets in a Hong Kong bank account.  See id. at 301-04 and Government Exhibit 100-6.  This letter, which the government obtained from Washington Mutual Bank and admitted into evidence as Government Exhibit 100-6, was submitted to Washington Mutual Bank to verify the asset information listed on Zhang's loan application.  In addition, Yeung asked Zhang to sign a loan application containing false information relating to his employment, income and intent to reside in the property.  See id. at 305-11.  It was Zhang's understanding that the fraudulent loan application and forged Hang Seng Bank letter were transmitted to Washington Mutual Bank, which in turn funded the refinance loan for 261 San Fernando Way.  In March 2005, Yeung and Zhang obtained a refinance loan from Washington

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

1   Mutual Bank, the proceeds of which paid off Yeung's previous high interest rate

2   mortgage loans totaling almost $1.2 million for this property.  See TT at 299-318, 2034-

3   35, 2044-53.  Bank and escrow file documents show Yeung also received approximately

4   $86,500 from the refinance loan proceeds.  Id. at 2036; see also Government Exhibits

5   101-1, 101-2, 101-6, 101-7 and 101-9.

6       Zhang's testimony regarding the first 261 San Fernando Way was amply

7   corroborated.  For example, Zhang was corroborated by Andy Louie.  Louie testified that

8   he met Yeung after graduating from U.C. Berkeley in 2004.  See TT at 1102-04.  His

9   first job after graduating was to work as a secretary for Yeung at AEFI.  Louie believed

10  he was hired in part because Yeung's maid was a friend of Louie's mother.  Louie

11  worked in the basement of Yeung's residence located at 261 San Fernando Way, San

12  Francisco, California.  See id. at 1104-08.  Louie testified that he helped Zhang and

13  Yeung to forge the Hang Seng Bank letter in order to allow Yeung to refinance her

14  residence at 261 San Fernando Way using Zhang's credit.  See id. at 1133-40.

15      In addition to the testimony of Zhang and Louie, the government also presented

16  recordings of conversations between Zhang and Yeung that Zhang made at the direction

17  of the FBI.  See Government Exhibits 601 and 603 (transcripts of recordings made on

18  September 18, 2007 and October 18, 2007).  These recordings proved beyond a

19  reasonable doubt that Yeung, together with Zhang and Louie, forged the Hang Seng Bank

20  letter in order to obtain the Washington Mutual Bank refinance loan for 261 San

21  Fernando Way.  For example, during these calls Zhang and Yeung specifically discussed

22  the Hang Seng Bank letter.  Yeung acknowledged that she had directed Zhang and Louie

23  to create a false letter from a Hong Kong bank, and that the letter had been used to

24  procure the refinance loan.  Yeung also told Zhang that the bank account listed on the

25  Hang Seng Bank letter was in fact her mother's bank account.  Yeung also repeatedly

26  instructed Zhang to lie to the FBI about the Hang Seng Bank letter.  Specifically, she

27  CR 09-376 (SI)
    UNITED STATES' OPPOSITION
28  TO DEFENDANT'S POSTTRIAL MOTION

directed Zhang to tell the FBI that he did, in fact, have significant assets at Hang Seng Bank.  Yeung told Zhang that the FBI would be unable to confirm the accuracy of that information, and that if he admitted the truth about forging the letter she would testify against him and he would go to jail.  See, e.g., Government Exhibit 601 at 56-60, 61, 72-73, 75-77, 100-05, 107-08, 108-09 and Government Exhibit 603 at 20-22, 23-24, 28-29, 36-37, 39-41, 41-44, 48-49, 50-51, 53, 56-57, 81, 86-91, 119.

####         2.      The First 1351 Third Street Straw Buyer Transaction

Louie also testified that in or about October 2005, Yeung asked him to use his name and credit to purchase the house located at 1351 Third Street in Gilroy, California. See TT at 1158-60, 62.  Although Yeung did not explicitly offer to pay Louie for the use of his name and credit, she owed him approximately $20,000 in back pay and Louie understood from his conversations with Yeung that she would be able to pay him some or all of this amount from the proceeds of the sale.  Yeung promised to pay the mortgage and other expenses related to the house, and they had an understanding that Louie would not live in the house.  See id. at 1145, 1148, 1163-65, 1167.

Louie testified at trial that the application that he was given to sign contained false information about his income, employment and intent to occupy the residence at 1351 Third Street.  Id. at 1173-79 and Government Exhibits 200-1 and 200-12.  For example, the loan application falsely represented that Louie was a "board member" of America Education Foundation and that he earned $15,875 per month when in fact he was working there as an unpaid secretary.  Furthermore, Louie testified that Yeung directed him to create a forged Hang Seng Bank letter that falsely indicated Louie had significant assets at the bank.  TT at 1180-84.  Yeung explained that he needed the letter verification in order to qualify for the loan they obtained to purchase the house.  Id. at 1182.

///

///

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

Louie was corroborated by the testimony of Alex Yee, a mortgage broker who assisted Yeung in obtaining loans for straw buyers Louie, Ferrari, Phung and Lam.[2]  Yee testified that he first met Yeung in early 2005.  See TT at 589.  Approximately two to three months later, Yee met with Yeung at her house in San Francisco.  During the meeting, Yeung told Yee that she wanted to purchase the property located at 1351 Third Street in Gilroy, California for the purpose of holding it a short period and then selling it at a profit.  Id. at 612.  Yeung asked Yee to obtain mortgage loans in the name of Andy Louie for the purpose of purchasing the property.  Id. at 613.  Yeung told Yee that she could not own the house in her name because of her "political status."  Id. at 615.  Yeung also told Yee that she wanted to borrow 100% of the purchase price and that she would make the mortgage payments.  Id. at 617, 619.

Yee also testified that he determined, based on the price of the house and the amount of the loans Yeung wished to obtain, what income they would have to list on the loan application for Louie.  Id. at 620-21.  Yee told Yeung what Louie's income would have to be, and also that the job title listed on his loan application would have to be consistent with his income.  Yeung told Yee that, in substance, Louie's actual job title would not justify the required income.  Id. at 621-22.  They then talked about listing Louie as an executive director of Yeung's company.  Yee told Yeung that the lender would call to verify Yee's employment, but not his income.  Id. at 623.  Yee went on to testify that he prepared and submitted a false loan application in Louie's name in order to obtain mortgage loans for the Third Street property.  Id. at 626-27.  Yee also testified that Yeung provided him with bank documents purporting to show that Louie had assets at First National Bank and Hang Seng Bank.  Id. at 651-52.

---

[2]  As discussed below, Yee assisted Yeung by attempting to obtain a loan in Lam's name for the refinancing of 261 San Fernando Way.  Ultimately, however, Yee stopped helping Yeung before the transaction was completed.

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

Ultimately, they obtained first and second mortgage loans from Long Beach Mortgage Company. Id. at 628. When the transaction closed, Yee earned a commission of approximately $11,000. See TT 1040-41.

The testimony of Louie and Yee regarding Yeung's knowing participation in the fraud relating to this transaction was corroborated by the testimony of Shawna Varney. Varney testified that on October 19, 2005, she telephoned someone named "Judy" who informed Varney that Louie was employed at American Education Foundation as a "board member." Id. at 1490-91 and Government Exhibit 200-5. The phone number that Varney called was the same as the phone number on Judy Yeung's business card. Cf. Government Exhibits 806 and 200-5.

Finally, the government's proof of Yeung's participation in the conspiracy to fraudulently obtain loans for the purchase of the Third Street property in Louie's name included recorded statements by Yeung herself. For example, Yeung told Zhang: "When Andy was doing Gilroy, he already has it. He has the letter from Hong Kong, National Bank and the letter from Hong Kong. He had it. He did. Andy... Andy altered it. Altered it and then gave it to whomever, gave it to Alex Yee." Government Exhibit 603 at 53.

A few months after Third Street property was purchased in Louie's name, Louie told Yeung that he wanted his name taken off the property because he was concerned that his credit would be affected if Yeung was unable to make the mortgage payments. As a result, Yeung and Alex Yee found another straw buyer — Kenneth Ferrari — to take over the property. TT at 1195-96.

### 3.    The Second 1351 Third Street Straw Buyer Transaction

Ferrari testified that he met Yee while working in the hotel industry in San Francisco. Yee got Ferrari a job working at BayCal as a mortgage broker. Id. at 1307-08. In approximately December 2005, Yee asked Ferrari if he was interested in letting his

name and credit be used by Yeung to purchase the 1351 Third Street property.  Yee said that Yeung would pay all of the expenses, pay Ferrari $20,000 for his participation and then take his name off the property within approximately six months.  TT at 1318-22; 1338.  After Ferrari agreed, Yee took him to meet with Yeung at a holiday party in December 2005.  During the meeting, Yeung thanked Ferrari for helping her with "a favor" and also offered to help him get a job with the San Francisco Fire Department.  Id. at 1324-27.  Ferrari went on to testify that he, together with Yee and Mesler, prepared a loan application and supporting documentation for mortgages to purchase the Third Street property that contained false information relating to, among other things, his income and employment as well as to his intention to live in the property as his principal residence. Id. at 1340-41 and 1345-48.  Ferrari's testimony was strongly corroborated by three consensually-recorded calls between Yeung and Ferrari, which he made at the direction of the FBI.  See Government Exhibits 604, 606 and 608.

Yee also provided testimony relating to the second Third Street transaction, and in doing so corroborated Ferrari.  He testified that two to three months after the Louie transaction closed, he received a call from Yeung.  TT at 707, 713.  Yeung informed him that Louie needed to be removed from the title and the loan for the Third Street property because his mother objected to the arrangement.  Id. at 707-08.  Yeung asked Yee to find another straw buyer, and offered to pay anyone who would act as the borrower.  Id. at 709.  Yee then recruited Ferrari to act as Yeung's straw buyer.  Id.  He told Ferrari that Yeung would pay him for the use of his credit to purchase the Third Street property, and that Yeung would pay the mortgage.  Yee also told Ferrari that Yeung would help him get a job with the San Francisco Fire Department.  Id. at 711-12.  Yee testified that Yeung was informed of and agreed to everything he was doing and that he would not have taken these steps without her approval.  Id. at 711-13.

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

Once Ferrari agreed to act as Yeung's straw buyer, Yee together with Mesler worked to prepare a loan application and supporting documentation that would ensure Ferrari qualified for loans to purchase the property from Louie.  In order to obtain mortgage loans in Ferrari's name, Yee and Mesler prepared a loan application that contained materially false information relating to Ferrari's income, employment and assets.  In addition, the loan application falsely represented that Ferrari intended to live in the property.  Finally, Yee and Mesler obtained a falsified rent verification letter as well as a letter from a CPA that falsely verified the employment listed on Ferrari's loan application.  TT at 720-28; 730-33; 738-41; 746.  Yee informed Yeung that Ferrari would not qualify for mortgage loans unless false information was provided to lenders, and also told her about the falsified documents that were used to ensure that Ferrari qualified for mortgage loans to purchase the Third Street property.  Id. at 721-23, 730-32,  746.

On December 30, 2005, Long Beach Mortgage funded the Ferrari loans, and in the process paid off the loans that had been obtained in Louie's name.  See Government Exhibit 301-1.  Yee earned a commission of approximately $4,000 from this transaction.  TT at 1056.  When escrow closed, Ferrari paid $377.10 from the proceeds back to Yeung. Id. at 1370-71 and Government Exhibit 1018.  In addition, Yeung paid Ferrari for at least one month's mortgage payment for the Third Street property.  TT at 1375-82.[3] Ultimately, Yeung informed Yee that she would not pay the mortgage loans that had been taken out in Ferrari's name.  Id. at 1388-92.  Ferrari and Yee subsequently reported the transaction to the San Francisco District Attorney's Office.  Id. at 1396-98.

---

[3]  Yeung first had her accountant make a check made out to Ferrari for the first and second month's mortgage payment.  However, shortly after Ferrari received the check, Yee called Ferrari and informed him that a stop payment had been placed on the check. TT at 1382-1384.

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

4.      **The Pitlochry Drive Straw Buyer Transaction**

Phung testified that he met Yeung in approximately September 2005 through Janet Gong, who was Yeung's accountant.  During their initial conversation, Yeung told Phung that she wanted to use his name and credit to purchase a residential property.  Yeung promised to pay Phung $40,000 and to pay all the expenses associated with the property until Phung's name was taken off the property.  Phung ultimately agreed to participate with the scheme.  TT at 1553-56.

Before Phung signed the closing documents, he became concerned that Yeung might not pay the mortgage for the property purchased using his name and credit.  He therefore drafted a contract between himself and Yeung, which stated in pertinent part that Yeung has agreed to pay $20,000 Phung for the use of his credit to purchase the 7187 Pitlochry Drive property, that Yeung would make all the payments associated with the property, and that Yeung would sell the property and take Phung's name off of it.  Yeung and Phung signed the contract, and the government offered it into evidence during its case-in-chief.  Id. at 1573, 1581-85 and Government Exhibit 406.

Phung also testified that during a meeting at which Phung signed the loan application documents, Yeung told Phung that they needed to falsify information relating to his income and employment in order to qualify for the mortgage loans.  Yeung told Phung that if the lending institution called him, he should confirm that he worked for Yeung's non-profit organization.  TT at 1595-96.  After the purchase, Yeung never paid any of the mortgage expenses on the house.  Instead, Yeung proposed that Phung help her with the purchase of another property, located at 200 Darien Way.  Phung attempted to do so, but they were not able to obtain a loan to purchase 200 Darien Way.  Ultimately, Phung sold the property at a loss.  Id. at 1605, 1610-14, 1616-19, 1621.

Yee's testimony corroborated Phung.  He testified that, approximately two months after Yeung purchased the 1351 Third Street property using Ferrari's name and credit, she

contacted Yee once again.  Yeung told Yee that she wanted to purchase another house in Gilroy and then sell it at a profit.  Specifically, Yeung wanted to purchase the 7187 Pitlochry Drive property using Larry Phung as a straw buyer.  TT at 769-71, 775-76.  Once again, Yee and Yeung had explicit conversations relating to false information that was then used to support Phung's mortgage applications.  Specifically, Yee told Yeung that Phung's city job did not pay him enough to qualify for a mortgage for the property.  Yeung then told Yee to list Phung as an employee of her non-profit organization and agreed to verify his employment to the lending institution.  After consultation with Yeung, Yee also included false information on Phung's loan application showing that Phung was paying $6,500 per month in rent.

Yee submitted the loan applications containing materially false information to Silver State Financial Services, which in turn funded first and second mortgage loans totaling approximately $1.3 million.  Id. at 777-78; 783-88; 801-06; 808-09.  Yee testified that Yeung told him that she had received a call from the lender, and that she had (falsely) verified that Phung worked for American Education Foundation.  Id. at 806.[4]  Yee also testified that he received documentation from Yeung purporting to show that Phung had assets with Hang Seng Bank.  Id. at 813.  Yee was corroborated on this point by Louie, who testified that at Yeung's request he forged a Hang Seng Bank letter for Phung.  Id. at 1199-1202 and Government Exhibit 903.  Yee submitted the forged Hang Seng Bank letter in support of the information on the Phung loan application.  Id. at 811-13.  Yee also earned a commission from this transaction.  Id. at 798.

///

---

[4]  Yee's testimony on this point was directly corroborated by the testimony of Lavette Armendariz, an employee of Silver State Financial Services.  Armendariz testified that on or about March 3, 2006, she called Judy Yeung who verified that Phung was the executive director of American Education Foundation.  See TT at 1861-62 and Government Exhibit 400-13.

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

### 5.      The Second 261 San Fernando Way Straw Buyer Transaction

Not long after Yeung, Yee, Mesler and Phung were involved in the 7187 Pitlochry
Drive transaction, Yeung asked Yee to help to use Dinh Lam as a straw buyer for a
variety of other properties, including 200 Darien Way and 240 San Fernando Way.  TT at
908-10.  Yee testified that, after receiving Lam's bank records from Yeung, he
specifically told Yeung that Lam did not earn sufficient income to qualify for mortgage
loans for these properties, and that they would need to falsify his income.  TT at 917-18.
Yee also testified that, at Yeung's direction, he attempted to obtain a mortgage loan for
Lam so that he could act as the straw buyer for 261 San Fernando Way.  TT at 931 and
Government Exhibit 900-1 (Lam purchase contract and loan package for 261 San
Fernando Way).  Yee explained that Yeung told him that she wanted to engage in a real
estate transaction whereby the house at 261 San Fernando Way would be "sold" from
Zhang to Lam so that she could pay off liens from EMC mortgage,[5] Cal State 9 Credit
Union and Bay One Credit as well as a creditor named Nick Fu and also obtain cash from
the refinance loan.  TT at 936-39, 940-41.  At the time, the Zhang and Fu loans were both
in default.

Ultimately, Yee did not complete the Lam straw buyer transaction and stopped
working with Yeung.  Id. at 939, 955.  However, documents admitted into evidence
proved beyond a reasonable doubt that Yeung was able to complete the Lam straw buyer
transaction for 261 San Fernando Way without Yee's assistance.  For example, the
government admitted first and second mortgage loan applications that were submitted to
Chase and Cal State 9.  See Government Exhibits 500-3 and 501-8.  These loan
applications falsely represented that Lam was a bona fide purchaser who intended to live

---

[5] Evidence admitted at trial established that Washington Mutual Bank sold the 261 San
Fernando Way Zhang loan to EMC.

in the property as his principal residence.  They also falsely listed the same Hang Seng Bank account number used on the Zhang, Louie and Phung loan applications.  In addition, Yeung and Lam submitted a forged Hang Seng Bank letter identical to those used by Yeung to procure loans for Zhang, Louie and Phung.  See Government Exhibits 100-6, 903 and 500-9.  Escrow records established that the Lam transaction closed in 2007.  Chase loaned Lam $1,732,500 and Cal State 9 loaned Lam $467,500.

As a result of the Lam loan transaction, Yeung was able to pay off the entirety of the mortgage loan in Zhang's name.  She also was able to pay off two other significant loans that she had obtained using 261 San Fernando Way as collateral.  Moreover, she obtained approximately $67,000 in cash from the loan proceeds.  See TT at 2091-96 and Government Exhibits 502-18 and 502-22.  Yeung used a portion of these proceeds to make a payment on the mortgage loan that was now in Lam's name.  TT at 2102-06.  She also continued to live in the house until at least October 2007.  Id. at 337-38 (Zhang's recorded meeting with Yeung on October 18, 2007 took place at her house on 261 San Fernando Way).

**6.     Proof of Defendant's Use of Interstate Wires**

At trial, the government introduced proof beyond a reasonable doubt that wires were transmitted in interstate commerce in furtherance of each of the charged loan transactions.  Specifically, the mortgage loans in question were funded by way of interstate wires from the lending institution to the title companies that disbursed the funds at the closing.  Each wire was transmitted in interstate commerce via a Federal Reserve bank.  See Government Exhibit 1208 (stipulation regarding interstate wires).

///

///

///

///

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

## C.     Counts Ten through Twelve:  Witness Tampering

Counts Ten through Twelve of the Superseding Indictment charged Yeung with witness tampering in violation of Title 18, United States Code, Section 1512(b)(3).  Count Ten related to Yeung's efforts to convince Andy Louie to lie to the FBI.  Louie testified that he was first contacted by the FBI on or about May 8, 2007.  TT at 1243.  During this interview, Louie spoke to the FBI about his background and the fact that he used to work for Yeung.  Id. at 1219-20.  He then agreed to meet with the FBI at another time to specifically discuss his role in purchasing the Gilroy property.  Id. at 1221.  Louie contacted Yeung after the meeting, and on May 9, 2007, they met at her house at 261 San Fernando Way in San Francisco.  Louie testified that during this meeting, Yeung urged him to lie to the FBI in order to conceal her role in obtaining the property.  Among other things, Yeung instructed Louie to falsely say that he knew nothing about the Hang Seng Bank account, when in fact, they both knew that false information was submitted to the lender stating that Louie had funds in that account.  Id. at 1222-26.  Yeung also instructed Louie to keep his answers to the FBI "short and sweet."  Id. at 1229.

The next day, on May 10, 2007, Louie once again met with the FBI.  During this meeting, Louie lied to the FBI and claimed that Yeung's husband had asked him to act as a straw buyer for the purpose of acquiring the Gilroy property.  When asked about the Hang Seng Bank account information on his loan application, Louie told the agents that he did not have an account there and knew nothing about how the information got on the loan application.  Id. at 1231:13-1233:2.

Louie's testimony was repeatedly corroborated by the recorded conversations between Zhang and the defendant.  For example, the defendant told Zhang "So Andy set aside one day for him [the FBI agent].  Before going there, he came over here."  See Government Exhibit 601 at 44.  She also stated: "The other days, I, ah ah Janet and Andy, we challenged each other for three hours. . . .  Andy asked questions; Janet and I coached

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

him." Id. at 79-80.  Yeung also told Zhang: "Do like Andy, let me know right after your interview to let me know what had been asked . . . .  He said, 'Auntie, the things he asked me were exactly the same as the things you and Janet taught me last night.'" Id. at 115-16.

Counts Eleven and Twelve arose from events that took place on September 18, 2007 and October 18, 2007.  On those dates, Kenneth Zhang met with Yeung.  These meetings were recorded with the consent of Zhang and at the agents' direction.  At trial, the government introduced the full transcript of the entire meetings.  See Government Exhibits 601 and 603.  During both meetings, Yeung repeatedly directed Zhang to lie to the FBI about crucial aspects of their mortgage fraud scheme, including the fake bank documents that Yeung and Zhang created together in order to inflate Zhang's creditworthiness.  For instance, Yeung instructed Zhang to claim (falsely) that he had money in the Hang Seng Bank account.  She assured him that the FBI's investigation would not reach so far as to check the bank in Hong Kong.  As another example, Yeung instructed Zhang not to mention her when he responded to questions from the agents.  She was quite clear that she did not want her involvement revealed.

### V.
### THE CHARGED CONSPIRACY WAS PROVEN BY OVERWHELMING EVIDENCE

Yeung now moves for acquittal or a new trial on Count One on grounds that the evidence presented at trial was insufficient to establish the single overall conspiracy alleged, and that at most the evidence established multiple conspiracies.  Yeung further claims that she was prejudiced by the variance between what was alleged and what was proved.  Finally, she argues that even if the government did establish the single conspiracy, there was insufficient evidence to establish her knowing participation in that conspiracy beyond a reasonable doubt.  Each of these contentions is without merit.

///

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

21

A.      **The Evidence Proved Beyond a Reasonable Doubt that Yeung Participated in a Single Overall Conspiracy**

The question whether a single conspiracy, instead of multiple conspiracies, has been proved is a question of the sufficiency of the evidence.  United States v. Bauer, 84 F.3d 1549, 1560 (9th Cir. 1996).  Using the applicable Rule 29 standard, the question here is whether the evidence, when viewed in the light most favorable to the prosecution, was sufficient for any rational trier of fact to have found beyond a reasonable doubt that Yeung and her-conspirators engaged in a single overall conspiracy to accomplish the objective of obtaining mortgage loans.  United States v. Arbelaez, 719 F.2d 1453, 1457 (9th Cir. 1983).  The evidence introduced at trial amply proved beyond a reasonable doubt the single overall conspiracy alleged in the indictment.  As discussed in more detail below, (1) each transaction in furtherance of this objective was carried out at Yeung's behest and direction; (2) several key participants took part in more than one transaction; (3) the method by which Yeung and her co-conspirators went about executing the scheme remained constant throughout the various transactions; and (4) the overall goal of the conspiracy, that is, to obtain mortgage loans for Yeung's benefit, remained the same throughout.

A conspiracy is "an agreement to accomplish an illegal objective, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense."  United States v. Bibbero, 749 F.2d 581, 587 (9th Cir. 1984) (internal citation omitted).  "To establish the existence of a single conspiracy, as compared to multiple conspiracies, the basic 'test is whether there was "one overall agreement" to perform various functions to achieve the objectives of the conspiracy.'"  Arbelaez, supra, at 1457 (quoting United States v. Zemek, 634 F.2d 1159, 1167 (9th Cir. 1980)).  However, "the evidence need not be such that it excludes every hypothesis but that of a single conspiracy; rather it is enough that the evidence adequately

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

1    supports a finding that a single conspiracy exists." Id. at 1457-58.  See also, United

2    States v. Bauer, 84 F.3d 1549, 1560 (9th Cir. 1996).

3          The Ninth Circuit has endorsed examining several factors in order to determine the

4    existence of one overall agreement, and hence, one overall conspiracy.  For instance, in

5    United States v. Duran, 189 F.3d 1071, 1080 (9th Cir. 1999), the Court held that

6    "[t]ypically, the inference of an overall agreement is drawn from proof of a single

7    objective [citation omitted], or from proof that the key participants and the method of

8    operation remained constant throughout the conspiracy."  In noting the latter factor, the

9    Court cited its earlier decision in Bibbero, supra, 749 F.2d at 587, where "four key

10   participants and method of operation remained relatively constant." Id. at 1080.

11   Furthermore, in deciding whether there was one overall scheme or conspiracy, the Ninth

12   Circuit has examined whether the evidence showed that the "*defendant* knew, or had

13   reason to know, that others were involved in a broad project ... and that his benefits were

14   probably dependent upon the success of the entire operation."  United States v. Kearney,

15   560 F.2d 1358, 1362 (9th Cir. 1977) (emphasis added).

16         In discussing how to analyze the evidence in any particular case in light of this

17   criteria, the Ninth Circuit has recognized that "subgroups and subagreements" can exist in

18   a single conspiracy.  Arbelaez, supra, 719 F.2d at 1457.  Also see Bauer, supra, 84 F.3d at

19   1560; Bibbero, supra, 749 F.2d at 587.  "A single conspiracy does not need to have to

20   have all of the same conspirators throughout the conspiracy."  United States v. Henson,

21   123 F.3d 1226, 1236 (9th Cir. 1997), overruled on other grounds, United States v. Foster,

22   165 F.3d 689, 692 n.5; United States v. Abushi, 682 F.2d 1289, 1294-95 (1982).  Nor

23   does the government have to prove that the defendant participated in every phase of the

24   conspiracy.  Henson, supra, at 1236.  Furthermore, it need not be shown "that an alleged

25   co-conspirator knew all of the purposes and all participants in the conspiracy." Kearney,

26   supra, 560 F.2d at 1362.

27   CR 09-376 (SI)
     UNITED STATES' OPPOSITION
28   TO DEFENDANT'S POSTTRIAL MOTION

In addition, performance of separate acts in furtherance of a conspiracy is not inconsistent with one overall agreement.  United States v. Zemek, 634 F.2d 1159, 1167 (9th Cir. 1980).   In Kearney, supra, 560 F.2d at 1361-63, the Ninth Circuit rejected the defendants' argument that they did not engage in a single overall conspiracy based on evidence that they engaged in different instances of drug smuggling.  In upholding the conviction on the single charged conspiracy, the Court noted that "[a]lmost any venture, criminal or legitimate, is analyzable into a series of bits, each of which, in turn, is characterizable as an independent plan or goal."  Id. at 1362.  The Court found that such an exercise did not resolve the single conspiracy / multiple conspiracy issue, and found that a single conspiracy can include the performance of "separate acts at separate times." Id. at 1362-63.  Indeed, the Supreme Court has recognized that there may be a "single agreement to commit several offenses," and a single agreement to commit an offense does not necessarily become several conspiracies because it continues over time.  Braverman v. United States, 317 U.S. 49, 52 (1942).

Applying these principles, there was more than sufficient evidence presented at trial for a juror to have found beyond a reasonable doubt that between 2004 and 2007, Yeung devised and participated in a single overall conspiracy with Yee, Mesler and the straw buyers to obtain mortgage loans through fraudulent means.  In arguing that the evidence, at best, proved multiple conspiracies, Yeung attempts to break down her actions into a "series of bits" and focuses on the fact that the conspiracy was executed through consummating five separate loan transactions.  However, Yeung's argument ignores all the commonalities in her scheme to obtain mortgage loans through identical fraudulent means.  Indeed, just as an ongoing single conspiracy to engage in drug trafficking can be executed through a number of separate drug transactions, Yeung's ongoing single conspiracy to obtain mortgage loans was executed through a series of separate loan transactions.  The existence of different transactions — which involved a changing

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

combination of conspirators — does not transform Yeung's single scheme to obtain mortgage loans into separate conspiracies.

## 1. The Conspiracy Was Characterized by a Single Common Objective

As a starting place, and establishing one of the criteria for a single overall conspiracy, the conspiracy that Yeung devised and executed was characterized by the single objective of obtaining mortgage loans from lenders through fraudulent means. The objective of each of the five loan transactions was the same: Obtaining a mortgage loan through fraudulent means. The conspiracy started when Yeung recruited Kenneth Zhang and Andie Louie to help her refinance 261 San Fernando Way when she was having difficulty paying the two high interest loans secured by the property. See TT at 293-294, 296 and 301-04. Yeung could not get a new lower interest loan with her bad credit score, so she used Zhang as a "straw buyer" to get the Washington Mutual loan. See id. at 305-11. At Yeung's direction, Zhang and Louie forged a Hang Seng Bank letter to verify the information listed on Zhang's loan application. Id. at 301-304. When the loan was approved and funded, Yeung benefitted by having the two problematic loans paid off, getting a new lower interest loan that was not in her name, pocketing $86,500 in cash, avoiding default, and positioning the property so that it could be used as collateral for three additional loans. Id. at 2039-40, 2044-46, 2052-55 and Government Exhibits 101-1 and 1007. In fact, once 261 San Fernando Way was stabilized, Yeung was able to obtain three loans totaling approximately $750,000 using the property as collateral; from those three loans, $393,121 went into her bank accounts. See generally TT at 2031-2121.

For each of the three straw buyer subsequent transactions, the objective was the same. Yeung wanted to invest in the then-rising California real estate market. She could only do so by obtaining mortgage loans, and she could only get those loans by the same fraudulent means that she used with Zhang. Therefore, in order to buy and hold the two properties in Gilroy, she found new straw buyers Andy Louie, Kenneth Ferrari, and

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

Lawrence Phung.  See id. at 1158-60, 1162, 1318-22 and 1553-56.  In each instance, she achieved her objective: mortgage loans were obtained and Yeung now controlled properties from which she planned to make a profit.  See id. at 628, 750 and 824.

Similarly, Yeung's objective with the second 261 San Fernando Way property was obtaining mortgage loans for her own financial benefit.  As shown through escrow file records and certified copies of default notices admitted into evidence, Yeung was in trouble on her existing loans on her home and was at risk of foreclosure.  See id. at 2089-91 and Government Exhibits 1113 to 1115.  Once again, she recruited a straw buyer – this time Dinh Lam – to obtain mortgage loans from lenders Chase and Cal State Nine Credit Union for her own financial benefit.  See TT at 2092-93.  When the loans were approved and funded, Yeung benefitted by having three other loans paid off, getting a new loan that was not in her name, pocketing $67,000 in cash, avoiding default, and remaining in her up-scale home.  See id. at 2094-96, 2097-99 and Government Exhibits 502-6, 502-18 and 1013.

### 2. Several Key Co-Conspirators Participated in Multiple Transactions in Furtherance of the Single Conspiracy

In order to make her argument that the government only proved multiple conspiracies, Yeung seizes on the fact that each transaction involved a different straw buyer and that not every co-conspirator was involved in every transaction.  However, this argument assumes more than the law requires.  As discussed above, a single conspiracy can consist of different participants over a period of time, and each participant does not necessarily have to know about all the other co-conspirators.  See Henson, supra, 123 F.3d at 1236.  Moreover, Yeung minimizes the evidence showing that key participants engaged in several transactions over a period of time with the common objective of obtaining mortgage loans through fraud for Yeung's, and hopefully their own, financial benefit.

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

1    However, this is not some case where the defendant participated in a discrete
2    transaction and is now arguing after conviction that she had no idea that there was a larger
3    conspiracy in place.  Here, the evidence clearly showed that Yeung herself came up with
4    the idea of getting loans by using straw buyers, and then played a key role in each
5    transaction as the scheme was executed.  Alex Yee, Kenneth Zhang, Andy Louie, Ken
6    Ferrari and Lawrence Phung each testified that Yeung was the driving force behind each
7    transaction.  See TT at 293-96, 612-13, 1158-60, 1162, 1324-27 and 1553-56.  Yeung
8    decided to refinance 261 San Fernando Way by using Zhang and Lam as straw buyers.
9    Id. at 293-96.  She came up with the idea of buying the Third Street property and using
10   Louie as the straw buyer to do so.  See id. at 1158-60.  She told Alex Yee that she needed
11   a second straw buyer for Third Street when Louie wanted out.  See id. at 1318-22.  She
12   recruited Phung to be the straw buyer for the Pitlochry loan and Lam for the second 261
13   San Fernando Way transaction.  See id. at 1553-56 and 908-910.  Yeung knew in each
14   case that false information was being submitted to the lenders as to the identity of the true
15   borrower, that is, the person who was going to be responsible for making the loan
16   payments.  Furthermore, the testimony of Yee, Zhang, Louie, Phung, Varney and
17   Armendariz established that Yeung knew and approved of other false information
18   submitted in connection with the loan applications.  See id. at 301-04, 651-52, 1133-40,
19   1180-84, 1490-91, 1595-96.  The false information about the straw buyer's supposed
20   assets held in an account at Hang Seng Bank in four of the five loan transactions is the
21   most blatant of those lies.
22        The proof established beyond a reasonable doubt that Yeung's participation
23   stretched across all five fraudulent loan transactions, thereby showing that this was a
24   single conspiracy.  In addition, Yee acted as loan broker for the Louie, Ferrari, and Phung
25   loans.  TT at 612-19, 707-13 and 769-76.  He was also involved in the conspiracy to use
26   Lam as a straw buyer in order to obtain the second fraudulent mortgage loan on 261 San

27   CR 09-376 (SI)
28   UNITED STATES' OPPOSITION
     TO DEFENDANT'S POSTTRIAL MOTION

27

Fernando Way. Yee testified that in the summer and early fall of 2006, when Yeung was in trouble on existing loans on the property, she sought out Yee to broker yet another loan and proposed Lam as the straw buyer. TT at 908-910. Yee went as far as preparing documentation and submitting information to at least one lender, but ended up withdrawing before a loan could be obtained. Id. at 905, 910, 931-37 and Government Exhibit 900-1. The government introduced evidence that several months after Yee withdrew, Chase and Cal State Nine Credit Union issued loans to borrower Lam using 261 San Fernando Way as collateral. See, e.g., Government Exhibits 500-3 and 501-8. Thus, even though Yee did not participate in the final loan that Yeung and Lam apparently obtained together, he was certainly a participant, at one point in time, in the conspiracy to obtain a mortgage loan in Lam's name for Yeung's benefit.

Furthermore, other co-conspirators' participation in the conspiracy stretched over time and transactions. Louie testified that he helped manufacture the fake Hang Seng Bank letter submitted in support of the Zhang loan; he participated in obtaining a loan in his own name to purchase Third Street and manufactured another fake Hang Seng Bank letter in support of that loan; and he helped manufacture yet another Hang Seng Bank letter to support the Phung loan so that Yeung could purchase the Pitlochry property. TT at 1133-1140, 1158-60, 1199-1202. Finally, Yee testified that Rick Mesler, one of their broker colleagues, participated in processing the Ferrari and Phung loan applications. Id. at 721 and 812. Ferrari corroborated that Mesler was fully involved in coming up with the false information and supporting documentation for his loan. Id. at 1340-4, 1345-48.

### 3. The Method of Operation Remained Strikingly Consistent Throughout Execution of the Conspiracy

The single continuing conspiracy is also established by the fact that the modus operandi for the five loan transactions remained constant – even identical – throughout. First, Yeung recruited or used Yee to recruit a straw buyer with good credit. Second,

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

Yeung together with her co-conspirators submitted a loan application in the name of the straw buyer that materially inflated the straw buyer's creditworthiness by falsifying employment, income and asset information as well as the buyer's intent to live in the property in question.  For example, because the asset information for each loan had to be verified, the common thread of the fake Hang Seng Bank letter materialized.  See, e.g., TT at 301-04, 1180-84, 813 and Government Exhibits 100-6, 903 and 500-9.  This distinct common denominator, which Yeung fails to address, is one of the most telling indicia of a single overall conspiracy as opposed to multiple conspiracies. In addition, the proof also established that Yeung had nearly identical arrangements with each of the straw buyers.  Zhang, Louie, and Phung testified that Yeung recruited them to act as straw buyers and use their credit so that she could get a mortgage loan; she told them that she had bad credit and could not get the loan in her own name; she told them that she would make the loan payments and they would have no responsibility for doing so.  TT at 293-96, 1133-40 and 1553-56.  In one instance, Yeung even reduced the agreement to writing and signed a contract with Phung stating the terms described above.  See Government's Exhibit 406.  Yee corroborated the testimony of Louie and Phung, and testified that he had the same discussions and understanding with Yeung about those loans.  TT at 612-19 and 769-76.  Yeung's arrangement with Ferrari was the same.  Id. at 709-713.

### 4. Yeung Clearly Knew that Her Benefits Were Probably Dependent on the Success of the Operation

The evidence was more than sufficient for the jury to find that Yeung knew of the participation of her co-conspirators Yee, Mesler, Zhang, Louie, Ferrari, Phung, and Lam.  Indeed, the evidence showed the Yeung was the organizer and leader of this conspiracy, and that she recruited Yee as well as all of the straw buyers.  For his part, Yee clearly knew about the participation of his co-worker Mesler as well as straw buyers Louie, Ferrari, Phung, and Lam.  Id. at 721, 812, 612-19, 769-76, 908-10.  Louie knew about

Zhang and knew that Yeung had arranged to get him off his own loan by finding, as he put it, "another Andy Louie," i.e. Ferrari.  TT at 1196.  Louie also assisted Yeung with the Phung transaction by forging a Hang Seng Bank letter to verify the information listed on Phung's loan April 2, 2010 application.  TT at 1199-1202.  Thus, the fact that a number of the co-conspirators knew about each other and what they were doing with Yeung further underscores the existence of a single overall conspiracy.

In addition, the evidence could not have been more clear that Yeung fully understood that for her and others to benefit from the conspiracy to obtain mortgage loans, the efforts to obtain mortgage loans had to be successful.  If the Zhang loan in March 2005 had not been successful, Yeung would not have stabilized her tenuous situation with 261 San Fernando Way, would not have realized a cash profit, and would not have been able to use the property as collateral for new loans.  TT at 295, 2040-42, 2044-53, 2061-62.  Zhang knew that his hope of recovering some of the money Yeung owed him would not be realized unless the loan came through.  TT at 294, 295-96, 306, 313-14.

Similarly, in mid-2006, when Yeung asked Yee to use Lam as a straw buyer for another loan secured by 261 San Fernando Way, she was in trouble again with loans secured by the property.  TT at 2089-91 and Government Exhibits 1113 and 1115.  If the Lam loan had not been successful, Yeung would not have stabilized her situation, would not have realized a cash profit, and would not have been able to remain living in her home.  TT at 2094-99 and Government Exhibits 502-18, 1013 and 502-6.

The same desire for financial benefit motivated Yeung's desire to purchase the two properties in Gilroy.  Yee, Louie, and Phung all testified that her plan was to acquire control of the properties and then sell them at a profit in a few months as the real estate market continued to climb.  TT at 1163-64, 612 and 1553-56.  Thus, if the Louie and Phung loans had not been successful, Yeung would not have been in a position to make a

profit in the real estate market.  If the Ferrari loan had not closed, she could have lost Third Street.

Furthermore, Yeung well knew that her other co-conspirators would not benefit unless the operation was successful.  Yee and Mesler would not make commissions on the loans on which they worked unless the loans were approved and funded.   Furthermore, Yee testified that Yeung led him to believe that if he remained successful in getting the loans that she sought, she would use him and his employer, Chartered Financial, as the sole loan brokers for a residential building project in the Hunters Point area of San Francisco, thereby resulting in immensely valuable commissions.  Louie, as Zhang, testified that Yeung led him to believe that if his loan was approved, she would pay him some of the back pay owed.  TT at 1131 and 293-94.  Ferrari understood that if his loan application was approved and funded, Yeung would pay him $20,000.  TT at 1318-22 and 1338.  Yeung acknowledged as much during a tape-recorded telephone conversation with Ferrari.  Government Exhibits 604, 606 and 608.  Finally, Phung testified that at one point, Yeung promised to pay him if the loan went through.  TT at 1555-56.  His testimony is corroborated by his written contract with Yeung, which was admitted into evidence and  states that Yeung would pay him $20,000.  See Government Exhibit 406.

### 5. Yeung's Variance Argument Is Without Merit

As stated above, the evidence proved beyond a reasonable doubt the existence of the single conspiracy charged in the Superseding Indictment.  In her effort to argue otherwise, Yeung relies heavily on Kotteakos v. United States, 328 U.S. 750 (1946).  Yet when examined as a whole, the evidence here is distinguishable.  In Kotteakos, the indictment named thirty-two defendants as co-conspirators in a single conspiracy to obtain loans from financial institutions by providing false and fraudulent information.  Id. at 1242-43.  Three of the convicted defendants argued on appeal that the evidence proved numerous conspiracies, not one.  They argued that there was only one key figure in the

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

conspiracy – a man named Brown – who acted as broker in placing the loans, and that they, as conspirators of Brown, acted independently of each other. Id. at 753-54. The Court found that the evidence showed that the three petitioners had engaged in separate, discrete transactions with the broker, and that they had nothing to do with each other. Id. at 754. The Court agreed, finding that "there were at least eight, and perhaps more, separate and independent groups, none of which had any connection with any other, though all dealt independently with Brown as their agent." Id. 754-55 (internal quotations omitted). On appeal, the government conceded as much, characterizing the pattern as "that of separate spokes meeting at a common center, though we may add without the rim of the wheel to enclose the spokes." Id. at 755 (internal quotations omitted). The Court thus found that the proof made out a case not of a single conspiracy, but of several conspiracies. Id.

Kotteakos does not support the Yeung's argument. Here, the government proved beyond a reasonable doubt that Yeung was the common denominator; she was the instigator, director, and ultimate beneficiary of the overall scheme and of each transaction through which the scheme was executed. Yeung's participation in these roles spanned the entire course of the conspiracy. Furthermore, Yeung was not the only conspirator whose participation stretched over multiple transactions. As shown above, Yee was involved in four loan efforts in furtherance of the conspiracy; Mesler participated in at least three; and Louie participated in three. The single objective of obtaining mortgage loans for Yeung, so that she could then use the property secured by those loans for her financial benefit, remained constant throughout the conspiracy. Importantly, the method of executing the conspiracy remained constant and spanned the entire conspiracy. This included the use of straw buyers in each transaction and the same fake Hang Seng Bank account in four of the five transactions. In addition, Yeung knew that for her to benefit, she and her co-conspirators needed to be successful. Thus, in contrast to the facts in Kotteakos, Yeung's

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

role was common to, and woven throughout, the various transactions undertaken to execute Yeung's scheme, thereby binding the scheme into one overall conspiracy.

In light of all of the above, there was more than sufficient evidence for a rational juror to find beyond a reasonable doubt that the single conspiracy charged in the indictment existed. Similarly, and as described at length in the Summary of Evidence, and in the argument above, there was more than sufficient evidence for a rational juror to find beyond a reasonable doubt that a single scheme to defraud lenders existed.

Yeung's final argument — that the government's witnesses are all lying — should be rejected. The government's witnesses corroborated each other; they were in turn corroborated by independent evidence such multiple recordings of Yeung's conversations with Ferrari and Zhang, the independent testimony of Varney and Armendariz, the written contract between Yeung and Phung, as well as bank records showing Yeung's involvement in each of the transactions and motive for the scheme.

**B. Yeung Has Failed to Meet Her Burden of Establishing That She Was Prejudiced by the Alleged Variance**

As shown above, there was no variance between what was alleged and what was proved at trial. Moreover, even if a defendant is able to establish a variance, that does not end the inquiry. A variance only warrants a new trial if the defendant can establish that she was prejudiced by the variance. Yeung has failed to meet that burden here.

A variance warrants a judgment of acquittal (or a reversal of a judgment of conviction) only if it "affects the substantial rights" of the defendant. United States v. Duran, 189 F.3d 1071, 1081 (9th Cir. 1999). In Kotteakos, 328 U.S. 750 (1946), the Supreme Court addressed the issue of prejudice after it found that the evidence established multiple conspiracies as opposed to the single conspiracy alleged in the indictment. Id. at 754-55. After examining the roles of the petitioners in the various components of the numerous separate conspiracies, the Court came to the conclusion that

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

1  the variance prejudiced the petitioners.  That is, the error permitted the jury to find each

2  defendant guilty of a conspiracy with thirty-five other potential co-conspirators, and that

3  error affected their substantial rights not to be tried "en masse for the conglomeration of

4  distinct and separate offenses committed by others..."  Id. at 769, 775.

5       In reaching this conclusion, the Supreme Court took pains to distinguish its earlier

6  holding in Berger v. United States, 295 U.S. 78 (1935), where it found that "the variance

7  was not fatal where one conspiracy was charged and two were proved, relating to

8  contemporaneous transactions involving counterfeit money."  Kotteakos, at 756.  In

9  Berger, four people were charged with one conspiracy.  The Court found that two

10  conspiracies existed, and that the petitioner only participated in one of the two

11  conspiracies.  Nonetheless, the Berger Court found that the variance was not prejudicial

12  to the petitioner.  Id. at 757.  In finding that the variance was prejudicial under the

13  Kotteakos facts, but not under those in Berger, the Kotteakos Court stated that "the sheer

14  difference in numbers, both of defendants and of conspiracies proven, distinguishes the

15  situation."  Id. at 766.  "Obviously, the burden of defense to a defendant, connected with

16  one or a few of so many distinct transactions, is vastly different not only in preparation

17  for trial, but also in looking out for and securing safeguard against evidence affecting

18  other defendants, to prevent transference as 'harmless error' or by psychological effect, in

19  spite of instructions for keeping separate transactions separate."  Id.

20       The Kotteakos analysis is instructive and applicable here.  First, not every

21  conspiracy / multiple conspiracy variance results in prejudice to the defendant.  Second,

22  the Kotteakos Court made it clear that its finding of prejudice was driven by the

23  difference in the magnitude of the alleged conspiracy and the relative positions of each

24  petitioner within the scope of the conspiracy.  The key was the prejudice that a defendant

25  in the position of one of the Kotteakos petitioners could suffer as a result of the spillover

26  effect from the presentation of evidence pertaining to the entire conspiracy, many

27
28  CR 09-376 (SI)
    UNITED STATES' OPPOSITION
    TO DEFENDANT'S POSTTRIAL MOTION

1  components of which did not relate to the petitioner.  See, e.g., United States v. Duran,

2  189 F.3d 1071, 1081-83 (9th Cir. 1999)(finding that even though the evidence at trial

3  established two separate drug conspiracies instead of the single conspiracy charged, there

4  was no prejudice to the petitioning defendants who had nothing to do with one

5  conspiracy, holding that the evidence of each conspiracy could be compartmentalized and

6  therefore, the case was closer to Berger than in Kotteakos).

7      With the issue framed as the danger of the spillover effect when a defendant

8  complains of an alleged single conspiracy / multiple conspiracy variance, it becomes even

9  more critical to examine the role of the complaining defendant.  The Ninth Circuit

10  recognized this in United States v. Moore, 522 F.2d 1068 (1975).  In Moore, five

11  defendants were charged with a single conspiracy to steal, conceal, and sell United States

12  property.  Id. at 1071.  The appellant argued that the evidence at trial did not prove a

13  single conspiracy, but instead proved three smaller conspiracies: one consisting of himself

14  and defendant H; one with himself and defendant P; and one with himself and defendants

15  M and R.  The appellant argued that this variance required reversal.  In rejecting

16  appellant's claim, the Court stated that even if it were to find that his interpretation of the

17  evidence was correct, "he would be unable to show, as he must, that he was prejudiced by

18  the variance."  Id. at 1074.  This was because '[u]nder the appellant's own view of the

19  evidence, he was the central figure in each of the alleged three smaller conspiracies."  Id.

20  "Consequently, unlike the situation presented in Kotteakos [citation omitted], upon which

21  the appellant relies, he was not subjected to the danger that he might be convicted on the

22  basis of evidence that related only to a conspiracy of which he was not a part."  Id.

23      Moore is directly applicable to Yeung.  As discussed at length above, the evidence

24  clearly established that she was not only involved in each of the five transactions that she

25  and her conspirators executed in furtherance of the conspiracy, she was the instigator,

26  director, and ultimate beneficiary in each transaction and the overall conspiracy.

27
28

1    Accordingly, even if she was able to show – as she argues – that there were actually three

2    separate conspiracies here: one with her and Zhang and Louie; one with her and Yee,

3    Mesler, Louie, Ferrari, and Phung; and one with her and Lam, she cannot meet her burden

4    of showing that she was prejudiced by the spillover effect of introducing evidence about

5    conspiracies to which she was not a party.  See also, United States v. Anguiano, 873 F.2d

6    1314, 1317-18 (9th Cir. 1989)(finding no prejudice to the defendant when the evidence

7    proved two drug conspiracies instead of the single conspiracy charged due to the fact that

8    the defendant was common to each conspiracy and stood trial alone: "[t]here is no

9    problem of spillover when, as in this case, the defendant stands trial alone").

10        Yeung's other claims of prejudice are similarly unpersuasive.  First, her

11   speculation that if she had been charged with multiple conspiracies, it is less likely that

12   she would have been convicted on all the wire fraud counts is a variation of the spillover

13   argument, which simply does not apply here.  Furthermore, the Court properly instructed

14   the jury that each wire fraud count was to be considered separately, and that the verdict

15   on one count should not control the verdict on any other count.  TT at 2310: 19-22.  There

16   is no reason to believe that the jury did not follow that instruction.  See Richardson v.

17   March, 481 U.S. 200, 211 (1987) (jurors are presumed to follow instructions given to

18   them by Court); United States v. Nelson, 137 F.3d 1094, 1107 (9th Cir.), cert. denied, 525

19   U.S. 901 (1998) (same).  If the jury found, as Yeung argues, that there was insufficient

20   evidence of Yeung's involvement in the 261 San Fernando Way transaction involving

21   Lam – despite Yee's testimony, the proof that she pocketed $67,000 from the transaction,

22   three of her loans were paid off, and the Hang Seng Bank account number used in her

23   other loans appeared on Lam's loan applications – there is no reason why the jury could

24   not have returned a not guilty verdict on the specific wire fraud count associated with that

25   transaction.

26        Second, Yeung's argument that there was a danger that the jury convicted her on

27

28   CR 09-376 (SI)
     UNITED STATES' OPPOSITION
     TO DEFENDANT'S POSTTRIAL MOTION

the conspiracy and wire fraud counts without reaching a verdict on what crime, if any, she committed, simply makes no sense.  It is well established that a conspiracy is an agreement to commit a crime.  The government is not required to prove that any substantive crime was committed.  As discussed above, there was more than sufficient evidence for the jury to find beyond a reasonable doubt that Yeung agreed with one or more persons to obtain loans by fraud and that it was foreseeable that interstate wires would be utilized in furtherance of that objective.  Those are the elements of the conspiracy charge on which the jury would have to be unanimous.

Furthermore, as Yeung acknowledges, the jury was correctly charged by the Court that they were only to determine whether the defendant was guilty or not guilty of the charged crimes, and that she was not on trial for conduct or offenses not charged in the indictment.  TT at 2310: 8 -12.  In addition, the Court properly instructed the jury that Yeung was charged with a conspiracy to commit wire fraud that took place over the course of December 2004 through January 2007, see TT at 2314: 18-25, 2315: 1-3; that they must find that there was a plan to commit one of the crimes alleged, with all agreeing on the particular crime that the conspirators agreed to commit, see TT at 2315: 17-20; and that unless the jury found that the conspiracy, as explained by the Court, actually existed, then they must acquit her of the conspiracy charge.  See TT at 2316: 12-14.  Again, given the nature of the evidence presented about the overall conspiracy and the separate loan transactions that were executed in furtherance of the conspiracy, there is no reason to believe that the jurors were not able to, and did not, follow these instructions, or that their deliberations would have led to a different result if the government had charged multiple conspiracies instead of a single conspiracy.

Finally, Yeung claims that she was prejudiced by the alleged variance because if the case had been charged as multiple conspiracies, then the evidence about how she used the 261 San Fernando Way property as collateral for additional, non-fraudulent loans

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

would not have been admissible.  This argument also fails.  As discussed further below, the evidence that Yeung used the San Fernando Way property as collateral in order to pocket $393,121 from additional loans is directly tied to the Zhang and Lam straw buyer transactions.  The Zhang loan stabilized Yeung's position sufficiently so that she could use the property as collateral to drain out more equity; she engaged in the Lam loan in order to pay off the Zhang and subsequent loans coming due on the property.  The evidence of the additional loans explains Yeung's motive for engaging in the Zhang and Lam loans, and furthered the objectives of her scheme.  Thus, even if the fraudulent transactions that Yeung executed with Zhang and Lam had been charged as separate conspiracies, there is no reason to think that the evidence of the intermediate loans would have been inadmissible.

In sum, Yeung has failed to show either that there was insufficient evidence for the jury to have found that she and others engaged in a single conspiracy, or that she was prejudiced by the variance that she alleges.  Accordingly, her motion for acquittal or new trial on these grounds should be denied.

## VI.  A NEW TRIAL ON COUNT TEN IS UNWARRANTED

Yeung asserts that the weight of the evidence in support of the witness tampering charged in Count Ten was insufficient to support the jury's verdict for two reasons.  First, Yeung argues Louie was not a credible witness.  In the alternative, Yeung asks for a new trial on the basis that the jury's verdict on this Count may have been based on evidence that she instructed Louie to keep his answers "short and sweet" rather than the evidence that she instructed Louie to lie to the FBI.  For the reasons set forth below, the government respectfully submits that neither argument has merit.

**A.    The Court Should Not Second-Guess The Jury's Assessment of Louie's Credibility**

The defense concedes, as it must, that Louie testified Yeung instructed him to lie

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

1     to the FBI about the forged Hang Seng Bank letters that they created in furtherance of

2     their scheme to defraud mortgage lenders.  See Defendant's Brief at 22:3-4, citing TT at

3     1224:19-23.  See also TT at 1226:5-27:1.  However, Yeung now argues that a new trial is

4     necessary on Count Ten because Louie's testimony was "inconsistent and not credible."

5             In support of her contention that Louie's testimony was not credible, Yeung

6     primarily relies on the fact that, during trial, Louie initially testified that he could not

7     remember if he lied to the FBI about the Hang Seng Bank letters during his first meeting

8     (before he met with Yeung for advice) or his second meeting (after his meeting with the

9     defendant.  See TT at 1220:10-1221:8.  Louie went on to testify that immediately after his

10    first meeting with the FBI, he was worried about the forged Hang Seng Bank letters and

11    met with Yeung to discuss what he should say to the FBI.  Id. at 1223:9-23; 1226:5-23.

12    Louie testified that he met with Yeung at her home at 261 San Fernando Way, and that

13    during this meeting she told him to lie to the FBI about the Hang Seng Bank letters.

14    Specifically, Yeung instructed Louie to say that he did know anything about the letters if

15    the FBI asked him about them.  Id. at 1224:19-1225:4.  The government then asked Louie

16    once again whether, to the best of his memory, the FBI brought up the subject of the

17    Hang Seng Bank letters during the first meeting, and Louie testified that he believed that

18    took place during the second meeting.  Id. at 1225.

19            Yeung also suggests that the Court should reject Louie's testimony because he

20    concealed the defendant's witness tampering until he received immunity from the

21    government for his fraudulent acts.  See Defendant's Brief at 22:24, citing TT 1252:11-

22    22.  This argument distorts the factual record.  As the defense well knows, Louie admitted

23    during an interview with the FBI as early as June 16, 2008 that he had lied during earlier

24    meetings in order to protect Yeung.  During the same meeting, Louie informed the FBI

25    that he had met with Yeung after his first contact with the FBI, and that Yeung had

26    instructed him not to mention her to the FBI.  Subsequently, Louie obtained counsel and

27    CR 09-376 (SI)

28    UNITED STATES' OPPOSITION
      TO DEFENDANT'S POSTTRIAL MOTION

                                              39

met with the FBI on March 25, 2009; during this interview, Louie disclosed that Yeung had instructed him to lie to the FBI about the Hang Seng Bank letters.[6]  It was not until April 1, 2009 that the government and Mr. Louie executed a non-prosecution agreement.  See Government Exhibit 702.  It is therefore factually incorrect to suggest that Louie did not inform the FBI of Yeung's witness tampering until after the government agreed not to prosecute him for his involvement in Yeung's mortgage fraud scheme.

In any event, the government respectfully submits the Court should reject the defendant's request for a new trial on Count Ten based on the claim that Louie's testimony was not credible.  To begin with, the fact that Louie initially testified that he could not remember whether he lied to the FBI about the forged letters during his first meeting does not logically require one to conclude that he perjured himself (or that he was mistaken) when subsequently testifying that Yeung instructed him to lie to the FBI if they asked him again about the letters.  A full reading of that portion of the trial record indicates that while Louie was initially unclear of the precise chronology of events relating to his early FBI interviews (which took place in 2007), he was able upon further questioning to recall more clearly the timing of the pertinent events.  See TT 1224-26.  Indeed, the fact that the jury convicted Yeung on Count Ten indicates that they viewed Louie as a credible witness who did his best to remember events accurately and to truthfully answer questions.

In addition, the defendant's argument completely ignores the fact that Louie's testimony was corroborated by the defendant's own recorded statements.  For example, the defendant told Zhang "So Andy set aside one day for him [the FBI agent].  Before going there, he came over here."  Government Exhibit 601 at 44.  She also stated: "The other days, I, ah ah Janet and Andy, we challenged each other for three hours. . . .  Andy

---

[6]  The defense was provided with FBI reports of these interviews well before trial.

asked questions; Janet and I coached him." Id. at 79-80.  Yeung also told Zhang: "Do

like Andy, let me know right after your interview to let me know what had been asked . . .

. He said, 'Auntie, the things he asked me were exactly the same as the things you and

Janet taught me last night.'" Id. at 115-16.  As the government argued at trial, these

recordings squarely corroborated Louie's testimony that he met with Yeung after his

contact with the FBI and that Yeung instructed Louie to lie to the FBI.  See, e.g., TT at

2361.  Louie is also corroborated by the evidence (consisting of the defendant's own tape-

recorded statements to Zhang) that Yeung repeatedly instructed Zhang to lie to the FBI

about the forged Hang Seng Bank letters as well.

     The fact is that Louie disclosed Yeung's witness tampering to the FBI as soon as

he was represented by counsel, that he testified at trial in a manner consistent with his

pre-trial interviews with the FBI, and that he is corroborated by independent evidence

such as the consensually-recorded conversations between Zhang and Yeung.  The

government submits that the jury watched and listened to Louie as he was examined by

both the government and defense counsel.  The arguments that defense counsel makes to

the Court now about Louie's credibility are the same that were presented to the jury.  See,

e.g., TT at 2372 (arguing that all of the government's witnesses lied); 2378:19-2379:10

(arguing that jury should disregard Louie's testimony); 2389:15-25 (same); 2392:18-

2393:10 (same); 2407:4-2409:4 (same).  The jury reviewed the evidence in its totality,

considered the defendant's arguments relating to Louie's credibility and found the

defendant guilty of Count Ten.  The Court should not now second-guess the jury on the

issue of whether Louie was credible.  As the Supreme Court explained long ago, the

determination of whether a witness is to believed belongs properly to the jury:

> The jury were the judges of the credibility of the witnesses. . . and in weighing
> their testimony had the right to determine how much dependence was to be placed
> upon it.  There are many things sometimes in the conduct of a witness upon the
> stand, and sometimes in the mode in which he answers are drawn from him
> through the questioning of counsel, by which a jury are to be guided in

determining the weight and credibility of his testimony.  That part of every case, such as the one at bar, belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men; and, so long as we have jury trials, they should not be disturbed in their possession of it, except in a case of manifest and extreme abuse of their function.

Aetna Life Insurance Co. V. Ward, 140 U.S. 76, 88 (1891) (cited with approval in Sartor et al. v. Arkansas Natural Gas Corp., 321 U.S. 620, 628 (1944).  Under these circumstances, we submit that the Court should heed the well-established case law establishing that "[t]he credibility of the witnesses is solely within the province of the jury."  See United States v. Schoneberg, 396 F.3d 1036, 1043 (9th Cir. 2005) (citing United States v. Geston, 299 F.3d 1130, 1136 (9th Cir. 2002) and United States v. Sanchez-Lima, 161 F.3d 545, 548 (9th Cir. 1998)).

**B.    There Is No Risk The Jury Rendered Its Verdict Based On Evidence Of The Defendant's Non-Coercive Attempts To Persuade Louie To Withhold Information From The FBI**

Yeung also argues that a new trial should be held with regard to Count Ten because Louie testified that in addition to telling him to lie to the FBI about the Hang Seng Bank letters, Yeung instructed him to keep his answers "short and sweet."  TT at 1229.  Arguing that the Ninth Circuit has not conclusively ruled that "non-coercive attempts to persuade a witness not to disclose information to law enforcement officials" amount to a violation of Title 18, United States Code, Section 1512(b)(3), the defendant claims that it is unclear whether the jury found the defendant guilty based on her instructions to Louie that he should lie to the FBI or her instructions that Louie should keep his answers "short and sweet."

The Court specifically addressed the issue of whether non-coercive attempts to persuade a witness not to disclose information to law enforcement violates Section 1512(b)(3) during the charge conference held on January 28, 2010.  See TT at 2227-29.  At the defendant's suggestion, see TT 2230, the Court instructed the jury that the government needed to establish "more on the part of Ms. Yeung than simply attempting

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

to discourage a witness from disclosing information to the Government in order to hinder an investigation.  In other words, to be guilty under this section, a defendant must actively persuade another to provide false information in order to hinder and prevent a Government investigation."  TT at 2322:3-9.  The Court went on to instruct the jury at Yeung's request in the following sentence that "In order to return a guilty verdict on any of these [witness tampering] counts, all jurors must unanimously agree on at least one specific act of intimidation, threat or corrupt persuasion as alleged . . . in the count you are considering.  It is not enough, for example, that six of you agree that one action violates the statute and six of you agree that a different action violates the statute."  TT at 2322:10-16.

There is no basis to conclude that the jury failed to follow or was confused by the Court's instructions.  At no point did the government suggest that the jury should convict on this count based on Yeung's statements to Louie to the effect that he should keep his statements to the FBI "short and sweet."  To the contrary, during closing arguments, the government unambiguously argued that Yeung should be found guilty of Count Ten because she told Louie to lie to the FBI about the Hang Seng Bank letters.  See TT at 2361.  Simply because the record included some evidence that Yeung told Louie to keep his answers "short and sweet" does not somehow suggest that the jury likely convicted Louie on this evidence rather than on the evidence that Yeung instructed Louie to lie to the FBI about the forged bank letters.

## VII.
## THE COURT CORRECTLY ADMITTED EVIDENCE OF THE INTERMEDIATE 261 SAN FERNANDO WAY LOANS

The Superseding Indictment alleges that, in furtherance of the charged wire fraud conspiracy, Yeung obtained three loans using the 261 San Fernando Way property as collateral between June 2005 and June 2006 (collectively, the "Intermediate 261 Loans"), and then paid off those loans with the proceeds of the second 261 San Fernando Way

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

straw buyer transaction.  SI ¶¶ 8(g) and 8(w).  As discussed above, the government established at trial that the Zhang transaction stabilized Yeung's grip on her home at 261 San Fernando Way, and the Intermediate 261 Loans then provided Yeung with a source of cash after the Zhang transaction was completed.  Yeung pocketed some of that cash, and used some of it to maintain control over the 261 San Fernando Way property until she found another straw buyer (Dinh Lam) to whom she could "sell" the property at a significant profit.  The government also proved that Yeung used the proceeds of the Lam transaction to pay off the remaining Intermediate 261 Loans.  Yeung now argues that the government should not have been permitted to introduce any evidence relating to the Intermediate 261 Loans.

**A.  Summary of the Intermediate 261 Loan Evidence**

As the government proved at trial, Yeung fraudulently refinanced her home at 261 San Fernando Way in March 2005 by using Zhang as a straw buyer and by making materially false statements on his loan application.  See TT at 299-318, 2034-35, 2044-53.  This loan allowed Yeung to pay the more than $1.2 million debt in high interest rate mortgage loans with lenders BayMark Financial and Roberts Realty, and to replace these loans with a lower interest rate loan in Zhang's name.  See id. at 295, 2044-53 and Government Exhibits 101-3, 101-4, and 101-16.  The Zhang transaction also made it possible for Yeung to secure the Intermediate 261 Loans — loans which both profited Yeung and allowed her to maintain control of the 261 San Fernando Way property.

In June 2005, shortly after the Zhang refinance transaction closed, Yeung obtained a loan of $250,000 from Saxe Mortgage Co. ("Saxe Loan") by using the 261 San Fernando Way property as collateral.  See TT at 2061-62 and Government Exhibits 809-4 and 809-1.  After deducting various fees, $244,121.77 from the Saxe Loan was deposited into Yeung's bank account.  See TT at 2062-65 and Government Exhibits 1009 and 1023.  These funds were withdrawn from the bank account within nine days, leaving a zero

1    balance.  Id.

2          As the Saxe Loan was outstanding, Yeung along with her husband Mike Farrell

3    took out another loan in November 2005 from Cal State 9 Credit Union of $300,000 ("Cal

4    State Loan").  See TT at 2067-68.  Yeung used $253,793.16 of Cal State Loan proceeds to

5    pay off the Saxe Loan while pocketing another $29,045.34.  See TT at 2069-70 and

6    Government Exhibits 1009 and 1023.

7          In March 2006, Washington Mutual took steps to foreclose on the 261 San

8    Fernando Way property because Yeung had failed to make payments on the Zhang loan.

9    See TT at 2076-77 and Government Exhibit 1112.  Soon after receiving this notice, in

10   June 2006, Yeung secured the third Intermediate 261 Loan from Nishen "Nick" Fu of

11   $200,000 ("Nishen Fu Loan").  See TT at 2078-79.  Yeung used $50,928.19 of the Nishen

12   Fu loan to make payments on the Zhang loan.  See id. at 2079 and Government Exhibit

13   812-8.  The remaining proceeds of $149,000 were deposited into Yeung's personal bank

14   account.  See id. at 2084 and Government Exhibits 1011 and 1019.  Still, Yeung did not

15   escape trouble with the 261 San Fernando Way property after securing the Nishen Fu

16   Loan.  Washington Mutual again filed a notice of default on the Zhang loan in October

17   2006.  See TT at 2089-90 and Government Exhibit 1113.  Shortly thereafter, Nishen Fu

18   filed a notice of default in December 2006.  See TT at 2090-91 and Government Exhibit

19   1115.

20         When Yeung began defaulting on both of these loans, she set up the final

21   fraudulent purchase sale transaction with Dinh Lam in January 2007.  Using Lam as a

22   straw buyer, Yeung was able to obtain a first mortgage loan from JP Morgan Chase Bank

23   of $1,732,500 and a second loan from Cal State 9 Credit Union of $467,500.  See TT at

24   2092-93.  Yeung used some these loan proceeds to pay off the remaining Intermediate

25   261 Loans.  See TT at 2095-96 and Government Exhibit 502-18.  Yeung pocketed the

26   surplus proceeds of approximately $67,000.  See TT at 2098-2099 and Government

27   CR 09-376 (SI)
28   UNITED STATES' OPPOSITION
     TO DEFENDANT'S POSTTRIAL MOTION

1   Exhibit 502-6 and 1013.  Some of those funds were used, in turn, to make a payment on

2   the Lam loans.  TT at 2106-2108.

3   **B.  The Intermediate 261 Loan Evidence Was Properly Admitted**

4           The Court properly admitted evidence relating to the Intermediate 261 Loans as

5   acts in furtherance of the charged mortgage fraud conspiracy.  As the government argued

6   to the jury at trial, the fraudulent Zhang loan allowed Yeung stabilize her grip on the 261

7   San Fernando Way property by replacing two high interest rate loans in her name with a

8   lower interest rate loan in Zhang's name.  This in turn allowed Yeung to take out the

9   Intermediate 261 Loans, which once again helped her to stay in the property and drain

10  money out of it.  See TT at 2012:3-2013:13.  The importance of the Intermediate 261

11  Loans is underscored by the Lam transaction, which allowed Yeung to pay off the Zhang

12  loan, the two remaining Intermediate 261 Loans, and also to pocket $67,000.  Had Yeung

13  not obtained the Intermediate 261 Loans, Washington Mutual would have foreclosed on

14  the Zhang loan and Yeung would not have been able to stay in her home or to profit from

15  the Lam transaction.  The fact that the Intermediate 261 Loans were not themselves

16  procured fraudulently does not alter the fact that they were important to the success of the

17  overarching conspiracy as charged in the Superseding Indictment.  Furthermore, the

18  existence of these loans and the threat of foreclosure on them established Yeung's motive

19  and intent to consummate both the Zhang and Lam straw buyer transactions.  Because the

20  Intermediate 261 Loans were acts in furtherance of the conspiracy, and because evidence

21  relating to these loans helped both to establish Yeung's motive for committing the

22  fraudulent scheme and to place the two 261 San Fernando Way transactions in context,

23  they were properly admitted at trial and were not prejudicial.  This evidence did not waste

24  time, did not confuse the jury and was not prior act evidence since it illustrated an integral

25  part of Yeung's scheme.

26  ///

27  CR 09-376 (SI)
28  UNITED STATES' OPPOSITION
    TO DEFENDANT'S POSTTRIAL MOTION

Finally, the Court should reject Yeung's argument that the Intermediate 261 Loans evidence was admitted as "prior bad act" evidence pursuant to Rule 404(b).  At no time did the government argue or suggest that the Intermediate 261 Loans were in themselves improper, or that it is illegal or improper to refinance one's property multiple times. Rather, the government admitted this evidence to show that these loans were part and parcel of a bigger scheme to defraud mortgage lenders by facilitating and funding those straw buyer transactions.  See United States v. Blitz, 151 F.3d 1002, 1007 (9th Cir. 1998) (introduction of bank records was not prejudicial because they "went to one of the central issues in this prosecution for mail and wire fraud - the existence of a scheme to defraud.") Moreover, these loans helped establish motive for the second straw buyer transaction and prove that Yeung knowingly engaged in a scheme to defraud by soliciting straw buyers to submit false information to lenders.   See United States v. Pichnarcik, 427 F.2d 1290, 1291 (9th Cir. 1970) (defendant's prior bankruptcy "was circumstantial evidence which tended to establish motive, intent, or design on the part of [defendant] in carrying out the alleged scheme to defraud" in mortgage financing application scheme and therefore not prejudicial.)  These are precisely the reasons why the government introduced the Intermediate 261 Loans at trial.  Therefore, they were properly admitted and Yeung is not entitled to a new trial.

///

///

///

///

///

///

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION

# VIII.  <u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that Yeung's motion for a judgment of acquittal and for a new trial should be denied.


DATED: April 9, 2010                    Respectfully submitted,



                                        JOSEPH P. RUSSONIELLO
                                        United States Attorney


                                        _____/s/_____
                                        SUSAN E. BADGER
                                        JEFFREY RABKIN
                                        Assistant United States Attorneys

CR 09-376 (SI)
UNITED STATES' OPPOSITION
TO DEFENDANT'S POSTTRIAL MOTION