1  JOSEPH P. RUSSONIELLO (CSBN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CSBN 163973)
3  Chief, Criminal Division

4  SUSAN E. BADGER (CSBN 124365)
   JEFFREY RABKIN (CSBN 189798)
5  Assistant United States Attorney

6     450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102
7     Telephone: (415) 436-7167
      Facsimile: (415) 436-7234
8     Email: jeffrey.rabkin@usdoj.gov

9  Attorneys for Plaintiff

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,        )    No. CR 09-376 SI
                                     )
15        Plaintiff,                 )    **UNITED STATES' SENTENCING
                                     )    MEMORANDUM**
16        v.                         )
                                     )    Date:  July 9, 2010
17  JUDY YEUNG,                      )    Time:  11:00 a.m.
        also known as "Miu Wan Yeung,"  )    Court: Hon. Susan Illston
18                                   )
19        Defendant.                 )
                                     )
20                                   )

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. BRIEF FACTUAL SUMMARY OF THE OFFENSE CONDUCT . . . . . . . . . . . . . . . . . . . . 2

III. GUIDELINES CALCULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV. CONTESTED SENTENCING ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   A. Applicable Standards of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   B. Loss Amount Calculations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.      The Long Beach Mortgage Ferrari Loans (Exhibit 1) . . . . . . . . . . . . . . . . . . . 7

        2.      The Cal State 9 Lam Loan (Exhibit 2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        3.      The Chase Lam Loan (Exhibit 3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        4.      The Silver State Phung Loan (Exhibit 4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        5.      The Total Loss Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   C. Aggravating Role Adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1

V.  SENTENCING RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2

3

A.  The Nature and Circumstances of the Offense  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

4

5

B.  Seriousness of the Offense and Need for General Detterence . . . . . . . . . . . . . . . . . . . . . 12

6

7

C.  The Need to Protect The Public From Further Crimes of the Defendant  . . . . . . . . . . . 13

8

9

D.  The Kinds of Sentences Available and the Applicable Sentencing Guideline Range . . . 14

10

11

E.  Other Characteristics of the Defendant: Health Issues  . . . . . . . . . . . . . . . . . . . . . . . . 14

12

13

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Harrison-Philpot*, 978 F.2d 1520 (9th Cir. 1992) . . . . . . . . . . . . . . . . . 4

*United States v. Hauptman*, 111 F.3d 48 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Howard*, 894 F.2d 1085 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Martin*, 455 F.3d 1227 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. McCormac*, 309 F.3d 623 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Riley*, 335 F.3d 919 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Staten*, 466 F.3d 708 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## STATUTES, RULES AND GUIDELINES

U.S.S.G. § 2B1.1, cmt. n.2(A) (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G. § 2B1.1, cmt. n 3(C) . . . . . . . . . . . . . . . . . : . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G. § 2B1.1, cmt. n.3(D)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S.S.G. § 2B1.1, cmt. n.3(E)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

1

U.S.S.G. § 3B1.1, cmt. n.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

2

3

U.S.S.G. § 3B1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. INTRODUCTION

The United States respectfully submits this Sentencing Memorandum pursuant to Federal Rule of Criminal Procedure 32 and Criminal Local Rule 32-5. Applying the relevant Sentencing Guidelines to this case, the United States agrees with the Department of Probation's Presentence Investigation Report ("PSR") that defendant Judy Yeung's total offense level is 29, that her criminal history category is I, and that her Guidelines range is 87-108 months.

For the reasons set forth below, the United States respectfully concurs with the Department of Probation's recommendation that a Guidelines sentence of 87 months imprisonment, to be followed by five years of supervised release, is appropriate in this case. The government also concurs with the PSR's calculation of restitution totaling $1,375,502.64. Finally, the government agrees with the Department of Probation that the defendant should be permitted to self-surrender to the Bureau of Prisons pursuant to Title 18, United States Code, Section 3143(b).[1]

# II. BRIEF FACTUAL SUMMARY OF THE OFFENSE CONDUCT

On February 2, 2010, a jury found the defendant guilty beyond a reasonable doubt of wire fraud conspiracy, in violation of Title 18, United States Code, Section 1349, eight counts of wire fraud, in violation of Title 18, United States Code, Section 1343, and three counts of witness tampering, in violation of Title 18, United States Code, Section 1512(b)(3). The defendant's offense conduct has been described in detail both in the government's opposition to the defendant's post-trial motion as well as the PSR, both of which are incorporated by reference. This Sentencing Memorandum will therefore only briefly summarize the defendant's pertinent offense conduct.

///

---

[1] The government is not seeking the defendant's immediate remand. Rather, we request that the Court allow the defendant to self-surrender by a date sufficient to allow the Bureau of Prisons to designate an appropriate facility, but in no event more than 90 days from the date of sentencing.

1   At trial, the government proved that the defendant was the organizer and leader of

2   a mortgage fraud conspiracy between approximately December 2004 and January 2007.

3   During this time, the defendant conspired with five straw buyers (Kenneth Zhang, Andy

4   Louie, Kenneth Ferrari, Lawrence Phung and Dinh Lam)[2] and two mortgage brokers

5   (Alex Yee and Richard Mesler) fraudulently to obtain mortgage loans from various

6   lenders in order to purchase and refinance residential properties within the Northern

7   District of California.   The defendant recruited the straw buyers (with the exception of

8   Ferrari, who was recruited by Yee) to use their good credit to obtain the loans in their

9   names.  The conspiracy included an agreement between the defendant and the straw

10  buyers that the defendant was the true purchaser, would be the in-fact owner of the

11  property, and would be solely responsible for making the mortgage payments.  By

12  submitting the loan applications in the names of the straw buyers, the defendant and her

13  co-conspirators provided misleading and materially false information to the lenders as to

14  the true identity of the borrower.  In addition, the defendant, together with other members

15  of the conspiracy, falsified information on the straw buyers' loan applications.  For

16  example, as the defendant well knew at the time, the straw buyers' loan applications

17  materially overstated their monthly income, falsified their employment information and/or

18  misstated their assets.

19  In addition, the government proved at trial that on three separate occasions, the

20  defendant committed witness tampering.  Once the defendant learned from Andy Louie

21  that he had been approached by the FBI, she instructed him to lie to the case agents.  In

22  addition, one two separate occasions the defendant attempted to convince Kenneth Zhang

23  to lie to the FBI.

24  ///

25  ///

26

27      [2] A "straw buyer" is a person who uses or allows his or her name and credit to be used

28  for the purchase of a property they never intend to pay for, use or control.

USA SENTENCING MEMORANDUM
CR 09-376 SI                              3

## III.  GUIDELINES CALCULATIONS

The United States agrees with the Department of Probation's calculation of the Guidelines as:

| | | |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(1): | 7 |
| b. | Loss amount over $1,000,000, U.S.S.G. § 2B1.2(b)(1)(I): | +16 |
| c. | Aggravating Role, U.S.S.G. § 3B1.1(c): | +4 |
| d. | Obstruction of Justice, U.S.S.G. § 3C1.1: | <u>+2</u> |
| e. | Adjusted offense level | 29 |

The defendant's criminal history category is I, resulting in a Guidelines range of 87 to 108 months imprisonment.

## IV.  CONTESTED SENTENCING ISSUES

Based on defense counsel's written objections to the Presentence Investigation Report, dated June 11, 2010, the government anticipates that both the loss amount and aggravating role enhancement will be contested issues at the defendant's sentencing.  We therefore address those issues in detail below.

A.  <u>Applicable Standards of Proof</u>

"[T]he party bearing the burden of proof will be required to meet a 'preponderance of the evidence' standard" on sentencing guidelines issues.  *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990).  *See also United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005); *but see United States v. Staten*, 466 F.3d 708, 717 (9th Cir. 2006) ("[T]he clear and convincing standard still pertains post-*Booker* for an enhancement applied by the district court that has an extremely disproportionate effect on the sentence imposed.") The government respectfully submits that, with the exception of the loss amount issue, the defendant's factual challenges to the Guidelines calculation should be resolved under the preponderance of the evidence standard.  *See, e.g., United States v. Riley*, 335 F.3d 919, 926 (9th Cir. 2003); *United States v. Harrison-Philpot*, 978 F.2d 1520, 1523-24 (9th Cir. 1992).  We also respectfully submit that the government is able to meet its burden of

1    proof regarding sentencing issues, such as loss amount, that the Court resolves under the

2    "clear and convincing" standard.

3        B.   <u>Loss Amount Calculations</u>

4          With regard to loss calculations, "loss is the greater of the actual or intended loss."

5    U.S.S.G. § 2B1.1, cmt. n.2(A) (2001); *United States v. McCormac*, 309 F.3d 623, 627 (9th

6    Cir. 2002). The Sentencing Guidelines specifically provide that "[t]he court need only

7    make a reasonable estimate of loss." U.S.S.G. § 2B1.1, cmt. n.3(C). As a general matter,

8    the proper loss calculation in a mortgage fraud case such as this one should be based on

9    the gross amount of the unpaid loan, less any funds recovered after foreclosure or short

10   sale. U.S.S.G. § 2B1.1, cmt. n.3(E)(ii) ("Loss shall be reduced by the following: ... In a

11   case involving collateral pledged or otherwise provided by the defendant, the amount the

12   victim has recovered at the time of sentencing from disposition of the collateral, or if the

13   collateral has not been disposed of by that time, the fair market value of the collateral at

14   the time of sentencing."). As the Court is aware, two of the five separate transactions

15   involved fraudulently procured loans that were then entirely paid off (Kenneth Zhang's

16   loan from Washington Mutual Bank and Andy Louie's loan from Long Beach Mortgage).

17   The loss figures set forth in the PSR and below therefore do not include these loans. As

18   will be explained in more detail below, based on information received from the victim

19   lenders, the government calculates the relevant loss amount to be $1,375,502.64.

20         The chart below summarizes the information that the government has received

21   from the lenders relating to the fraudulent loans in the names of straw buyers Ferrari,

22   Phung and Lam. In each case, the defendant failed to pay the mortgages taken out in the

23   names of the straw buyers, and the properties were sold in foreclosure or "short sale" for

24   an amount less than the amount of the mortgage loans.[3] In the case of three of the loans

25   (the two Ferrari loans and Phung's loan), investors purchased the loans after they were

---

[3] The government has provided defense counsel with extensive discovery relating its loss calculations, including FBI 302 interview reports, emails between FBI agents and lender representatives, as well as underlying bank records.

originated.  It was therefore these investors who suffered the loss when the loans defaulted.  For Ferrari's loan, the government has used the investors' purchase amount as the basis for calculating the loss amount.  In the case of Phung's loan, the government has to date been unable to determine whether the investor's purchase amount was less than the amount of the loan itself; for sentencing purposes we therefore have used the original loan amount to calculate the loss.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ferrari | Third Street, Gilroy | Long Beach | $664,000 | Deutsche Bank | $663,689 | Deutsche Bank | $299,667.93 |
| Ferrari | Third Street, Gilroy | Long Beach | $166,000 | Deutsche Bank | $165,901 | Deutsche Bank | $165,851.22 |
| Lam | 261 San Fernando Way, San Francisco | Cal State 9 | $467,500 | None | N/A | Cal State 9 | $467,500 |
| Lam | 261 San Fernando Way, San Francisco | Chase | $1,732,500 | None | N/A | Chase | $232,500 |
| Phung | Pitlochry Drive, Gilroy | Silver State Mortgage | $300,000 | LaSalle Bank (now Bank of America) | Unknown | LaSalle Bank | $209,983.49 |
| **TOTAL:** | | | **$3,330,000** | | | | **$1,375,502.64** |

The government has not included interest owing, fees or penalties in the loss amounts above, pursuant to U.S.S.G. § 2B1.1, cmt. n. 3(D)(i) (loss shall not include interest of any

///

///

kind, fees or penalties).[4]  The government has attached Exhibits 1 through 4 to this Sentencing Memorandum that document the losses reported by the lenders.  Each Exhibit will be briefly explained below.

### 1.    The Long Beach Mortgage Ferrari Loans (Exhibit 1)

The defendant used two Long Beach Mortgage loans, in the amounts of $664,000 and $166,000 and in the name of Ken Ferrari, to purchase the property at 1351 Third Street, Gilroy, California.  The defendant then defaulted on the loans, after they had been sold to Deutsche Bank at a slight discount.  The property was sold in foreclosure for $363,863.  The first mortgage loan resulted in a loss of $299,667 (the $663,531.56 investor purchase price less the recovery of $363,863).  The second mortgage loan was a total loss of $165,901 (the investor purchase price).  These figures are reflected in the documents attached hereto as Exhibit 1, which were provided by Chase (which now owns Washington Mutual Bank, the parent company for Long Beach Mortgage).

### 2.    The Cal State 9 Lam Loan (Exhibit 2)

The defendant used two loans, one from Chase and one from Cal State 9, to "buy" 261 San Fernando Way in the name of straw borrower Dinh Lam.  The Cal State 9 loan was in the amount of $467,500.  The defendant defaulted on the Cal State 9 loan before any principal payments were made, and the property was sold in a foreclosure sale to Chase resulting in a total loss to Cal State 9.  These figures are reflected in documents attached hereto as Exhibit 2, which were provided by Cal State 9.

### 3.    The Chase Lam Loan (Exhibit 3)

The Chase loan in the name of Lam was in an amount of $1,732,500.  The defendant defaulted on the Chase loan before any principal payments were made.  The property was put up for sale in foreclosure on October 1, 2007, and was sold back to

---

[4] The PSR indicates that GMAC suffered a loss with regard to the Phung loan. Based on information recently provided by GMAC, the government believes that in fact the losses attributable to this loan were incurred by LaSalle Bank, which has been acquired by Bank of America. Restitution relating to this loan should therefore be paid to Bank of America, not GMAC.

Chase in an amount of $1,710,771. The property was subsequently sold by Chase on February 26, 2008 to a third party in the amount of $1,500,000, resulting in a loss of $232,500. These figures are reflected in documents attached hereto as Exhibit 3, which were provided by Chase.

4.     The Silver State Phung Loan (Exhibit 4)

The defendant used two loans, both from Silver State Mortgage, to buy the property at 7187 Pitlochry Drive, Gilroy, California in the name of straw borrower Lawrence Phung. The defendant then defaulted on the loans, resulting in the property being sold in foreclosure. One of the two Phung loans was paid off. The second mortgage, however, was not fully paid off. The loss amount for this loan is the loan amount ($299,807.34) less the recovered amount ($89,823.85), or $209,983.49. These figures are reflected in documents attached hereto as Exhibit 4, which were provided by GMAC (the loan servicer).

5.     The Total Loss Amount

The total loss for the Ferrari, Lam and Phung loans is $1,375,502.64. This figure represents the outstanding principal balance on the defaulted loans less any money recovered from a sale of the properties used as collateral for the loans. It does not include any interest owed, or any fees or costs associated with the foreclosures and short sales.

C.     Aggravating Role Adjustment

The government submits that an upward adjustment in the base offense level for the defendant's leadership role in the conspiracy is warranted under U.S.S.G. § 3B1.1(a), which provides for a four-level adjustment where the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. In determining whether the adjustment applies to a particular defendant, the Court should consider "the exercise of decision making authority, the nature of participation in the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and

1    authority exercised over others." U.S.S.G. § 3B1.1, cmt. n.4.  In the instant case, all of
2    these factors apply to the defendant's conduct and role in the offense.

3        Based on the testimony of the defendant's co-conspirators (e.g., Zhang, Louie,
4    Phung, Yee and Ferrari), the defendant was clearly the organizer and leader of criminal
5    activity that involved five or more participants.  The government's proof established that
6    it was the defendant – and not one of the other co-conspirators – who came up with the
7    charged mortgage fraud scheme.  Kenneth Zhang testified that after he went to work for
8    the defendant, she approached him about getting a refinance loan for her house at 261 San
9    Fernando Way by using his name and credit.  Yee testified that after he first met the
10   defendant, she asked for his help in getting a loan in Andy Louie's name so that she could
11   buy the Third Street house in Gilroy.  Louie corroborated Yee's testimony; it was the
12   defendant who approached him with the idea of acting as a straw buyer so that she could
13   purchase an investment property.  Similarly, the defendant told Yee that she needed a
14   borrower to replace Louie and asked for his assistance.  When she wanted to purchase the
15   Pitlochry house in Gilroy, the defendant approached Lawrence Phung to be the straw
16   buyer and introduced him to Yee.  Phung testified that it was the defendant who provided
17   him with a written contract and she was the one who offered him money for his
18   participation.  Yee also testified that the defendant introduced him to Dinh Lam, who
19   would be the straw buyer for several other properties in San Francisco that she wished to
20   purchase.

21       Furthermore, it was the defendant who principally benefitted from the scheme.
22   While the defense tried to imply that the real estate broker and loan brokers Yee and
23   Mesler were the ones who made the most money off the fraudulent loans, the evidence
24   introduced at trial proved otherwise.  As demonstrated during the testimony of financial
25   analyst Philip Villanueva, the defendant benefitted from the Zhang and Lam loans by
26   paying off existing mortgages on the San Fernando Way property, staving off foreclosure,
27   and pocketing $154,355 in net cash proceeds.  Moreover, by obtaining the Zhang
28   refinance loan and stabilizing the property financially, she was able to strip another

$393,121 in equity from the property in additional loans.  As to the two Gilroy properties, her plan was to sell the properties at a profit in a rising real estate market.  When the loans on those properties closed, the defendant was the one who controlled the properties and stood to gain by their future sale.  The straw buyers, on the other hand, were the ones who signed the promissory notes and were legally liable for repaying the large loans.

In addition, the defendant was the one who decided which properties were going to be purchased using fraudulently-procured loans.  Yee testified that as he put the Louie, Ferrari, and Phung loan packages together, he ran all decisions by the defendant for her approval.  It was his understanding that is the way she wanted it and that he worked for her.  Furthermore, it was the defendant who personally recruited four of the five straw buyers.  While co-conspirators Yee and Mesler may have actively assisted the defendant in accomplishing her objective of obtaining loans on these properties, the evidence presented at trial established that the defendant was the person who came up with the idea, made decisions, and benefitted the most from the fraud.  Accordingly, the defendant's role in the offense warrants a four-point adjustment under § 3B1.1(a).

## V.  SENTENCING RECOMMENDATION

The defendant victimized multiple lenders and straw buyers by committing serious financial crimes over an extended period of time, and then compounded those crimes by attempting to obstruct justice on three separate occasions.  Although convicted after trial of all counts in the indictment, the defendant has expressed neither an acknowledgment of wrongdoing, nor remorse for her conduct and the resulting harm.  As such, and taking into account the sentencing factors in Title 18, United States Code, Section 3553(a), the government recommends that the Court impose a sentence at the low end of the applicable guideline range.  As discussed further below, a sentence of 87 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

A.    The Nature and Circumstances of the Offense

Beginning with the first of the factors set forth in Section 3553(a) – that is, the

1   one-time lapse of judgment but rather a criminal scheme that took place over the course

2   of years.  Furthermore, the defendant persisted in her quest to make money through real

3   estate investment even though she clearly did not have the financial wherewithal to

4   follow through on the promises she made to the straw buyers to make the mortgage

5   payments on the loans she obtained in their names.  Her financial fragility was evidenced

6   not only in her quick default on the Ken Ferrari and Lawrence Phung loans, thereby

7   leaving both Ferrari and Phung in the lurch, but also in the evidence presented by

8   financial analyst Philip Villanueva at the close of the government's case.  Testifying

9   about property, loan, and bank records, Mr. Villanueva demonstrated that in the time

10  frame covered by the indictment, the defendant could only support her lifestyle by

11  obtaining a series of loans secured by her residence at 261 San Fernando Way.  She used

12  one loan to pay off what was owing on the prior loan; she was able to also pull out equity

13  because home values were rising at the time.  Of course, given her financial history and

14  lack of any real resources, it was a house of cards that would eventually crumble if she

15  could not continue to obtain loans.  The reality of the defendant's financial situation

16  apparently did not deter her from obtaining additional high-dollar value loans through

17  fraud, thereby exhibiting a complete disregard for the financial risk to which she was

18  exposing the straw buyers and the lenders.

19          Moreover, the defendant's mortgage fraud scheme was followed by a series of

20  witness tampering crimes intended to thwart the government's investigation.  In

21  counseling Andy Louie and Kenneth Zhang to lie about and conceal material information

22  from the F.B.I., the defendant not only sought to shield herself from scrutiny, but also

23  exposed Louie and Zhang to further serious criminal consequences.  Again, this was not a

24  single lapse in judgment on defendant's part; she did it on three separate occasions.

25          One of the most troubling aspects of the defendant's scheme was the manner in

26  which she convinced unsophisticated individuals such as Zhang, Phung, Louie and Ferrari

27  to become straw buyers.  The Court had the opportunity to hear from these witnesses at

28

USA SENTENCING MEMORANDUM
CR 09-376 SI                              11

trial.[5]  Based on the credible testimony of each of these witnesses, it is apparent that the defendant manipulated them into taking part in serious financial crimes in which, but for the defendant, they would not have gotten involved.  The defendant particularly took advantage of Louie and Zhang, two young men who trusted the defendant implicitly and believed that she was operating in their best interests.  Moreover, Louie and Phung both testified that when they attempted to withdraw from the defendant's scheme, she intimidated them by claiming they could be sued for breach of contract.  The facts of the case establish the defendant used the straw buyers that she recruited for their good credit, without any regard to the damage her failure to pay the mortgages would inflict on their financial affairs.  In this sense, the defendant's scheme not only victimized the mortgage lenders but also the unsophisticated individuals that she used as straw buyers.

B.    Seriousness of the Offense and Need for General Detterence

With regard to the seriousness of the defendant's mortgage fraud conduct, as well as the need to deter it, there can be no question that mortgage fraud is a lucrative, hard-to-detect crime that has had a major impact on the global financial system, the nation's economy and the residents of this District.  In light of the events of the last two years, there can be no reasonable question that mortgage fraud of the type in which the defendant here engaged is a serious crime that Courts should seek to deter because of its detrimental economic impact.

As a general matter, courts have recognized that *"white collar crime . . . requires heavy sentences to deter* because it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997) (emphasis added).  "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and

---

[5]  The defendant also persuaded Dinh Lam to be a straw buyer, as the government proved at trial.

white collar crime therefore can be affected and reduced with serious punishment." *Id.* at 1240. When it comes to mortgage fraud, deterrence is particularly important. The consensus among federal, state, and local law enforcement is that mortgage fraud was, until recently, the fastest growing white collar crime in the Northern District of California. Since January 2005, mortgage lenders have reported more than 11,000 instances of suspected mortgage fraud in this District alone, amounting to a total loss of over $345 million. As reported in the FBI's June 2009 Mortgage Fraud Report, California has more reported instances of mortgage fraud than any other state in the country. In 2008 alone, financial institutions and other mortgage lenders reported 3,427 instances of mortgage fraud in this District. That pace appears to have increased in 2009, with financial institutions currently filing over 300 mortgage fraud reports per month. These statistics clearly demonstrate that people across the nation, and particularly in this District, believed at one point that engaging in mortgage fraud, even though it was dishonest and against the law, was worth the risk. The devastating harm that results from that way of thinking has now materialized. The imposition of meaningful prison sentences for mortgage fraud is an important means of fulfilling the goal of affording deterrence and promoting respect for the law.

C.    The Need to Protect The Public From Further Crimes of the Defendant

The defendant's repeated mortgage fraud offenses, combined with her persistent and calculated efforts to tamper with witnesses in an effort to undermine the government's investigation, demonstrate she has little respect for the law. The evidence introduced in connection with the witness tampering charges showed that the defendant did not hesitate to deflect law enforcement interest from herself even though it meant encouraging Zhang and Louie to commit additional crimes and putting themselves at risk for prosecution. She even suggested what turned out to be one of her defenses at trial: they would put the blame on her ex-husband, Michael Farrell. The defendant's failure to recognize her own culpability, along with her complete lack of remorse for the harm caused by these crimes, suggest that even sitting through the process of a jury trial has

1  | done nothing to change her attitude.

2  |     The defendant's attitude toward the law suggests that a meaningful sentence is
3  | necessary in order to impress upon the defendant that the Court and community regard
4  | these offenses as serious, and that she is accountable for the harm that has resulted from
5  | her actions.  Conversely, a lenient sentence would send exactly the wrong message to the
6  | defendant and to the public by suggesting that mortgage fraud is not viewed by the Court
7  | as a serious offense; this in turn would strongly suggest that there is little risk in engaging
8  | in similar conduct again.  Such a sentence would clearly undermine the goals of
9  | sentencing under Section 3553(a) and, we submit, would be a disservice to the
10 | community.

11 |     D.    The Kinds of Sentences Available and the Applicable
12 |           Sentencing Guideline Range

13 |     As discussed above, the applicable guideline range in this case is 87 to 108
14 | months.  While the sentencing guidelines are now advisory, they are nonetheless one of
15 | the factors that the Court is required to take into consideration in fashioning a defendant's
16 | sentence, in that the principles of uniformity in sentencing and treating similarly situated
17 | defendants in a similar manner are relevant to the sentencing of any defendant.

18 |     E.    Other Characteristics of the Defendant: Health Issues

19 |     The PSR indicates that the defendant has a aortic aneurism, which the government
20 | understands to be a general term for any swelling or dilation of the aorta.  Such a
21 | condition usually represents an underlying weakness in the wall of the aorta, which in
22 | turn may occasionally cause discomfort and present the risk of rupture.  The government
23 | has consulted with the Bureau of Prisons, which indicates that it is fully capable of
24 | treating the defendant's medical condition and that in fact the Bureau currently houses
25 | inmates with aortic aneurisms.

26 | ///
27 | ///

28 |     On July 1, 2010, the defense provided the government with some additional

USA SENTENCING MEMORANDUM
CR 09-376 SI                          14

medical records and letters from medical doctors relating to the defendant's health. The government immediately provided those materials to the Bureau of Prisons, but does not yet know whether the additional information will change the Bureau of Prison's assessment of its ability to provide appropriate care for the defendant. At the present time, we have no basis to believe that the defendant's health issue cannot be addressed while she is in custody. Accordingly, we submit that the defendant's medical diagnosis does not provide a basis for reducing the her sentence below the applicable guideline range.

## VI. CONCLUSION

Taking into account all of the factors cited in Section 3553(a), the government concurs with the Department of Probation's recommendation that the Court impose a sentence of 87 months, which is a sentence at the low end of the applicable Guidelines range. This sentence appropriately reflects the severity of the defendant's financial crimes and obstruction of justice as well as the need for both general and specific deterrence. The government submits that a lower sentence would not adequately reflect the severity of the defendant's crimes, promote respect for the law or protect society from the possibility that the defendant will re-offend. The government also asks that the Court order the defendant to pay restitution in the total amount of $1,375,502.64 to the victim lenders identified above; serve a five-year term of supervised release with all

///
///
///
///
///
///
///
///
///

1    the general and specific conditions recommended by the Probation Officer. *See* PSR

2    Recommendation at 3.

3

4

5    DATED: July 2, 2010              Respectfully submitted,

6                                     JOSEPH P. RUSSONIELLO
                                      United States Attorney
7

8                                              /s/

9                                     JEFFREY RABKIN
                                      SUSAN E. BADGER
10                                    Assistant United States Attorneys

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

USA SENTENCING MEMORANDUM
CR 09-376 SI                              16