Martha Boersch (Cal. Bar No. 126569)
Lara Kollios (Cal. Bar. No. 235395)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104-1500
Telephone:      (415) 626-3939
Facsimile:      (415) 875-5700
Email:          mboersch@jonesday.com
Email:          lkollios@jonesday.com

Attorneys for Defendant
JUDY YEUNG aka MIU WAN YEUNG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUDY YEUNG, aka Miu Wan Yeung<br><br>Defendant. | **Case No. CR 09-376 SI**<br><br>**DEFENDANT JUDY YEUNG'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD DEPARTURE AND VARIANCE, AND REQUEST FOR EVIDENTIARY HEARING**<br><br>Date of Sentencing: July 9, 2010<br>Dept.:              Crtrm. 10, 19th Floor<br>Judge:             Hon. Susan Illston |

SFI-644774v1

Yeung's Sentencing Memo, Mtn. For Downward
Departure & Variance, & Req. For Evid. Hrg.
CR 09-00376- SI

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

   I.     The Offense ............................................................................................ 2

   II.    The Lenders Were A Cause Of Their Own Loss, If Any ........................ 7

         A.    Kenneth Zhang's Refinance of 261 San Fernando Way, San Francisco .................................................................................... 7

         B.    Andy Louie's Purchase of 1351 Third Street, Gilroy ................ 8

         C.    Ken Ferrari's Purchase of 1351 Third Street, Gilroy .................. 8

         D.    Lawrence Phung's Purchase of 7187 Pitlochry Drive, Gilroy .................. 9

         E.    Dinh Lam's Purchase of 261 San Fernando Way, San Francisco ........... 10

   III.   The Presentence Report And Objections ............................................. 11

LEGAL STANDARD ........................................................................................ 14

DISCUSSION ................................................................................................... 15

   I.     The Government Has Failed To Prove The Amount Of Loss That Determines The Sentencing Guideline Range ...................................... 15

   II.    Because The Amount Of Loss Has Not Been Proven And Cannot Be Reasonably Determined, The Court Should Use Gain To The Defendant .......... 18

   III.   Because The Use of Loss In The Fraud Guidelines Is Not Based On Empirical Data And Is Nonsensical From A Policy Perspective, This Court Should Give Little, If Any, Weight To The Sentencing Guidelines In This Case ........................................................................................................ 19

   IV.   The Evidence Presented At Trial Does Not Justify A Four-point Enhancement For Ms. Yeung's Role In The Offense ......................... 22

   V.    The Sentencing Factors Justify A Downward Departure And Variance ............. 25

         A.    The Nature of the Offense ........................................................ 25

         B.    History and Character of Defendant ......................................... 26

             1.    The Defendant's Commitment to the Community ....................... 26

             2.    The Defendant's Struggle with Abuse ......................................... 27

             3.    The Defendant's Age and Status as a First-time Offender .......... 27

             4.    The Defendant's Health ............................................................... 29

             5.    The Defendant's Mental Condition .............................................. 30

             6.    The Defendant's Cultural Background ......................................... 32

          C.    The Need to Avoid Sentence Disparity ...................................... 33

         D.    The Need for the Sentence to Protect the Public ....................... 34

   VI.   Request For Evidentiary Hearing ....................................................... 35

CONCLUSION ................................................................................................. 36

# TABLE OF AUTHORITIES

Page

Cases

*Kimbrough v. United States*
1552 U.S. 85 (2007) ............................................................................................ 14

*Simon v. United States*
361 F. Supp. 2d 35 (E.D.N.Y. 2005) ................................................................. 28

*Spears v. United States*
129 S. Ct. 840 (2009) ......................................................................................... 20

*United States v. Aldeson*
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................................... 19, 22

*United States v. Arenas*
340 Fed. Appx. 384 (9th Cir. 2009) ................................................................... 34

*United States v. Booker*
543 U.S. 220 (2005) ............................................................... 14, 15, 19, 32

*United States v. Cabrera*
567 F. Supp. 2d 271 (D. Mass. 2008) ............................................................... 28

*United States v. Carty*
520 F.3d 984 (2008) ...................................................................................... 14, 15

*United States v. Charles*
531 F.3d 637 (8th Cir. 2008) ............................................................................. 30

*United States v. Charlesworth*
217 F.3d 1155 (9th Cir. 2000), quoting *Mezas de Jesus,* 217 F.3d 638 ............................ 12, 16

*United States v. Chase*
560 F.3d 828 (8th Cir. 2009) ............................................................................. 29

*United States v. Cunningham*
429 F.3d 673 (7th Cir. 2005) ............................................................................. 31

*United States v. Darway*
255 Fed. Appx. 68 (6th Cir. 2007) ..................................................................... 28

*United States v. Emmenegger*
329 F. Supp. 2d 416 (S.D.N.Y. 2004) ............................................................... 22

*United States v. Gall*
552 U.S. 38 (2007) ............................................................................................. 15

*United States v. Hamilton*
2009 WL 995576 (2d Cir. Apr. 19, 2009) ......................................................... 28

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Holt*
486 F.3d 997 (7th Cir. 2007)............................................................................... 28

*United States v. Hopper*
177 F.3d 824 (9th Cir. 1999)............................................................................... 12

*United States v. James*
592 F.3d 1109 (10th Cir. 2010).................................................................... 16, 17

*United States v. Kimbrough*
128 S. Ct. 558 (2007)......................................................................................... 19

*United States v. Laurienti*
__ F.3d __, 2010 WL 2473573 (9th Cir., June 8, 2010) ............................ 12, 17, 18

*United States v. Mendez*
284 Fed. Appx. 653 (11th Cir. 2008)................................................................. 32

*United States v. Milwitt*
475 F.3d 1150 (9th Cir. 2007)............................................................................ 17

*United States v. Morgan*
376 F.3d 1002 (9th Cir. 2004)............................................................................ 18

*United States v. Nellum*
2005 WL 300073 (N.D. Ind. Feb. 3, 2005)........................................................ 28

*United States v. Ressam*
593 F.3d 1095 (9th Cir. 2010)............................................................................ 15

*United States v. Restrepo*
946 F.2d 654 (9th Cir. 1991).............................................................................. 12

*United States v. Stoddard*
150 F.3d 1140 (9th Cir. 1998)............................................................................ 16

*United States v. Treadwell*
593 F.3d 990 (9th Cir. 2010).............................................................................. 13

*United States v. Ward*
814 F. Supp. 23 (E.D. Va. 1993)........................................................................ 29

*United States v. Williams*
553 F.3d 1073 (7th Cir. 2009)............................................................................ 31

*United States v. Yu*
954 F.2d 951 (3d Cir. 1992)............................................................................... 32

# TABLE OF AUTHORITIES
## (continued)

Page

### Statutes and Codes

18 U.S.C.
§ 1343......................................................................................................... 2
§ 1349......................................................................................................... 2
§ 1512(b)(3) ............................................................................................... 2
§ 3553(a) ........................................................................................... passim
§ 3553(a)(1)............................................................................................. 14
§ 3553(a)(2)............................................................................................. 14
§ 3553(a)(2)(c)......................................................................................... 34
§ 3553(a)(6)............................................................................................. 33
§ 3559(a)(3)............................................................................................. 15
§ 3561(a)(1)............................................................................................. 15
§ 3582(a) ................................................................................................. 14

### Other Authorities

Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* (1998)................................................................................ 19

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1 (2006) ................... 20

U.S. Sentencing Commission, *2000 Sourcebook of Federal Sentencing Statistics* (2000) ........... 21

U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Criminal Justice System is Achieving the Goals of Sentencing Reform* (Nov. 2004)................................................................. 20

U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Comparison of the Federal Sentencing Guidelines* (May 2004) ............................................... 28

U.S. Sentencing Commission, *Recidivism and the "First Offender"* (May 2004) ....................... 28

*United States Sentencing Guidelines Manual*, Section 2F1.1(b)(1) (1987).................................. 20

### Rules and Regulations

Local Rule 32-5(d) ...................................................................................... 35

**INTRODUCTION**

Ms. Yeung is a mother of two who was "put on this earth to help others" and "cares a lot about education; within her family and the community." *See* Letter from Son Jimmy Lau.[1] She also has a "tendency to believe people, almost to a fault." *Id.* She has absolutely no criminal record and throughout her more than twenty years in the San Francisco Bay Area has been a "positive influence" on both her family and the community at large. *Id.* Her two grown sons are successful, upstanding citizens in the Bay Area. Ms. Yeung is now nearly 60 years old and is in poor health, with her "condition worsening all the time." *See* Letter from son Danny Lau. She regrets deeply the events that gave rise to this case and is simply "not a candidate to reoffend." *Id.* The extreme sentence advocated by the government is simply not warranted here.

The Probation Office's and the government's sentencing recommendation of 87-months in prison bears no relationship to the nature and seriousness of Ms. Yeung's offense, to her personal history and personal characteristics, or to the likely sentences of those who were as or more culpable than Ms. Yeung. Nor is such a draconian sentence necessary to adequately deter criminal conduct or to protect the public. Ms. Yeung has numerous objections to the Presentence Report (PSR), which are set forth below, and requests an evidentiary hearing to determine the amount of loss, if any, that is attributable to Ms. Yeung's conduct, rather than the conduct of others or of the market generally, and to determine the identity of the victims, if any.

Ms. Yeung also requests a variance under 18 U.S.C. § 3553(a) in this case based on the nature of the offense, Ms. Yeung's personal history and background, the need to avoid disparity in sentencing among similarly situated defendants, the lack of danger that Ms. Yeung poses to the public, and the fact that a harsh sentence will promote few, if any, important public policies. Ms. Yeung respectfully asks that she be sentenced to a five-year term of probation with a term of home confinement and/or community service, a justified variance and a sentence that satisfies all of the factors the Court must consider under § 3553(a) when imposing a sentence. Such a sentence will more accurately reflect the minimal danger that Ms. Yeung poses to the community.

---

[1] The letters have been provided to the Probation Officer and should have been provided to the Court with the final PSR. *See* PSR ¶ 54. The defendant will bring copies of the letters to Court at the time of sentencing.

1    More importantly, this sentence will be proportionate to the sentences of Alex Yee and Richard

2    Mesler, the licensed loan brokers who encouraged and aided Ms. Yeung in the majority of the

3    charged transactions, and who committed far more offenses than Ms. Yeung.  As such, Ms.

4    Yeung respectfully requests that the Court give consideration to a downward variation.

5                                           **BACKGROUND**

6    **I.      THE OFFENSE.**

7          On February 2, 2010, Ms. Yeung was convicted of one count of conspiracy to commit

8    wire fraud (18 U.S.C. § 1349), eight counts of wire fraud (18 U.S.C. § 1343), and three counts of

9    witness tampering (18 U.S.C. § 1512(b)(3)).  Each of the witnesses called by the government who

10   purported to have any personal knowledge of the conduct alleged in the indictment had an

11   agreement with the government that either gave them immunity from prosecution – Mr. Zhang,

12   Mr. Louie, and Mr. Phung – or, in Mr. Yee's case, an agreement that allowed him to plead guilty

13   to only a fraction of the wrongs he actually committed, which Mr. Yee hopes results in "[n]o jail

14   time, at least." TR 985:18-19.  Two of the people alleged to have participated in the scheme – Mr.

15   Mesler and Mr. Lam – were not called to testify at all.  Mr. Lam has immunity from the frauds he

16   committed, while Mr. Mesler, a licensed broker, received the same lenient plea agreement that

17   was given to Mr. Yee.

18         The evidence at trial showed that the lenders on the loans at issue in this case were either

19   complicit in the fraud or recklessly disregarded the false statements in the loan applications.  For

20   instance, the first loan – the refinance of 261 San Fernando by Washington Mutual – was

21   obtained through WAMU loan broker Eliza Wu, who the government chose not to call as a

22   witness.  And yet the evidence at trial demonstrated that it was Ms. Wu who suggested that the

23   loan application be falsified.  TR 299:4-301:8 (Ms. Wu hinted that WAMU might issue the loan if

24   Zhang had "some sort of asset in the bank").  The evidence also showed that Ms. Wu knew that

25   the information in the loan applications was false.  *Compare* TR. 423:2-16, 2296:3-22 *with* Govt.

26   Ex. 100-15 (Ms. Wu signed the loan applications even though the information within the

27   applications was inconsistent with the information Mr. Zhang provided to Ms. Wu in their first

28   meeting).  Finally, it was clear from the evidence that neither Ms. Yeung nor Mr. Zhang ever tried

1   to "hide the fact that [Zhang was] helping Ms. Yeung refinance her house at 261," and "did not

2   hide the fact from Washington Mutual that Judy Yeung was using [Zhang's] credit to get a

3   refinance loan."  TR. 432:6-12.  In fact, many of the title company and Washington Mutual

4   documents made clear the both Ms. Yeung and Mr. Zhang were the borrowers.  *See, e.g.,* Govt.

5   Exs. 101-3, 101-24.

6       More than two years after the refinance, and after Mr. Zhang agreed to cooperate with the

7   government, Mr. Zhang went to Ms. Yeung's house wearing a wire.  *See* Govt. Exs. 601, 603.

8   The FBI instructed Mr. Zhang "to try to get Judy to talk about the refinancing of 261 San

9   Fernando Way during their meeting."  TR 2298:6-9.  Mr. Zhang was first to bring up the

10   refinance and repeatedly asked Ms. Yeung how he should respond to the FBI if questioned.  TR

11   399:17-400:8.  Although Ms. Yeung discussed the fake Hang Seng Bank letter during the wired

12   conversations, Mr. Louie had already informed Ms. Yeung that he had created a fake letter, and

13   Mr. Zhang had spoken to Ms. Yeung about this case prior to wearing the wire.  TR 33:10-34:2;

14   Govt. Exs. 601 at 76, 603 at 21-22.  Ms. Yeung did not make any recorded statements about the

15   letter that she could not have learned at an earlier date from Mr. Louie or Mr. Zhang.

16       The evidence at trial also demonstrated that the scheme was executed by individuals

17   whom the government, for unexplained reasons, never charged or apparently never interviewed.

18   These individuals made more money off the scheme than Ms. Yeung.

19       For instance, Mike Farrell, Ms. Yeung's husband at the time, was the person who

20   approached Mr. Louie and asked him to purchase 1351 Third Street in Gilroy, California.  TR

21   1262:24-63:14.  Mr. Farrell had originally planned to purchase the house, but his credit score was

22   too low.  *Id*.; TR 1017:24-18:4.  When Mr. Farrell discovered he had bad credit, it was Alex Yee

23   who ran Mr. Louie's credit and determined his credit was good enough for the purchase.  *Id*., TR

24   557:11-13.  Janet Gong, a real estate agent and Mr. Louie's CPA, completed a purchase contract

25   for the transaction.  TR. 1256:7-15; Govt. Ex. 200-19.  In order to close the transaction, Janet

26   Gong lent Mr. Louie approximately $4000, and Mr. Louie used the sale proceeds to repay Ms.

27   Gong.  TR 1265:25-66:5; Def. Ex. J.

28       Mr. Yee and Mr. Mesler made the material decisions relating to this transaction and

1   submitted the false information and documents to the lender, Long Beach Mortgage:  Mr. Yee

2   decided the false income amount reported in Mr. Louie's application (TR 620:17-24); Mr. Yee

3   filled in most of the fraudulent information on the loan applications (with Mr. Louie completing

4   the remainder) (TR 626:4-27:19); Mr. Yee prepared the false verification of rent, which Mr.

5   Farrell signed (TR 690:1-11; 693:24-94:19; Govt. Ex. 200-9); Mr. Mesler suggested that they

6   obtain the loans from Long Beach Mortgage (TR 1027:16-23); and Mr. Yee submitted the loan

7   applications to Long Beach Mortgage.  TR 624:3-8.

8          Ms. Yeung's name was not on any of the documents and there is no documentary

9   evidence that she communicated with Mr. Yee or anyone else about the purchase of this property.

10  Moreover, Ms. Yeung did not receive any money at the close of this transaction.  Many other

11  people, however, did:  Mr. Yee received a portion of BayCal's $24,000 commission; Ms. Gong

12  received a $6000 commission; Ms. Gong's sibling received $497,521.98 in sales proceeds, and

13  Mr. Louie received between $500 and $1000.  TR 1296:4-12; Govt. Ex. 201-8.

14         Less than three months after Mr. Louie purchased 1351 Third Street, he sold it to Mr.

15  Ferrari for $30,000 more than Mr. Louie's purchase price.  Govt. Ex. 300-1.  Mr. Yee and Mr.

16  Mesler (and not Ms. Yeung) recruited Ken Ferrari, a co-worker at BayCal, to purchase the

17  property.  TR 1050:7-9, 1318:1-21:12.  Mr. Yee told Mr. Ferrari that he would receive $20,000

18  upon the completion of the deal.  TR 1321:24-25.  Mr. Yee and Mr. Mesler called Mr. Farrell, not

19  Ms. Yeung, to report that Mr. Ferrari would be purchasing 1351 Third Street and that they

20  intended to use Mr. Farrell's business, Vector Shooting Services, as Mr. Ferrari's false employer.

21  TR 1018:9-21. At closing, Mr. Yee again received a cut of the $12,900 commission to BayCal

22  (along with Mr. Mesler and their boss, Alden Wong).  TR 1056:11-13; Govt. Ex. 301-1.  Ms.

23  Yeung received no money at closing, although Mr. Ferrari did write her a $377 check which

24  included the closing proceeds.  Govt. Ex. 1018.

25         Just as with Mr. Louie's purchase, Mr. Yee made the substantive decisions regarding this

26  transaction and Mr. Mesler was also "100 percent" involved.  TR 721:13-17.  In addition to

27  recruiting Mr. Ferrari, Mr. Yee submitted all of the false loan applications to the lender (TR

28  171:16-25); Mr. Yee, Mr. Farrell and Mr. Mesler made-up Mr. Ferrari's false employment

1   information—that Mr. Ferrari was the co-owner of Mike Farrell's business, Vector Shooting

2   Services (TR 722:4-14, 842:9-12); Mr. Yee backed into both the false income and false rental

3   figure appearing on Mr. Ferrari's loan applications (TR 730:11-23, 731:25-32:20); Mr. Yee and

4   Mr. Mesler created fake letters of explanation that were submitted to the lender (TR 742:7-22,

5   746:5-12); Mr. Mesler obtained a fake CPA letter from a person named Marcos Rodriguez to

6   submit to the lender (TR 1031:4-6); and Mr. Yee, not Ms. Yeung, paid Mr. Rodriguez $350 or

7   $500 for the letter.  TR 1031:7-10.  Mr. Ferrari discussed his true income and rental payments

8   with both Mr. Yee and Mr. Mesler, and was aware that false information would ultimately be

9   submitted to the lender.  TR 1347:24-49:10.

10          In late 2006, Janet Gong called Mr. Phung and asked if he "wanted to make some money

11   buying properties."  TR 1626:24-27:1.  Mr. Phung had been friends with Ms. Gong since 1999.

12   TR 1626:8-16.  Mr. Phung's wife worked for Ms. Gong and Ms. Gong did the Phungs' taxes.  *Id.*

13   Mr. Phung agreed to Ms. Gong's proposal to make money, and attended a meeting at Ms. Gong's

14   office with Mr. Yee, Mr. Farrell, Ms. Gong and Ms. Yeung.  TR 1553:6-12, 1624:7-20.  Ms.

15   Gong loaned Mr. Phung $6000 for closing costs.  Mr. Phung viewed himself as one of the owners

16   of the property (rather than a straw buyer).  TR 1629:4-6, 1637:8-9.

17          In November 2005, Mr. Phung signed a purchase contract drafted by Ms. Gong for

18   Pitlochry for the sale price of $1.3 million.  TR 1561:9-24; Gov. Ex. 401-9.  Again, Mr. Yee and

19   Mr. Mesler made all of the material decisions regarding the false information to be included on

20   Mr. Phung's loan documents:  Mr. Yee backed into a qualifying income figure (TR 808:20-24);

21   Mr. Yee overstated Mr. Phung's rent as $6,500, and had a colleague at BayCal falsely verify that

22   he was Mr. Phung's landlord (TR 852:16-53:24; Gov. Ex. 400-12);  Mr. Yee and Mr. Mesler

23   came up with the idea to include the Hang Seng bank account on Mr. Phung's application[2] (TR

24   812:9-13); Mr. Yee paid a colleague to forge Mr. Phung's verification of rent (TR 1058:21-25);

25   Mr. Yee instructed Janet Gong on how Mr. Phung should complete the loan applications (TR

26

27          [2]  Mr. Yee testified that the fake Hang Seng letter, created by Andy Louie, was necessary
to verify the asset provided for on the loan application.  TR 848:8-13.  There is no evidence,
28   however, that a Hang Seng letter was submitted to the lender, Silver State.

1059:20-62:12; Def. Ex. F); and Mr. Yee was responsible for filling out Mr. Phung's employment, occupancy, and asset information (TR 1078:10-22).  Mr. Yee "mainly spoke to Mike Farrell about the Pitlochry transaction."  TR 1019:13-15.  Mr. Farrell signed the original fake verification of rent for Mr. Phung, at Mr. Yee's direction.  TR 1021:17-20; Def. Ex. B.

Before submission of the loan application in February 2006, Mr. Phung and Ms. Yeung entered a notarized agreement regarding the purchase of Pitlochry.  Govt. Ex. 406.  This agreement mirrored an agreement Mr. Phung entered with Mr. Farrell regarding the purchase of a separate property, 37 Junipero Road, San Francisco.  TR 1627:21-28:2.  The agreement for 7187 Pitlochry was originally in Mr. Farrell's name but was later changed to Ms. Yeung.  TR 1634:22-36:5.  "The agreement was switched to Judy Yeung because Mr. Farrell did not show up for the meeting" when the agreement was signed.  TR 1635:25-36:5.  Ms. Yeung initially refused to sign the agreement, but later acquiesced.  TR 1635:4-8.  This was around the time period that Mr. Farrell and Ms. Yeung were separating.  TR 1636:15-16, Def. Ex. CC.

Just as with the other transactions, Ms. Yeung did not make any money at closing.  Govt. Ex. 401-1.  Mr. Yee and Mr. Mesler received 30% each of the $32,500 commission.  Mr. Yee additionally received a portion of the $3,200 yield spread premium.  Ms. Gong received a $45,375 commission at closing.  *Id*.; TR 1065:19-66:2.

There is virtually no evidence regarding Mr. Lam's January 2007 purchase of 261 San Fernando Way because Mr. Lam did not testify at trial.  Nor did any loan broker, real estate agent or any other witness with personal knowledge of the transaction.  Mr. Yee testified that he submitted a purchase contract to Marble Stone Mortgage Co., in August 2006, approximately five months before Mr. Lam purchased 261 San Fernando, but that transaction never came to fruition.  TR 931:15-33:22.  The government did not offer any evidence of direct or indirect communications between Mr. Lam and Ms. Yeung relating to Mr. Lam's purchase of 261 San Fernando.  Instead, the government relied on circumstantial evidence that Mr. Lam's loan application included information relating to the Hang Seng bank account number used in the Zhang, Louie and Phung transactions.  Govt. Ex. 501-8.

The proceeds from Ms. Yeung's sale to Mr. Lam largely went to pay off prior loans on the

1   property.  Govt. Ex. 1028.  Ms. Yeung received sale proceeds of approximately $60,000.  *Id.*

2   **II.     THE LENDERS WERE A CAUSE OF THEIR OWN LOSS, IF ANY.**

3           In each loan transaction at issue, the lender ignored standard red flags within the loan

4   application and throughout the underwriting process because the lender's primary objective was

5   to bundle and sell the loan to investors.  With the exception of Chase's loan to Mr. Lam, which is

6   still active, all of the loans at issue were sold to banks that were not involved in the underlying

7   transaction.  Thus, the original lenders did not suffer a loss.  Instead, the original lenders made

8   money after choosing to push the loans through without any reasonable basis to believe the

9   borrower would repay the loan.  All the lenders needed to sell the loan was a borrower with a

10   high credit score and an appraisal that matched the purchase price.  TR 1745:11-20.  The lender's

11   primary interest was having information that would allow it to sell the loan, not information that

12   would ensure that the borrower would repay.  The underwriting deficiencies in each loan at issue

13   are astounding.

14           **A.      Kenneth Zhang's Refinance of 261 San Fernando Way, San Francisco.**

15           The now-defunct Washington Mutual funded Mr. Zhang's stated income, verified asset

16   refinance of 261 San Fernando Way, San Francisco, California.  The forensic underwriter who

17   testified about the loan admitted on several occasions that she had "questions about the validity"

18   of parts of the underwriting process.  TR 1848:17-20.  In fact, Washington Mutual made

19   exceptions for nearly every condition it set for approval of Mr. Zhang's loan:

20       •   Washington Mutual conditioned approval on Mr. Zhang's provision of "two months most

21           recent bank statements supporting assets of $170,000 as stated."  TR 1847:10-1848:20.

22           Mr. Zhang did not provide those bank statements, but instead provided a letter, the

23           validity of which the government's forensic underwriter questioned.  *Id.*;

24       •   Washington Mutual conditioned approval on the receipt of "six months canceled checks

25           evidencing Kenneth Zhang ha[d] been making mortgage payments to BayMark

26           Financial."  TR 1849:13-1850:1.  Washington Mutual waived that condition.  *Id.*;

27

28

- Washington Mutual did not verify that Mr. Zhang had $30,000 in a Bank of America as stated on his loan application, despite that the loan was a *verified asset* loan (TR 1850:7-10); and

- Washington Mutual did not obtain Mr. Zhang's tax returns, although it had permission from Mr. Zhang to obtain them for free (TR 1853:15-23).

## B.   Andy Louie's Purchase of 1351 Third Street, Gilroy.

Mr. Louie's loans were funded by Long Beach Mortgage Company, a now defunct sub-prime division of Washington Mutual, which also no longer exists.  Long Beach Mortgage sold Mr. Louie a sub-prime loan with a high interest rate, even though Mr. Louie's credit score would qualify him for a much better rate.  TR 180924-1810:7.  Sub-prime loans needed less documentation for approval, which was a win-win for Long Beach Mortgage because they had to do less work to approve a loan, and received more money from the borrower.

In order to push Mr. Louie's loan through, Betty Wong, the underwriter assigned to Mr. Louie's loan, looked past the following red flags:

- Payment shock (i.e., the large difference between Mr. Louie's current rent and his future mortgage payments) (TR 1813:6-9);

- Discrepancies in the rental time period and payment amounts appearing between Mr. Louie's rent verification and loan application (TR 1812:3-23; 1813:16-1814:5)

- Discrepancies between the several liabilities appearing on Mr. Louie's credit report that he did not include on his loan application (TR 1814:20-23);

- There was no assessment of whether Mr. Louie's $190,500 yearly income was reasonable for his stated employment as a secretary of a small non-profit organization (TR 1814:24-1815:11); and

- Although Mr. Louie signed a 4506T permitting Long Beach Mortgage to receive his tax returns for free, Long Beach Mortgage chose not to verify his income in any manner (TR 1815:22-1816:2).

## C.   Ken Ferrari's Purchase of 1351 Third Street, Gilroy.

Long Beach Mortgage was also the lender for Ken Ferrari's purchase of 1351 Third Street,

1  which took place less than three months after Long Beach approved Mr. Louie's loan.  Ken

2  Ferrari's purchase price was $30,000 more than Mr. Louie's, allowing Long Beach to make even

3  more from its high interest loans.  Govt. Ex. 300-1.  Although Mr. Ferrari's credit score "was

4  higher than what we [Long Beach] typically had seen," Long Beach still sold Mr. Ferrari a high

5  interest sub-prime loan.  TR 18:20:10-16.

6       Just as with Mr. Louie's purchase, Long Beach ignored several red flags with Mr.

7  Ferrari's loan application:

8  •  Although Mr. Ferrari signed a form permitting Long Beach Mortgage to receive his tax

9     returns for free, Long Beach chose not to verify his income in any manner (TR 1818:19-

10    21);

11 •  Long Beach ignored discrepancies between information on Mr. Ferrari's verification of

12    rent form and loan application (TR 1819:4-1820:9).  Mr. Ferrari's loan was a stated

13    income stated asset loan, so one of the only items Long Beach was supposed to verify was

14    rent, and it did not; and

15 •  Long Beach did not perform a reasonability assessment of Mr. Ferrari's $222,000 stated

16    annual income while working at an entity called Vector Shooting Services (TR 1820:17-

17    1821:11).  This is particularly egregious because despite the high income, Mr. Ferrari had

18    over $12,000 in credit card debt alone (TR 1821:12-1822:2).

19      **D.  Lawrence Phung's Purchase of 7187 Pitlochry Drive, Gilroy.**

20      The now defunct Silver State Financial was the lender for Mr. Phung's purchase of 7187

21 Pitlochry Drive, Gilroy.  Silver State sold Mr. Phung a high-interest rate loan, despite his high

22 credit score and high income.  TR 1751:19-1752:7.  To push the loan through and lock in the high

23 rates, Silver State disregarded several warning signs in Mr. Phung's loan applications.  In fact, the

24 underwriter on Mr. Phung's loan had a reputation for "not [being] as thorough as can be."  TR

25 1749:14-23.

26 •  Silver State did not verify Mr. Phung's self-employment (TR 1752:14-17);

27

28

1       •   Silver State did not obtain a copy of Mr. Phung's tax returns, despite having a signed

2          4506T form from Mr. Phung granting Silver State permission to do so (TR 1752:22-

3          1753:5);

4       •   Silver State did not clarify the discrepancies among the two rental verifications supporting

5          Mr. Phung's loan application (TR 1757:10-1758:5); and

6       •   Mr. Phung purchased the house for $70,000 over asking so that he could fund the seller's

7          closing costs (TR 1760:7-15).

8       **E.     Dinh Lam's Purchase of 261 San Fernando Way, San Francisco.**

9       There is no evidence regarding the accuracy of the information on Dinh Lam's loan

10 application because Dinh Lam did not testify.  However, assuming the government's position that

11 the information on his loan applications was false, the two lenders funding Mr. Lam's purchase of

12 261 San Fernando Way from Ms. Yeung did not conduct a thorough underwriting process:

13       •   The primary lender, Chase, ignored a secondary appraisal of the property reducing its

14          value by roughly $200,000, funding a loan that was well above the appraised value (TR

15          1697:1-1698:9, 1898:14-20);

16       •   Both the primary and subordinate lenders ignored payment shock.  Mr. Lam was living

17          with his parents rent free and his mortgage payments were going to increase to $19,000

18          per month (TR 1704:17-1705:11, 1899:18-1903:2);

19       •   Although the "source of a borrower's income was important to the underwriter," the

20          underwriter at Chase ignored that Mr. Lam needed $150,000 in gift funds to make the

21          down payment.  TR 1701:5-1702:16.  The gift funds were suspect because there were two

22          letters identifying two different sources of the gift, and it was unusual that Mr. Lam

23          needed gift funds because his stated annual income was $696,000. *Id.*

24       •   Neither lender performed a reasonability assessment to determine whether an annual

25          income of $696,000 for someone who claimed to own a company called Infinia Systems

26          (TR 1699:15-1701:4, 1904:7-21); and

27       •   Although Mr. Lam signed a form permitting the lenders to receive his tax returns for free,

28          both lenders chose not to verify his income in any manner (TR 1905:2-7).

1    **III.     THE PRESENTENCE REPORT AND OBJECTIONS.**

2         The Presentence Report recommends a sentence of  87 months, the low-end of a

3    sentencing guideline range driven almost entirely by an amount of loss that the government did

4    not prove at trial and will be unable to prove at sentencing.  Ms. Yeung objects to the following

5    Paragraphs of the PSR:

6         Paragraph 6:  Ms. Yeung objects to this paragraph because it contains statements not

7    supported by the evidence introduced at trial.  Paragraph 6 states that Ms. Yeung had an

8    "understanding" with each of five straw buyers.  However, one of those straw buyers, Dihn Lam,

9    never even testified at trial, and there is no evidence of any understanding between Ms. Yeung

10   and Mr. Lam.

11        Paragraph 20:  Ms. Yeung objects to this paragraph because it misrepresents the facts

12   established at trial.  Paragraph 20 fails to incorporate the cross-examination testimony of Mr.

13   Phung that the original contract was between Mr. Farrell and Mr. Phung, and that Ms. Yeung was

14   only added to the contract because Mr. Farrell did not show up for a meeting with Mr. Phung.  TR.

15   1635:25-1636:5.

16        Paragraph 24: Ms. Yeung objects to this paragraph because it misrepresents facts

17   established at trial.  Mr. Louie did not testify with certainty that he told the FBI that Ms. Yeung's

18   husband had asked him to act as a straw buyer during his second meeting with FBI agents.

19   Rather, Mr. Louie testified that he did not "remember exactly" when this was said to the FBI.  Mr.

20   Louie further testified that it was "most likely the second (meeting)" only seconds after testifying

21   that the statement was made during the first FBI meeting.  TR 1227:18-1228:4.  The date this

22   statement was made was not established with certainty at trial and should not be referred to with

23   certainty in Paragraph 24.

24        Paragraph 26:  Ms. Yeung objects to this paragraph because it misrepresents the facts

25   established at trial and is argumentative.  Paragraph 26 states that the transcripts of recorded

26   conversations between Ms. Yeung and Mr. Zhang are "replete" with "unambiguous" efforts by

27   Ms. Yeung to convince Mr. Zhang to lie to the FBI.  However, a careful examination of the

28   transcripts demonstrates that in only a very small number of instances, if at all, did Ms. Yeung

"unambiguously" attempt to convince Mr. Zhang to lie.  This paragraph is argumentative and should be modified to neutrally present the facts established at trial.

Paragraphs 6, 28, 36:  Ms. Yeung objects to these paragraphs because the record does not support a loss calculation of more than $1.3 million to the identified lending institutions.  Furthermore, Deutsche Bank was not named in the indictment, nor was any evidence relating to supposed losses suffered by Deutsche Bank or GMAC introduced at trial or in discovery.  Therefore, there is no evidence to establish that Deutsche Bank or GMAC suffered any loss related to this case.  For the additional reasons discussed *infra*, these lenders are not victims for the purposes of calculating loss under the Sentencing Guidelines.  Lastly, the alleged victim lenders were complicit in the fraud and their losses, if any, cannot be considered.

Ms. Yeung also objects to this paragraph to the extent that it assumes that the amount of loss can be reasonably determined or that the amounts of loss were reasonably foreseeable to Ms. Yeung.  *See* U.S.S.G. § 2B1.1, Commentary, Application Notes 3(A)(iv) and (B).

The chart provided in Paragraph 35 provides no insight into how the loss for each alleged victim was calculated.  The loss amount should be recalculated according to relevant U.S.S.G. guidelines and case law interpreting those guidelines.  And, the calculation should be based only on admissible evidence.  In particular, any alleged loss must be offset with any gains to the alleged victims, and loss attributable to market forces or other causes unrelated to the alleged fraud must be "disentangled" from any loss allegedly resulting from the fraud.  *See United States v. Laurienti*, __ F.3d __, 2010 WL 2473573, at *26 (9th Cir., June 8, 2010)).

Because of these unresolved factual issues and the government's burden to prove the amount of loss at sentencing,[3] an evidentiary hearing will be required to establish any amount of

---

[3]  As discussed below, to satisfy due process, the government must prove beyond a reasonable doubt any fact that would increase Ms. Yeung's guideline range beyond the base offense level.  In the Ninth Circuit, the "general rule" is that "due process does not require a higher standard of proof than preponderance of the evidence."  *United States v. Restrepo*, 946 F.2d 654, 661 (9th Cir. 1991).  However, when a sentencing factor has an "extremely disproportionate effect on the sentence" then "the government must prove the factor by clear and convincing evidence."  *U.S. v. Charlesworth*, 217 F.3d 1155, 1160 (9th Cir. 2000) (quoting *Mezas de Jesus*, 217 F.3d 638, 642).  The current loss amount yields an increase of 16 points under the Guidelines, greatly enhancing her sentence and necessitating the "clear and convincing" standard of proof.  *See, e.g.*, *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999) ("a potential increase of 48 moths satisfies the…extremely disproportionate impact test").  Although

loss claimed by the government to support any upward adjustments of Ms. Yeung's base offense level.

Paragraph 38:  Ms. Yeung objects to any adjustment for the role of "organizer" or "leader" because the evidence at trial is insufficient to establish that she played such a role.  First, Paragraph 38 states that Ms. Yeung "orchestrated the conduct of the five straw buyers in this case."  However, one of the straw buyers, Dihn Lam, never testified and there is simply no evidence that Ms. Yeung exerted any control over Mr. Lam's actions.  Second, the evidence at trial showed that Ms. Yeung did not control straw buyer Ken Ferrari, nor did she control Lawrence Phung.

Paragraph 76:  Ms. Yeung objects to this Paragraph because it contains statutory maximums based on the fact that each lender was federal financial institution.  However, no such evidence was presented at trial.  Nor does the Superseding Indictment under which Ms. Yeung was charged make any mention of the lending institutions being federal financial institutions. Paragraph 76 should be amended to reflect proper statutory maximums.

Paragraphs 76-93:  Ms. Yeung objects to these paragraphs to the extent that they contain any reference to, or are based on, an amount of loss that has not been proven by the government at trial or established at an evidentiary hearing.  Ms. Yeung specifically objects to Paragraphs 92 and 93 and the recommendation that she be ordered to pay restitution of $1,375,502.64 because there is no evidence to support that recommendation.

Paragraph 94:  Ms. Yeung objects to this paragraph to the extent that it does not consider applicable bases for downward departures under the Sentencing Guidelines, such as Ms. Yeung's age (U.S.S.G. § 5H1.1); the conduct of the victim lenders in this case (U.S.S.G. § 5K2.10); diminished capacity (U.S.S.G. § 5K2.13 and § 5H1.3); and others factors not adequately taken

---

(continued…)

the Ninth Circuit has recently held that the preponderance of evidence standard applies when loss is based on a criminal conspiracy, *United States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir. 2010), Ms. Yeung maintains that due process requires the clear and convincing standard of proof – and perhaps proof beyond a reasonable doubt – where, as here, the amount of loss has such an extremely disproportionate effect on the sentence.

YEUNG'S SENTENCING MEMO, MTN. FOR DOWNWARD
DEPARTURE & VARIANCE, & REQ. FOR EVID. HRG.
CR 09-00376- SI

1  into consideration by the Sentencing Guidelines and addressed below (U.S.S.G. § 5K2.0)

2         Paragraph 95:  Ms. Yeung objects to Paragraph 95 to the extent that it does not consider

3  the fact that the fraud guidelines are not based on empirical data and therefore may not satisfy the

4  sentencing factors the Court must consider under Section 3553(a).  The guidelines as calculated in

5  the PSR assign a guideline range of 87 to 108 months.  Particularly when considering the history

6  of how the fraud guidelines were promulgated, not through use of empirical data, but rather

7  through Congressional directives, this range does not adequately account for the factors that the

8  Court must consider under Section 3553(a) and results in a sentence that overestimates the

9  seriousness of the offense under Section 3553(a)(1).

10         Ms. Yeung objects to Paragraph 95 to the extent it does not consider sentencing options

11  other than incarceration.  Although a sentence may include incarceration to address punishment, it

12  may also include sentencing alternatives to address advanced age, life expectancy, and medical

13  needs.  *See* 18 U.S.C. § 3582(a).  An alternative to imprisonment is particularly appropriate here,

14  where Ms. Yeung is a first-time offender, the offense resulted, at least in part, from the criminal

15  conduct of a number of individuals more sophisticated than Ms. Yeung, and Ms. Yeung is 60

16  years old and suffers from a variety of medical ailments.

17  **LEGAL STANDARD**

18         Following *United States v. Booker*, 543 U.S. 220 (2005), the Court must impose a

19  sentence in accordance with 18 U.S.C. § 3553(a).  In particular, the Court must impose a sentence

20  "sufficient, *but not greater than necessary*" to comply with the purposes of punishment set forth

21  in 18 U.S.C. § 3553(a)(2).  *Id.* (emphasis added); *see, e.g., Kimbrough v. United States*, 1552 U.S.

22  85, 111 (2007) ("sufficient, but not greater than necessary" requirement is the "overarching

23  instruction" of § 3553(a)).  "The overarching statutory charge for a district court is to 'impose a

24  sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense,

25  promote respect for the law, and provide just punishment; to afford adequate deterrence; to

26  protect the public; and to provide the defendant with needed educational or vocational training,

27  medical care, or other correctional treatment."  *United States v. Carty*, 520 F.3d 984, 991 (2008)

28  (*citing* 18 U.S.C. § 3553(a)).

1    A district court cannot presume that the Guidelines range is a reasonable sentence under

2    Section 3553(a).  *United States v. Gall*, 552 U.S. 38, 50 (2007).  *Booker* and its progeny hold that

3    the Guidelines are merely one factor for the Court to consider at sentencing, along with the other

4    factors enumerated in § 3553(a), and that the Court must make an individualized assessment

5    based on the facts presented.  *United States v. Ressam*, 593 F.3d 1095, 1117-18 (9th Cir. 2010).

6    Moreover, the Guidelines should not be accorded any more weight than any other factor.  *Carty*,

7    520 F.3d at 991.

8    Furthermore, the Sentencing Commission has recognized that in many cases the courts

9    should consider alternatives to incarceration and "address the relevance of certain specific

10   offender characteristics at sentencing."  The Sentencing Commission concluded that "[p]roviding

11   flexibility in sentencing for certain low-level, nonviolent offenders helps lower recidivism, is cost

12   effective, and protects the public."  *See* http://www.ussc.gov/PRESS/rel20100419.htm.

13   **DISCUSSION**

14   The government's and the Probation Officer's sentencing recommendation are wholly

15   unwarranted based upon the facts of this case and Supreme Court precedent and the factors this

16   Court must consider when imposing sentence.  For the reasons discussed below and based on the

17   record herein, Ms. Yeung respectfully requests that she be sentenced to a term of probation with

18   home confinement and/or community service.[4]

19   **I.     THE GOVERNMENT HAS FAILED TO PROVE THE AMOUNT OF LOSS THAT
20          DETERMINES THE SENTENCING GUIDELINE RANGE.**

     The Probation Officer concedes that the PSR determined the applicable guideline range

21   based upon an amount of loss that has not been proven and is unsupported by any evidence.  If

22   the Court accepts the recommendation of the PSR, it must conduct an evidentiary hearing to

23   determine the amount of loss, and Ms. Yeung requests such an evidentiary hearing.

24   First, the PSR summarily concludes that the alleged victim banks suffered a total loss of

25   over $1.3 million, but there is no evidence in the record or in the PSR to support a loss of that

26

27       [4]  Probation is authorized under 18 U.S.C. § 3561(a)(1) because the maximum sentence
     for the wire fraud offenses that Ms. Yeung was convicted is twenty years.  As such, they are Class
28   C felonies.  See 18 U.S.C.§ 3559(a)(3).

1    amount.  Indeed, the Probation Officer concedes that this amount is based entirely on the

2    government's say-so rather than any evidence.  *See* PSR, Addendum to the Presentence Report,

3    ¶ 6.  This Court cannot sentence Ms. Yeung to a sentence of imprisonment based on a guideline

4    range that is unsupported by any evidence.  *See Charlesworth*, 217 F.3d at 1159 ("The sentencing

5    judge therefore need be convinced [at least] by a preponderance of the evidence that the fact in

6    question exists.").[5]

7          There are numerous problems with the amount of loss asserted by the government and

8    accepted by the Probation Office.

9    •    First, the loss can only include loss that actually resulted from the defendant's

10        conduct.  *Charlesworth, id.* at 1159; *U.S. v. Stoddard*, 150 F.3d 1140, 1145-46 (9th

11        Cir. 1998) (sentencing court must take a "realistic, economic approach to

12        determine what losses the *defendant truly caused or intended to cause*.")

13        (emphasis added); U.S.S.G. § 2B1.1, Commentary, Application Note 3 (actual loss

14        "means the reasonably foreseeable pecuniary harm that resulted from the offense").

15        Because several of the loans at issue in this case were sold by the originating

16        lenders, and because the government has failed to present any evidence that

17        subsequent purchasers of those loans relied upon any of the falsities in the loan

18        applications, loss to subsequent purchasers cannot be considered under § 2B1.1.

19        *Charlesworth, id.*

20   •    Second, losses to these downstream lenders were not foreseeable to the defendant

21        and therefore cannot be added to the total loss calculation.  *See United States v.*

22        *James*, 592 F.3d 1109, 1115 (10th Cir. 2010) (district court finding that losses to

23        "successor lenders" could not be part of loss calculation because "the losses of

24        those entities do[] not constitute reasonably foreseeable pecuniary harm, because

25        the decision to resell [the original loans] was made entirely by the [original] lender

26

27        _____

          [5] As discussed supra, the loss calculation in Ms. Yeung's case gives rise to an "extremely
28   disproportionate" effect on her sentence that justifies the use of the "clear and convincing"
     standard of proof.

YEUNG'S SENTENCING MEMO, MTN. FOR DOWNWARD
DEPARTURE & VARIANCE, & REQ. FOR EVID. HRG.
CR 09-00376- SI

1    without the knowledge or input from the defendant"); U.S.S.G § 2B1.1,

2    Commentary, Application Note 3 (reasonably foreseeable pecuniary harm means

3    harm that the defendant knew, or, under the circumstances, reasonably should have

4    known, was a potential result of the offense).[6]

5    •    Third, the Court must offset any losses with any gain to the victim lenders.

6    *Laurienti*, ___ F.3d at ___, 2010 W.L. 2473573, at * 25 ("For a given victim, it is

7    the net loss . . . that truly accounts for the actual loss to the victim as a result of the

8    scheme to defraud"). Here, the original lenders sold the loans to successor lenders

9    (*see* TR 1822; 1621) and may have had some gain when the loans were sold, and

10   that gain must be taken into consideration. *James*, 592 F.3d at 1117 (Lucero, J.,

11   concurring) ("when a mortgage is resold, a successor lender pays the amount of

12   the original mortgage plus a markup equal to the original lender's profit. . . . [T]he

13   original lender's profit must be subtracted [from any loss]"). Furthermore,

14   evidence at trial indicates that lenders identified in the indictment gained at least

15   $90,808.59 from the loan transactions (*see* Ex. 502-18; *cf.* Ex. 201-3 and 201-5

16   with Ex. 301-1), and that amount may not include the fees, points and interest that

17   the lenders earned on the loans, which should also be calculated and deducted

18   from any purported loss. *See* U.S.S.G. § 2B1.1, Commentary, Applications Notes

19   3(D)(i) and (E).

20   •    Fourth, the government and the PSR apparently contend that the loss amount

21   should be determined by taking the total value of the loan (principal plus future

22   interest), and then subtracting the amount for which the lender sold the collateral,

23   or the amount received from the sale of the loan. This is incorrect. The victim

24   lenders are not entitled to recover future interest, or the amount of interest

25   _____

26   [6] Furthermore, including these lenders as victims who suffered a loss could amount to an impermissible constructive amendment of the indictment, because the indictment alleged that Ms. Yeung defrauded the originating lenders, not the successor lenders. *See, e.g., United States v.*

27   *Milwitt*, 475 F.3d 1150, 1156-1159 (9th Cir. 2007) (conviction reversed for constructive amendment of indictment where the indictment alleged certain victims were defrauded but

28   evidence showed that different victims were defrauded).

1   expected over the life of the loan.  *See United States v. Morgan*, 376 F.3d 1002,

2   1113-14 (9th Cir. 2004) (the Sentencing Guidelines make it "explicit that the

3   exclusion of interest applies to both contractual and opportunity cost interest...the

4   district court erred by including interest and finance charges in the amount of

5   loss"); U.S.S.G. § 2B1.1 ("Loss shall not include the following:…Interest of any

6   kind, finance charges, late fees, penalties, amounts based on an agreed-upon return

7   or rate of return, or other similar costs.").  Moreover, there is no evidence showing

8   the amount for which the original loans were sold.

9   •   Fifth, the Court must "disentangle the underlying value [of the collateral], inflation

10   of that value due to fraud, and either inflation or deflation of that value due to

11   unrelated causes," such as the conduct of third parties or the market forces that

12   were at play.  *Laurienti*, ___ F.3d ___, 2010 WL 2473573, at *26.  The chart in

13   Paragraph 35 of the PSR does not indicate when the alleged new victims suffered

14   their alleged loss or how much of that alleged loss was the result of the collapse of

15   the housing market rather than any of the fraud alleged in this case.  *Id.*

16   •   Lastly, the evidence at trial showed that the lenders were complicit in the scheme.

17   Any losses to such lenders cannot be included in the loss calculation because the

18   lenders knew or should have known the statements in the loan applications were

19   false.  Each issued the loans despite that knowledge.  Thus, their losses were not

20   caused by the alleged criminal conduct.

21   In sum, the loss amount identified in the PSR is incorrect, and Ms. Yeung's sentence

22   cannot be premised on the amount of loss urged by the government and adopted by the Probation

23   Office.

24   **II.   BECAUSE THE AMOUNT OF LOSS HAS NOT BEEN PROVEN AND CANNOT
25   BE REASONABLY DETERMINED, THE COURT SHOULD USE GAIN TO THE
    DEFENDANT.**

26   The Commentary to section 2B1.1 provides that if the amount of loss cannot reasonably

27   be determined, the Court shall use the amount of gain to the defendant.  U.S.S.G. § 2B1.1,

28   Commentary, Application Note 3(B).  The loss in this case has not been proven, nor can the los

1   be reasonably determined given the intervening collapse of the housing market in the United

2   States.  The amount of gain to the defendant is the most appropriate measure of loss.  In this case,

3   that amount is no more than $86,586.45 because Ms. Yeung did not receive any money from any

4   of the loans except the WAMU refinance of 261 San Fernando.[7]  Other amounts of gain the

5   government attributed to Ms. Yeung at trial cannot be used in a gain calculation because 1) the

6   proceeds were from legal, uncharged loans, that cannot be used as a substitute for unproved loss

7   to the alleged victim lenders, and 2) the evidence that the Dihn Lam loan was fraudulent was

8   wholly insufficient, and, in any event, that loan is still active.

9   **III.    BECAUSE THE USE OF LOSS IN THE FRAUD GUIDELINES IS NOT BASED
         ON EMPIRICAL DATA AND IS NONSENSICAL FROM A POLICY**

10  **PERSPECTIVE, THIS COURT SHOULD GIVE LITTLE, IF ANY, WEIGHT TO
         THE SENTENCING GUIDELINES IN THIS CASE.**

11          The Supreme Court in *Booker* and subsequent cases has made it clear that the Sentencing

12  Guidelines are but one factor that the court should consider under § 3553(a) when imposing

13  sentence.  The Court has also held that when the Sentencing Commission fails to fulfill its

14  institutional role of developing a particular guideline, or its later amendments based on empirical

15  data, national experience, or some rational policy, the district court has discretion to conclude that

16  the resulting advisory range "yields a sentence 'greater than necessary' to achieve § 3553(a)'s

17  purposes."  *United States v. Kimbrough*, 128 S. Ct. 558, 575 (2007).

18          The Sentencing Commission has amended the fraud guidelines over the last twenty years

19  to produce dramatically higher sentencing ranges.  This increase in length of sentences is without

20  any empirical support.  *See United States v. Aldeson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006)

21  (citing Kate Stith & Jose A. Cabranes, *Fear of Judging:  Sentencing Guidelines in the Federal*

22  *Courts* at 69 (1998) ("[B]ecause of their arithmetic approach and also in an effort to appear

23  'objective,' [the Guidelines] tend to place great weight on putatively measurable quantities, such

24  as . . . the amount of financial loss in fraud cases, without, however, explaining why it is

25

26  ─────────────────

27          [7]  Ms. Yeung continues to maintain that WAMU was not defrauded because the WAMU
    loan officer was fully aware of Zhang's role in the refinance and the falsity of the statements in

28  the loan application, and therefore even the gain to Ms. Yeung from the WAMU loan should not
    be considered as a basis to adjust Ms. Yeung's offense level upward.

1   appropriate to accord such huge weight to such factors").  Because the Commission failed to

2   support the increased length of sentences with any empirical date, and thus failed to fulfill its

3   institutional role, sentencing courts have broad discretion to disagree, on policy grounds, with

4   sentences resulting from application of § 2B1.1's loss calculations.  *See Spears v. United States*,

5   129 S. Ct. 840, 843 (2009) (where Commission fails to fulfill its institutional role, courts can vary

6   from the Guidelines "based on policy disagreement with them, and not simply based on an

7   individualized determination that they yield an excessive sentence in a particular case").

8          When the fraud guidelines were originally promulgated, the Sentencing Commission

9   stated that its aim was to ensure "*short* but definite periods of confinement for a larger proportion

10   of [] white collar cases."  *See* U.S. Sentencing Commission, *Fifteen Years of Guidelines*

11   *Sentencing:  An Assessment of How Well the Criminal Justice System is Achieving the Goals of*

12   *Sentencing Reform*, at 56 (Nov. 2004) (emphasis added) [hereinafter *Fifteen Year Report*].  At

13   that time the maximum sentence for a fraud offense was 78 months under the Guidelines.  Since

14   then, the maximum range under the Guidelines has increased dramatically.  For instance, in 1987,

15   the guideline range calculated by the PSR, and using the government's inflated loss calculation,

16   here would have resulted in a sentence of 37-46 months.  *See United States Sentencing Guidelines*

17   *Manual*, Section 2F1.1(b)(1) (1987).  Thus, the sentence for Ms. Yeung has more than doubled.

18   And yet, research has shown that increases in the severity of punishment does not yield

19   significant, if any, deterrent effect.  Michael Tonry, *Purposes and Functions of Sentencing*, 34

20   Crime & Just. 1, 28 (2006).

21          Two separate amendments – 154 and 617 – are responsible for the bulk of the increase to

22   the loss table.  In  support of Amendment 154's substantial increase to the loss table, the

23   Commission stated only that it sought to conform the fraud loss tables to the tax evasion tables

24   and "increase the offense levels for offenses with larger losses to provide additional deterrence

25   and better reflect the seriousness of the conduct."  USSG, App. C, Amend. 154 (Nov. 1, 1989).

26   And, in adopting the substantial increases in Amendment 617, the Commission claimed it was

27   responding to "comments received from the Department of Justice, the Criminal Law Committee

28   of the Judicial Conference, and others, that [the fraud guideline] under-punish[es] individuals

1    involved in moderate and high loss amounts, relative to penalty levels for offense of similar

2    seriousness sentenced under other guidelines."  USSG, App. C, Amend. 617 (Nov. 1, 2001).

3         The explanations offered by the Commission for the two amendments are both deficient

4    and faulty.  In each instance, the Commission failed to provide any empirical data to support

5    higher sentences for fraud offenders who typically have no criminal history and an exceptionally

6    low recidivism rate.  The Commission ignored the overwhelming social science research,

7    discussed at length above, demonstrating that increases in sentence severity, as opposed to

8    certainty, have virtually no deterrent value.  Second, in adopting Amendment 154, the

9    Commission sought to conform the fraud loss table with the tax loss table without explaining why

10   the tax loss table should itself be a model.  Furthermore, though the Commission cited comments

11   from the Justice Department and the Criminal Law Committee in support the higher sentences

12   adopted through Amendment 617, it ignored clear feedback from the district courts.  Though the

13   Guidelines explicitly allow for *upward* departures when the amount of loss does not ''fully

14   capture the harmfulness and seriousness of the conduct," (*see* USSG § 2F1.1 app. note 11 (2000)

15   *and* USSG § 2B1.1 app. note 14 (2000)), the sentencing courts granted upward variances in less

16   than 1 percent of § 2B1.1 cases and only 1.2 percent of cases under § 2F1.1 in the year 2000.  *See*

17   U.S. Sentencing Commission, *2000 Sourcebook of Federal Sentencing Statistics*, tbl. 28 (2000).

18   This feedback—from the institutional player best suited to make individualized sentencing

19   determinations—completely contradicted the recommendations of entities like the Justice

20   Department.  Finally, in adopting Amendment 617, the Commission relied on the argument that

21   the existing loss table resulted in sentences lower than the penalty levels for offenses of similar

22   seriousness.  The Commission failed to point out which offenses it deemed to be of comparable

23   seriousness to high-loss fraud.  The end result of its increases under § 2B1.1 have, however, led to

24   the absurd result that first-time, nonviolent fraud offenders are subject to sentences as high as, and

25   sometimes even higher than, those imposed on the most violent offenders (*e.g.*, sentences for

26   kidnapping, arson, high volume drug trafficking, and voluntary manslaughter).  *Compare* USSG

27   § 2B1.1 (2001) (offense level of 23 based only on base offense level and amount of loss over)

28   *with* USSG § 2A4.1 (2001) (offense level of 24 for kidnapping), USSG § 2K1.4 (2001) (offense

1  level of 24 for arson creating substantial risk of death or serious bodily injury), USSG § 2D1.1

2  (2001) (offense level of 24 for trafficking in over 100 kg marijuana) *and* USSG § 2A1.3 (2001)

3  (offence level of 25 for voluntary manslaughter).

4       Moreover, though the Commission has made the amount of loss the determinative factor

5  in the offense level calculation for fraud offenders, loss amount is a highly imperfect measure of

6  the seriousness of the offense.  *See United States v. Adelson,* 441 F. Supp. 2d 506, 509 (S.D.N.Y.

7  2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the

8  amount of actual or intended financial loss" without any explanation of "why it is appropriate to

9  accord such huge weight to [this]factor[ ]").  The specific amount of loss is often "a kind of

10  accident" and thus "a relatively weak indicator of [ ] moral seriousness ... or the need for

11  deterrence."  *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004).

12  Most defendants do not set out to defraud a specific amount of money; rather, the amount of loss

13  is dependent on the security procedures in place and the point in time when the ongoing fraud

14  happens to be detected.  *Id.*  As the *Emmenegger* court explained:  "Had [the defendant] been

15  caught sooner, he would have stolen less money; had he not been caught until later, he would

16  surely have stolen more."  *Id.*

17       In short, the Commission failed to fulfill its institutional role of considering empirical

18  evidence when making the amount of loss central to its fraud guideline and then repeatedly

19  increasing the amount of points imposed for specific loss amounts.  The resulting fraud guideline

20  is, therefore, entitled to no deference.  This Court should look to the all of the § 3553(a) factors,

21  and the empirical data not considered by the Commission, in fashioning a sentence "sufficient,

22  but not greater than necessary" to fulfill the various purposes of sentencing.

23       Because the sentencing guideline for fraud is not based on empirical data or sound policy,

24  this Court should give the Guidelines little, if any, weight under § 3553(a).

25  **IV.    THE EVIDENCE PRESENTED AT TRIAL DOES NOT JUSTIFY A FOUR-
POINT ENHANCEMENT FOR MS. YEUNG'S ROLE IN THE OFFENSE.**

26

27       As discussed above, the evidence at trial – apart from Mr. Yee's self-serving testimony –

28  showed that this scheme was primarily orchestrated and executed by the government's witnesses

1    and individuals whom the government has never charged.  Ms. Yeung should therefore receive no

2    increase for role in the offense.  Moreover, the Commentary to U.S.S.G. § 3B1.1 makes it clear

3    that it was meant to apply to criminal organizations and not to *ad hoc* and serendipitous

4    associations of people involved in a series of related transactions.  *See id.,* Commentary,

5    Background ("This section provides a range of adjustments to increase the offense level based

6    upon the size of a *criminal organization*") (emphasis added).  Furthermore, the adjustment for

7    role in the offense is duplicative or cumulative because Ms. Yeung is already being punished for

8    the losses caused by other, far more sophisticated players in the alleged conspiracy, by virtue of

9    the upward adjustment under Section 2B1.1.  Moreover, the other participants, such as Mr. Yee

10   and Mr. Wong, have either not been charged or will receive significantly lower sentences.

11   Therefore, under the § 3553(a) factors the Court must consider, no upward adjustment for role in

12   the offense should be made.

13          At worst, Mr. Yee's testimony demonstrates that Ms. Yeung should only receive three

14   points as a "manager or supervisor" of the activity giving rise to the charged transactions.

15   Section 3B1.1 of the Guidelines lays out several factors for the Court to consider in determining

16   the role played by a defendant for purposes of this adjustment, including the exercise of decision

17   making authority, the claimed right to a larger share of the fruits of the crime, the recruitment of

18   accomplices, and the nature of the defendant's participation in the offense.  *See* U.S.S.G. § 3B1.1.

19   Examining these factors demonstrates that the role played by Ms. Yeung in the commission of

20   this offense was, at most, more akin to that of a "supervisor or manager," rather than "organizer

21   or leader."  This is especially true given that Ms. Yeung, untrained and unlicensed to deal with

22   real estate, was receiving frequent instruction and advice from licensed professionals who should

23   have known better.

24          The evidence introduced at trial shows that the bulk of the decision making authority

25   rested with Alex Yee and Richard Mesler, both licensed mortgage brokers.  For example, with

26   respect to the loan application for Andy Louie, Yee testified that he himself calculated a false

27   income to write down for Louie and he told Ms. Yeung that Louie's employment information

28   would need to reflect a "greater role" in order for Louie to qualify for a loan. TR 621:16-18;

SFI-644774v1

YEUNG'S SENTENCING MEMO, MTN. FOR DOWNWARD
DEPARTURE & VARIANCE, & REQ. FOR EVID. HRG.
CR 09-00376- SI

622:19-21.  With respect to the Ken Ferrari loan application, Yee testified that it was "Rick Mesler and myself" that came up with the idea to list Michael Farrell as Ferrari's employer.  TR 722:8-14.  The trial record is full of examples of Yee taking responsibility for false information placed on various loan applications.  TR 620:17-24; 722:4-14; 842:9-12; 1018:9-21.  Yee himself delivered applications to the lenders.  TR 171:16-25.  Although Yee was not involved with the first transaction with Washington Mutual, Kenneth Zhang testified at trial that false information was placed on the loan application at the encouragement and "hint" of Eliza Wu, yet another licensed mortgage broker.  TR 299:4-301:8.  With respect to the Dinh Lam transaction, the government chose not to call Mr. Lam, so there is simply no evidence that Ms. Yeung exercised authority over that transaction.  Viewing this evidence in its totality suggests that the fraudulent methods of obtaining these loans were devised and carried out largely by licensed loan brokers whose training made them acutely aware of the illegality of the course of action they were recommending be carried out.

That the licensed brokers exercised the greatest amount of authority over the criminal activity in this case is corroborated by the fact that the "fruits of the crime" belonged largely to them rather than Ms. Yeung.  Evidence presented at trial shows thousands and thousands of dollars being earned by the brokers involved in each transaction.  For example, in the 1351 3rd Street transaction, Yee and Mesler made substantial fees off of the approximately $36,900 in commissions received by BayCal.  TR 1056:11-13; 1296:4-12.  In the purchase of 7187 Pitlochry by Lawrence Phung, Janet Gong, who initially recruited Phung to be a straw buyer, made a $45,375 commission and Yee and Mesler split a substantial share of BayCal's $32,500 commission.  TR 1065:19-66:2.  These commissions were directly transferred to the brokers with no strings attached, whereas any benefit to Ms. Yeung came in the form of a high-interest loan obligation secured by real property.  The financial benefits of this scheme seemed to directly benefit all those involved *except* Ms. Yeung, suggesting that she was not playing the role of "leader or organizer."

In sum, Ms. Yeung exercised a low degree of control over a majority of the charged transactions.  In fact, Ms. Yeung controlled little beyond identifying the property that she wished

1   to obtain.  The fraudulent applications were filled out by the licensed brokers, Yee and Mesler,

2   who calculated the exact figures and information that were necessary to attain each loan.  TR

3   620:17-24.  The true fruits of the crime, the commissions made from each deal, belonged to the

4   licensed brokers and not to Ms. Yeung.  Given that she was largely following the lead of these

5   licensed professionals, it is inappropriate to conclude that Ms. Yeung was the "leader or

6   organizer" of this criminal activity.  Accordingly, she should be classified, at worst, as a

7   "manager or supervisor" and her sentence adjustment reduced from four points to three.

8   **V.      THE SENTENCING FACTORS JUSTIFY A DOWNWARD DEPARTURE AND
         VARIANCE.**

9

10          **A.      The Nature of the Offense.**

11          The offenses for which Ms. Yeung was convicted were nonviolent offenses largely

12   enabled and encouraged by licensed professionals and her abusive ex-husband, Michael Farrell.

13   Rather than pointing out the illegality of Ms. Yeung's proposition (the use of a straw buyer's

14   good credit to obtain loans), they instead took an active role in the endeavor by creating and

15   submitting loan applications with blatantly false information.  Furthermore, the "victims" in this

16   case are hardly deserving of the name.  They were large lending institutions willing to make loans

17   without any kind of supportive documentation.  For example, they accepted that a young man,

18   just out of college and working for a non-profit organization, was making nearly $16,000 *per*

19   *month*.  The lenders made these loans not caring whether they would be repaid, because the vast

20   majority of these loans were immediately sold off.  The majority of the "victims" named in the

21   Superseding Indictment did not even suffer a loss.  In short, the mortgage industry fostered and

22   encouraged the exact type of behavior for which Ms. Yeung has been accused and convicted.

23   Those most criminally liable in this situation, the underwriters approving obviously fraudulent

24   loans and, worse, the licensed professional brokers who processed and encouraged these loans,

25   knowing them to be illegal, should bear the brunt of the punishment.  It makes little sense and

26   serves no constructive purpose to imprison lay people such as Ms. Yeung for years and years,

27   only to let those truly responsible off with a slap on the wrist or no punishment at all.  Given the

28   nature of this offense, and the role played by the "victims," and by those duly licensed to conduct

1    this business, a sentence of 87 months imprisonment simply does not reflect the wrong committed

2    by Ms. Yeung.

3         **B.    History and Character of Defendant.**

4         The Probation Office's sentencing recommendation of 87 months in prison is particularly

5    inappropriate given the history and character of Ms. Yeung.  Throughout her time in the United

6    States, Ms. Yeung has been a powerful advocate for the education of young people.  She has

7    absolutely no prior criminal record and, despite a history of abusive relationships, she has raised

8    two sons to be successful, contributing members of the community.  In addition, Ms. Yeung's

9    family connections and traditional Chinese upbringing greatly reduce the likelihood of recidivism

10   on her part, as her loss of "face" has already inflicted severe punishment.  Finally, Ms. Yeung's

11   advanced age and urgent medical conditions, both physical and mental, make a downward

12   departure and variance particularly appropriate in her case.

13        **1.    The Defendant's Commitment to the Community.**

14        Since her arrival in the Bay Area nearly 20 years ago, Ms. Yeung has advocated tirelessly

15   on behalf of children's education.  Ms. Yeung was unable to complete her own education when

16   she was growing up.  PSR ¶ 62.  However, she has always recognized the importance of

17   education and wanted to assure that children were provided with the opportunity to succeed.  PSR

18   ¶ 65.  As indicated by the plethora of letters, certificates of honor, and awards she has received

19   from the City and County of San Francisco, the Mayor of San Francisco, Peninsula Police

20   Department, Oceana High School, Nancy Pelosi, and others, Ms. Yeung has long been dedicated

21   to the improvement of educational opportunities for Bay Area youth.  These letters commend Ms.

22   Yeung for her "generosity," her "devoted work to create a better future for low income, high risk

23   youth of California," her "long-standing commitment to working to develop strong and

24   productive young people," and her "tireless efforts on behalf of our youth."  *See* Peninsula Police

25   Department Letter dated November 16, 1997; Letter dated June 17, 2004 from the Secretary of

26   State, Kevin Shelly; Letter dated May 17,  2004 from the City and County of San Francisco

27   Juvenile Probation Commission.

28        Ms. Yeung's efforts on behalf of her community suggest that the events leading up to this

1   case represent a lapse in judgment on her part.  Long-term incarceration will prevent Ms. Yeung

2   from paying back her debt to society by resuming the good works that she has been credited for

3   over the course of many years in the Bay Area.  Such positive work should not go unnoticed by

4   the Court in determining Ms. Yeung's final sentence.

### 2. The Defendant's Struggle with Abuse.

6       Ms. Yeung's personal history is one of suffering and abuse.  While growing up in Hong

7   Kong, she witnessed first-hand domestic violence committed against her mother.  PSR ¶ 49.  Her

8   first husband, Tony Lau, was frequently unfaithful and often left Ms. Yeung alone to raise her

9   two sons.  PSR ¶ 50.  Her relationship with her second husband was equally damaging.  He was

10  both unfaithful and dishonest with his finances and ultimately passed away leaving Ms. Yeung

11  with an enormous amount of debt that negatively impacted her credit.  PSR ¶ 51.  In 2005, Ms.

12  Yeung married Michael Farrell out of a desire to make her sons happy and escape her own

13  loneliness.  Within several weeks of marriage, Farrell became verbally and physically abusive.

14  Police were called on multiple occasions when Farrell threatened Ms. Yeung both physically and

15  with a gun.  PSR ¶ 52.

16      Despite this history of betrayal and abuse, Ms. Yeung managed to raise two upstanding

17  sons.  Jimmy, is a marketing manager for a computer company and Danny is a deputy district

18  attorney in Alameda County.  Both have written letters on their mother's behalf, describing her as

19  loving, supportive, and extremely dedicated to the issue of education.  Both continue to live and

20  work in the Bay Area.

21      Ms. Yeung has also found a loving and supportive relationship with her fiancé, Lee Klier,

22  with whom she currently resides.  Ms. Yeung's strong connection to both Mr. Klier and her sons

23  provides her with a support system that makes recidivism on her part highly unlikely and renders

24  a sentence of many years incarceration extremely counterproductive.

### 3. The Defendant's Age and Status as a First-time Offender.

26      Both the age of Ms. Yeung and her first offender status are powerful predictors of the

27  likelihood of recidivism.  Indeed, the Sentencing Commission has itself recognized that (1)

28  recidivism rates decline dramatically with age, and (2) first-time offenders are even less likely to

SFI-644774v1

YEUNG'S SENTENCING MEMO, MTN. FOR DOWNWARD
DEPARTURE & VARIANCE, & REQ. FOR EVID. HRG.
CR 09-00376-SI

27

reoffend than defendants with a limited criminal history who also fall within Criminal History Category I.  *See* U.S. Sentencing Commission, *Measuring Recidivism:  The Criminal History Comparison of the Federal Sentencing Guidelines*, at Ex. 9 (May 2004) [hereinafter *Measuring Recidivism Report*]; U.S. Sentencing Commission, *Recidivism and the "First Offender*," At 13-14 (May 2004) [hereinafter *First Offender Report*].  The Commission's research has, for example, demonstrated that a 20-year-old defendant in Criminal History Category I has a 29.5% chance of reoffending, while a 51-year-old defendant with the same criminal history has only a 6.2% chance of recidivating.  *Measuring Recidivism Report* at Ex. 9.  With respect to first offenders, the Commission has found that offenders with zero criminal history points have a recidivism rate of just 11.7%, while offenders with just one criminal history point have double the recidivism rate at 22.6%.  *First Offender Report* at 13-14.

A growing number of courts have themselves taken both age and first-offender status into account when fashioning an appropriate sentence under 18 U.S.C. § 3553(a).  *See, e.g., United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding sentence in child pornography case as reasonable where district court granted downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 2009 WL 995576, at *3 (2d Cir. Apr. 19, 2009) (holding that "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming a below-guidelines sentence where the district court's only reason for the variance was that the defendant's age made it unlikely that he would again be involved in another violent crime); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants, like Cabrera, "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (explaining that sentence of 262 months - as opposed to Guidelines sentence of 324 to 405 months - constituted "sufficient, but not excessive, deterrence" for 44-year-old defendant); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (explaining that age of offender is relevant to § 3553(a) analysis, even if not ordinarily relevant under the Guidelines, and granting variance to 57-year-old defendant); *United States v.*

1   *Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-

2   time offender since Guidelines do not "account for the length of time a particular defendant

3   refrains from criminal conduct" before committing his first - *i.e.,* the charged - act).

4        Given this framework, Ms. Yeung is particularly qualified for both a downward departure

5   under the Sentencing Guidelines and a downward variance under 18 U.S.C. § 3553(a).

6   According to U.S.S.G. §5H1.1, "[a]ge may be a reason to depart downward in a case in which the

7   defendant is elderly and infirm."  At age 60, with absolutely no prior criminal record, and

8   suffering from acute health problems described directly below, Ms. Yeung undoubtedly qualifies

9   for such a departure.  Her age, health issues, and status as a first-time offender make her less

10  likely to recidivate, less of a threat to the community, and make each year of incarceration that

11  much more devastating and unnecessary as a form of punishment.

12                    **4.      The Defendant's Health.**

13       Under U.S.S.G. § 5H1.4, a defendant's "extraordinary physical impairment may be a

14  reason to depart downward."  In addition, under 18 U.S.C. § 3553(a), when fashioning a

15  "sufficient sentence, but [one] not greater than necessary …factors such as a

16  defendant's…medical condition…can form the bas[is] for a variance."  *United States v. Chase*,

17  560 F.3d 828, 830-31 (8th Cir. 2009).  In this situation, Ms. Yeung's critical physical condition is

18  grounds for both a departure under the Sentencing Guidelines and a variance under 18 U.S.C.

19  3553(a).

20       Ms. Yeung suffers from a number of health conditions, at least one of which is potentially

21  life-threatening.  As early as the winter of 2009, Ms. Yeung was diagnosed with an aortic

22  aneurysm, a tear in her heart that needs to be replaced.  *See* Letter of Dr. Ka Wai Tam, MD dated

23  December 30, 2009, Ex. E.[8]  According to her current physician, Dr. Margaret Lo, "Ms. Yeung is

24  undergoing continued medical evaluation in preparation for surgery…Emotional stress which

25  raises the patient's blood pressure could result in sudden death.  The patient's condition will need

26  to be monitored into the foreseeable future."  *See* Letter of Dr. Margaret S. Lo, MD dated May 24,

27

28        [8] All Exhibits referenced with letters come from the Declaration of Martha Boersch
    submitted with this Sentencing Memorandum.

SFI-644774v1

YEUNG'S SENTENCING MEMO, MTN. FOR DOWNWARD
DEPARTURE & VARIANCE, & REQ. FOR EVID. HRG.
CR 09-00376- SI

2010 Ex. C.  Surely exposure to the stress and strain of prison life at such a late age will present the kind of "emotional stress" that is a dangerous threat to Ms. Yeung's life.  This diagnosis has been confirmed by at least two other medical organizations, including Kaiser Permanente and Camino Medical Group.  *See* Exs. A, B.  Ms. Yeung is currently taking medications to contain her symptoms of coronary issues, dizziness, anxiety, pain, and high blood pressure.  Her blood pressure in particular, which is dependant upon a healthy, low-sodium diet, is likely to be exacerbated by exposure to years of an institutional diet.  This in turn increases the risk posed by Ms. Yeung aortic aneurysm.  Simply put, given her current condition, incarceration is a direct threat to Ms. Yeung's life.  The serious risk that Ms. Yeung faces is grounds for both a departure under the Sentencing Guidelines and a variance under 18 U.S.C. § 3553(a) as it would subject Ms. Yeung to more than normal danger and hardship. *See United States v. Charles*, 531 F.3d 637, 641 (8th Cir. 2008) ("To determine if an extraordinary physical impairment exists, we ask three questions. First, is the particular defendant's physical condition such that he or she would find imprisonment more than the normal hardship? Second, would imprisonment subject him or her to more than the normal inconvenience or danger?...Third, does the physical condition have any substantial present effect on the defendant's ability to function?").

### 5. The Defendant's Mental Condition.

In addition to her physical issues, Ms. Yeung has also been diagnosed with a number of serious mental ailments.  On September 25, 2009, Ms. Yeung was examined by Dr. Scott Lines, Ph.D., a licensed psychologist.  Dr. Lines identified two serious mental conditions that appear to have contributed substantially to the criminal conduct for which Ms. Yeung has been convicted.  First, Dr. Lines concluded that Ms. Yeung suffers from what is known as "Histrionic Personality Disorder" ("HPD").  According to Dr. Lines, this condition manifested in Ms. Yeung as early as adolescence and causes a "pervasive pattern of excessive emotionality and attention seeking" that makes Ms. Yeung "highly suggestible, easily influenced by others."  *See* Report of Dr. Lines at 6, Ex. F.  Dr. Lines found Ms. Yeung's dependency on others to be "striking" and concluded that her easily manipulated, "impressionistic" style of cognitive reasoning "negatively impacts her judgment," *Id.* at 7.  All in all, Ms. Yeung has so many of the symptoms of Histrionic Personality

1   Disorder that Dr. Lines stated:  "I cannot think of another case in my clinical experience that

2   more completely fits the diagnostic criteria [for HPD]."  *Id.* at 6.

3       In addition to HPD, Ms. Yeung was also diagnosed with symptoms of Posttraumatic

4   Stress Disorder (PSD).  Dr. Lines concluded that Ms. Yeung's "anxiety problems are complicated

5   by experience of actual trauma, i.e. her second husband's daughter trying to stab her, this same

6   husband physically abusing her, her third husband pulling a gun on her, etc.  These incidents meet

7   the diagnostic criteria of threats to one's life or bodily integrity that are necessary for a diagnosis

8   of Posttraumatic Stress Disorder."  *See id.* at 7.  PSD manifests for Ms. Yeung in ways that

9   "affect her behavior and judgment."  *Id.*  The result is that Ms. Yeung "will tend to avoid conflict

10  in relationship and just go along in situations not in her best interest…She suffers from the

11  cumulative trauma of having been in at least two such relationships."  *Id.*  Notably, the report of

12  the government's expert, Dr. Emily Keram, M.D., confirmed several of Dr. Lines' findings,

13  concluding that Ms. Yeung suffers from "Paranoid, Dependent, and Histrionic Personality traits."

14  *See* Letter of Dr. Emily Keram, M.D., dated January 16, 2010, Ex. G.[9]

15      These serious disorders offer insight and explanation as to why Ms. Yeung's lapse of

16  judgment during the time of the offense transactions and why she allowed herself to go along

17  with the fraudulent course of action recommended and encouraged by her ex-husband and the

18  loan brokers in this case: Alex Yee, Richard Mesler, and Eliza Wu.  Given her inability to resist

19  manipulation, Ms. Yeung's conditions prevented her from exercising control over behavior that

20  she should have known to be wrongful.  In other words, these conditions "contributed

21  substantially" to the commission of the offense, and therefore should be grounds for a departure

22  under the Sentencing Guidelines.  *See United States v. Williams*, 553 F.3d 1073, 1084-85 (7th Cir.

23  2009) (remanding where district court failed to address defendant's arguments that his reduced

24  intellectual capacity made him more susceptible to manipulation by his brother, the ringleader of

25  the criminal activity); *United States v. Cunningham*, 429 F.3d 673, 676-80 (7th Cir. 2005)

26

27     [9] The government's other mental health expert, Dr. Milton Harris, Ph.D., ABBP-Cn, also
    concluded that Ms. Yeung suffers from "Paranoid Personality Traits" and "Dependent Personality
28  Traits."  *See* Letter of Dr. Harris, dated January 6, 2010, Ex H.

1   (remanding where district judge made no mention of diminished mental capacity as possible

2   mitigating factor despite evidence that defendant's long history of psychiatric illness…made him

3   more prone to commit the offense in question).  Even if a departure is not granted under the

4   Guidelines, Ms. Yeung's psychological conditions establish grounds for a variance under the

5   considerations of 18 U.S.C. § 3553(a).  *See*, *e.g.*, *United States v. Mendez*, 284 Fed. Appx. 653,

6   657 (11th Cir. 2008) (district court noted that defendant's "mental condition and mental history"

7   were factors that it "can, and should, and will consider" during sentencing in light of *Booker*).

8                    **6.      The Defendant's Cultural Background.**

9            An inseverable aspect of Ms. Yeung's personal history and character, which the Court

10   must consider under 18 U.S.C. § 3553(a), is Ms. Yeung's status as a member of the traditional

11   Chinese community.  Ms. Yeung grew up in Hong Kong where she experienced a "traditional

12   Chinese upbringing, which involved corporal punishment."  When considering just punishment,

13   one must consider the punishment Ms. Yeung has already endured and will endure regardless of

14   the ultimate length of her sentence.  She has suffered abuse all of her life, and it is not surprising

15   that she has made poor decisions in her relationships and in trusting others.  Moreover, she has

16   suffered "loss of face," a personal devastation.  In the Chinese community, the concept of "loss of

17   face" or extreme disgrace results when a person is involved in undesirable behavior.

18            In the Chinese culture, the concept of "face" describes one's status in the

19   community.  "Face" is similar to "reputation" in the Western culture, but in the Chinese culture,

20   its effects have the power to impact one's professional, personal, and public life far more

21   deeply.  In the Chinese tradition, "face" encompasses the community's perception of one's

22   personality, behavior, honor, trustworthiness, goodwill, prestige, status, and authority.  One who

23   loses "face" by some reprehensible conduct or behavior will lose huge amounts of trust,

24   acceptance and respect within her community.

25            This case has been published in the media, and Ms. Yeung has already suffered greatly

26   within the local Chinese community.  Given the additional severe collateral consequences that

27   this conviction may cost her, she is more than amply deterred from ever engaging in such conduct

28   again.  This should be given adequate weight by the Court in determining her final sentence.  *See,*

1    *e.g., United States v. Yu*, 954 F.2d 951, 956 (3d Cir. 1992) (Becker, J., dissenting) ("In a world

2    without sentencing guidelines, a sentencing court might consider a defendant's different cultural

3    background relevant to the appropriate sentence. . . . [because] cultural differences are sometimes

4    logically relevant to determining a proper sentence.").

5           **C.    The Need to Avoid Sentence Disparity.**

6           18 U.S.C. § 3553(a)(6) instructs that "[t]he court, in determining the particular sentence

7    to be imposed, shall consider…the need to avoid unwarranted sentence disparities among

8    defendants with similar records who have been found guilty of similar conduct."  In this case,

9    there is a great danger that carrying out the PSR's recommended sentence of 87 months will

10   ignore this consideration.  Namely, in this case Alex Yee and Richard Mesler, the licensed

11   mortgage brokers responsible for the majority of the fraudulent behavior in this case (and for

12   countless other loan applications not associated with Ms. Yeung), both made agreements with the

13   government that could lead to sentences that are but a fraction of what Ms. Yeung receives for her

14   behavior.  Yee's and Mesler's Plea Agreements with the government calculate a Sentencing

15   Guideline offense level of 18, far below the level 29 currently assigned to Ms. Yeung.  *See* Exs. I,

16   J.  It is likely that, given their cooperation, Yee's and Mesler's sentences will be reduced far

17   beyond the range that would be warranted by their total offense level under the Guidelines.  Mr.

18   Yee, for example, testified that he expected to get "no jail time, at least" in light of his

19   cooperation with the government.  TR 985:18-19.  It simply makes no sense, and flies in the face

20   of sentencing parity, to allow Mr. Yee and Mr. Mesler, licensed professionals who knew perfectly

21   well the illegality of what they were doing and who committed this type of fraud on a grand scale,

22   to walk away with a relative slap on the wrist while Ms. Yeung is sentenced to nearly a decade in

23   prison.  Such a result is simply unjust.

24          Even worse, other equally or more culpable individuals remain inexplicably uncharged

25   in connection to these transactions.  Alden Wong, for example, was the undisputed force behind

26   the fraudulent loans at BayCal.  TR 1056:11-13; Ex. K at 014713 (recording of Alden Wong

27   stating to Ken Ferrari:  "What we need to do is we need to keep the house [1351 3rd Street] in

28   your name. We'll make the payments until we sell the house. After we sell the house, then you

1    get back your money, okay. You don't get the 20 grand."). Yet, to this day Wong has not been

2    indicted and does not appear to be facing even the threat of jail time. Furthermore, each of the

3    straw buyers, some of whom were eager participants in the loan transactions, received full and

4    complete immunity. *See, e.g.,* TR 1321:24-1322:9. At the very least, the Court should consider

5    the sentences to be received by Mr. Yee, Mr. Mesler, and other equally or more culpable actors,

6    before assigning a final sentence to Ms. Yeung. *See U.S. v. Arenas*, 340 Fed. Appx. 384, 387 (9th

7    Cir. 2009) (district court explained that a twelve month variance below the Sentencing Guidelines

8    minimum was "necessary to account for the disparity between [defendant's] sentence and the

9    sentences of her co-defendants.").

10             **D.      The Need for the Sentence to Protect the Public.**

11            18 U.S.C. § 3553(a)(2)(c) instructs the Court to consider the "need for the sentence

12   imposed…to protect the public from further crimes of the defendant." Ms. Yeung's

13   circumstances, especially her age, lack of any criminal history, health, and traumatic experience

14   at her trial, all suggest that she is highly unlikely to cause harm to the public in any way. Ms.

15   Yeung has never presented a physical danger to the public. After going through the ordeal of a

16   public trial, she no longer poses a threat of future fraudulent behavior. "If one of the reasons of

17   imprisonment is to deter, then imprisonment may serve little purpose here…because [Ms. Yeung]

18   is not a candidate to reoffend." *See* Letter of Danny Lau. As described above, Ms. Yeung has

19   already received ample punishment in the form of loss of face. Furthermore, Ms. Yeung's

20   conduct was largely enabled and aided by licensed professionals who should have been informing

21   her of the illegality of the transactions they were carrying out together. Now that she has learned

22   this lesson in the hardest possible manner, there is simply no chance that Ms. Yeung will commit

23   another crime. This is particularly true now that she has the benefit of the guidance and support

24   of her fiancé, Lee Klier. Given Ms. Yeung's age and serious health issues, detailed above, her

25   focus will be on living out her remaining years as peacefully and trouble-free as possible. Ms.

26   Yeung simply does not pose a further threat to the public and placing her in prison for many years

27   will serve no such protective purpose.

28            Rather than sending Ms. Yeung to jail, an appropriate sentence would be probation with a

1    term of community service, where Ms. Yeung could contribute her skills to society.  *See*

2    http://www.ussc.gov/PRESS/rel20100419.htm (the Sentencing Commission concluded that

3    "[p]roviding flexibility in sentencing for certain low-level, nonviolent offenders helps lower

4    recidivism, is cost effective, and protects the public").

5    **VI.      REQUEST FOR EVIDENTIARY HEARING.**

6           Ms. Yeung requests an evidentiary hearing pursuant to Local Rule 32-5(d) to determine:

7    (1) the amount of loss, if any, that is attributable to Ms. Yeung's conduct, and (2) the identity of

8    the victims, if any.

9           The names of the witnesses to be called and a brief description of their testimony is below:

10         (1)      Kathy deLara:  Underwriter for Mr. Zhang's refinace of 261 San Fernando Way,

11                  San Francisco California.  Ex. L.  Ms. deLara will testify to the underwriting process

12                  relating to Mr. Zhang's loan.

13         (2)      Betty Wong:  Underwriter for Mr. Louie's purchase of 1351 Third Street, Gilroy

14                  California.  TR 1811:11-16.  Ms. Wong will testify to the underwriting process

15                  relating to Mr. Louie's loan.

16         (3)      Sean Nagy:  Underwriter for Mr. Ferrari's purchase of 1351 Third Street, Gilroy

17                  California.  Mr. Nagy will testify to the underwriting process relating to Mr. Ferrari's

18                  loans.

19         (4)      Susan Kupchunas:  Underwriter for Mr. Lam's purchase of 261 San Fernando Way,

20                  San Francisco California.  TR 1695:1-7.  Ms. Kupchunas will testify to the

21                  underwriting process relating to Mr. Lam's loan from Chase Bank.

22         (5)      Alicia Garcia:  Underwriter for Mr. Lam's purchase of 261 San Fernando Way,

23                  San Francisco California.  Ex. M.  Ms. Kupchunas will testify to the underwriting

24                  process relating to Mr. Lam's loan from Cal State 9.

25         (6)      Cathy Alden:  Underwriter for Mr. Phung's purchase of 7187 Pitlochry Drive,

26                  Gilroy, California.  TR 1749:14-23.  Ms. Alden will testify to the underwriting process

27                  relating to Mr. Phung's loan from Silver State Financial.

28

(7)     Chad D. Gonia:  Provided the amount of loss relating to the Long Beach Mortgage loans.  Mr. Gonia will testify as to how he calculated that amount of loss.

(8)     Caty W. McCarty:  Provided the amount of loss relating to Chase's loan to Mr. Lam.  Ms. McCarty will testify as to how she calculated that amount of loss.

(9)     Bob Williams:  Provided the amount of loss relating to the loans GMAC purchased from Silver State's loans to Mr. Phung.  Mr. Williams will testify how he calculated that amount of loss.

(10)     Ashley Speaker:  Provided the amount of loss relating to Long Beach Mortgage's loans to Mr. Ferrari and Chase's loans to Mr. Lam.  Ms. Speaker will testify as to how she calculated that amount of loss.

(11)     Expert on Mortgage Industry:  Will testify about the various sources of loss that may be attributable to each loan.

## CONCLUSION

Based on the foregoing, Ms. Yeung respectfully requests a sentence of probation with a term of home confinement and/or community service.

Dated: July 2, 2010                         Respectfully submitted,

                                            Jones Day


                                            By: /s/ Martha A. Boersch
                                                Martha A. Boersch

                                            Counsel for Defendant
                                            JUDY YEUNG

## CERTIFICATE OF SERVICE

I, Elizabeth Evans, declare:

I am a citizen of the United States and employed in San Francisco County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 555 California Street, 26th Floor, San Francisco, California  94104.  On July 2, 2010, I served a true copy of **DEFENDANT JUDY YEUNG'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD DEPARTURE AND VARIANCE, AND REQUEST FOR EVIDENTIARY HEARING; AND DECLARATION OF MARTHA BOERSCH IN SUPPORT OF DEFENDANT JUDY YEUNG'S SENTENCING MEMORANDUM, MOTION FOR DOWNWARD DEPARTURE AND VARIANCE, AND REQUEST FOR EVIDENTIARY HEARING WITH EXHIBITS A-M** on the following party:

> **Teresa Hoffman**
> U.S. Probation Office
> 450 Golden Gate Ave.
> San Francisco, CA  94102
>
> **Fax (415) 436-7572**

**BY MAIL:**  I caused the foregoing document(s) to be placed in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.

**XX**  **BY FACSIMILE:**  I caused the foregoing document(s) to be transmitted to the party(ies) set forth below at the fax number(s) specified.  The sending facsimile machine (or the machine used to forward the facsimile) issued a transmission report confirming that the transmission was complete and without error.

**BY HAND DELIVERY:**  I caused the foregoing document(s) to be delivered on the same day by an authorized courier in an envelope or package designated by the messaging service carrier addressed as set forth above.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 2, 2010 at San Francisco, California.


_____/s/  Elizabeth Evans_____
**Elizabeth Evans**

SFI-644774v1

37

Yeung's Sentencing Memo, Mtn. For Downward
Departure & Variance, & Req. For Evid. Hrg.
CR 09-00376- SI