JOSEPH P. RUSSONIELLO (CSBN 44332)
United States Attorney

BRIAN J. STRETCH (CSBN 163973)
Chief, Criminal Division

SUSAN E. BADGER (CSBN 124365)
JEFFREY RABKIN (CSBN 189798)
Assistant United States Attorneys

   450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102
   Telephone: (415) 436-7199
   Facsimile: (415) 436-7234
   Email: Susan.Badger@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>JUDY YEUNG,<br> also known as "Miu Wan Yeung,"<br><br>  Defendant. | No. CR 09-376 SI<br><br>**UNITED STATES'**<br>**SUPPLEMENTARY SENTENCING**<br>**MEMORANDUM**<br><br>Date: August 5, 2010<br>Time: 9:00 a.m.<br>Court: Hon. Susan Illston |

USA SUPP. SENTENCING
MEMO
CR 09-376 SI

# TABLE OF CONTENTS

I. INTRODUCTION ................................................. 2

   A. The Loans at Issue ........................................ 2

      1. The Loans In Which No Loss Occurred .......................... 2

      2. The Loans In Which Losses Were Sustained ....................... 3

         a. Lam Loan From Chase Secured by 261 San Fernando Way ........... 3

         b. Lam Loan from Cal State 9 Credit Union Secured by 261 San Fernando Way ...................................... 3

         c. Ferrari Loans From Long Beach Secured by 1351 Third Street ......... 3

         d. Phung Loans from Silver State Mortgage Secured by 7187 Pitlochry Drive ........................................ 4

   B. How Loss is Calculated for Purposes of the Sentencing Guidelines ........... 4

   C. The Upcoming Evidentiary Hearing on Loss ......................... 6

      1. The Government's Witness at the Evidentiary Hearing .................. 6

      2. Summary of the Evidence the Government Intends to Introduce ........... 8

         a. The Dinh Lam Loan From Chase (261 San Fernando Way) ........... 9

         b. The Dinh Lam Loan from Cal State 9 CU (261 San Fernando Way) ..................................... 10

         c. The Ferrari Loans from Long Beach (1351 Third Street) .............. 11

         d. The Lawrence Phung Loans from Silver State (7187 Pitlochry) ........ 13

         e. Total Loss ....................................... 15

   D. Gain to Yeung As an Alternative Means Of Calculating Loss and the Sentencing Guidelines ..................................... 15

   E. The Bureau of Prisons Can Provide Adequate Medical Care For Yeung ........................................... 17

# TABLE OF AUTHORITIES

## FEDERAL CASES

*United States v. Allen*, 88 F.3d 765 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Berry*, 258 F.3d 971 (9th Cir. 2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. Davoudi*, 172 F.3d 1130 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000)  . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Littlesun*, 444 F.3d 1196 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. McCormac*, 309 F.3d 623 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Sustaita*, 1 F.3d 950 (9th Cir. 1993)  . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Williams v. New York*, 337 U.S. 241 (1949)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

## STATUTES, RULES AND GUIDELINES

18 U.S.C. § 3661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Evid. 1101(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S.S.G § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        5

U.S.S.G. § 2B1.1, n.2(A) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 7

U.S.S.G. § 2B1.1, n.3(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

U.S.S.G. § 2B1.1, n.3(A)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

U.S.S.G § 2B1.1, n.3(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

U.S.S.G § 2B1.1, n.3(D)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G § 2B1.1, n.3(E)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G § 2B1.1, n.3(E)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G § 6A1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

# I.  INTRODUCTION

The Court has scheduled an evidentiary hearing for August 5, 2010 at 9:00 a.m. in order to provide the parties with the opportunity to present evidence relating to any losses resulting from the fraudulent loans in this case.  The government submits this Supplementary Sentencing Memorandum in order to review the law on how losses are calculated for purposes of establishing the applicable sentencing guidelines, advise the Court how the government intends to proceed at the evidentiary hearing, and provide a summary of the evidence that the government is prepared to present.  This memorandum also provides the Court with additional information regarding the Bureau of Prisons' ability to address Yeung's medical needs.

## A.  The Loans at Issue

As the Court is aware, the jury convicted Yeung of fraud in connection with six separate mortgage loans.  The six loans were secured by three different pieces of property.  Not all of the lenders who were defrauded sustained a loss.

### 1.  The Loans In Which No Loss Occurred

First, on March 22, 2005, Washington Mutual Bank funded a $1.36 million loan for straw buyer Kenneth Zhang secured by the property at 261 San Fernando Way in San Francisco.  That loan was eventually fully paid off by additional loans that Yeung obtained.  Evidence introduced at trial established that on May 25, 2006, Yeung obtained a $200,000 loan from Nishen Fu.  She used $50,928 of those funds to make a payment on the WAMU / Zhang loan.  On January 8, 2007, through Dinh Lam, Yeung obtained a $1.73 million loan from Chase secured by the 261 San Fernando Way property.  Evidence introduced at trial established that funds from that loan fully paid off the outstanding debt on the WAMU / Zhang loan.  There is therefore no loss associated with this loan.

Second, on October 20, 2005, Long Beach Mortgage, a division of Washington Mutual, funded first and second mortgages totaling $800,000 to straw buyer Andy Louie.  Those loans were secured by the property at 1351 Third Street in Gilroy, California.

Louie testified at trial that soon after the loan funded, he told Yeung that he no longer wanted to be involved with the loan.  At Yeung's behest, mortgage broker Alex Yee found another straw buyer, Ken Ferrari, to replace Louie.  Evidence introduced at trial established that on December 30, 2005, Long Beach Mortgage funded first and second mortgage loans to Ferrari totaling $830,000.  The loans were secured by the 1351 Third Street property.  When those loans funded, the original Louie loans were paid off.  There is therefore no loss associated with the Louie loan.

### 2. <u>The Loans In Which Losses Were Sustained</u>

At issue at sentencing are the losses sustained by the lenders in connection with the remaining four loans.  Those loans are as follows:

#### a.  Lam Loan From Chase Secured by 261 San Fernando Way

Evidence at trial established that Chase Home Finance funded a loan to straw buyer Dinh Lam, secured by 261 San Fernando Way, in the principal amount of $1,732,500 on January 8, 2008.  Lam and Yeung defaulted on this loan.  As discussed further below, and for purposes of determining the sentencing guidelines, the loss to Chase Home Finance on the Lam loan was $388,545.

#### b.  Lam Loan from Cal State 9 Credit Union Secured by 261 San Fernando Way

Evidence at trial established that, at the same time that Chase loaned Lam $1.73 million as a first mortgage, Cal State 9 Credit Union funded a second mortgage loan to Dinh Lam secured by 261 San Fernando Way, in the principal amount of $467,500.  As discussed further below, information and documents received from Cal State 9 Credit Union show that it took a loss for the entire amount of the principal loan after Lam and Yeung defaulted.  The loss to Cal State 9 Credit Union for purposes of determining the sentencing guidelines is $467,500.

#### c.  Ferrari Loans From Long Beach Secured by 1351 Third Street

As noted above, Long Beach Mortgage approved and funded first and second mortgages in the name of Ken Ferrari in amounts totaling $830,000.  The first mortgage

was secured by a note in the amount of $664,000, and the second was secured by a note in the amount of $166,000.  Ken Ferrari and Judy Yeung defaulted on these loans.  As discussed further below, the loss on the Ferrari loans was $465,519.

### d. Phung Loans from Silver State Mortgage Secured by 7187 Pitlochry Drive

On approximately March 7, 2006, Silver State Mortgage funded first and second mortgages in the amounts of $1 million and $300,000, respectively, for Lawrence Phung's purchase of the property at 7187 Pitlochry Drive.  The loans subsequently went into default and Mr. Phung sold the Pitlochry property for $1.2 million.  As discussed further below, the reasonable estimate of the loss on the Phung loan was $100,000.

## B. How Loss is Calculated for Purposes of the Sentencing Guidelines

With regard to loss calculations, "loss is the greater of the actual or intended loss." U.S.S.G. § 2B1.1, n.2(A) (2009); *United States v. McCormac*, 309 F.3d 623, 627 (9th Cir. 2002).  The Sentencing Guidelines specifically provide that "[t]he court need only make a reasonable estimate of loss."  U.S.S.G. § 2B1.1, n.3(C).  The Sentencing Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1, n.3(A)(i).  "Reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." § 2B1.1, n.3(A)(iv).

Section 1B1.3 of the Guidelines instructs the Court to take into account relevant conduct in determining the base offense level.  Section 1B1.3 states that the base offense level and specific offense characteristics are to be determined based on "all harm that resulted from" the acts committed, aided, abetted, or counseled by the defendant, or in the case of jointly undertaken criminal activity, all reasonably foreseeable acts in furtherance of the jointly undertaken activity.  *See* U.S.S.G. § 1B1.3(a)(3).

As a general matter, the proper loss calculation in a case such as the present one, where a loan obtained by fraud went into default and the lender sustained a loss, should

be based on the gross amount of the unpaid loan, less any funds recovered after sale of the property securing the loan.  Application Note 3(E)(ii) to Section 2B1.1 of the Sentencing Guidelines provides that loss shall be reduced "[i]n a case involving collateral pledged or otherwise provided by the defendant, [by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."  Loss shall not include "[i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." U.S.S.G. § 2B1.1, n.3(D)(ii).

The Guidelines are consistent with applicable Ninth Circuit case law.  In *United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000), the defendant obtained nine loans by making false statements to the bank in order to fund his purchase of a particular piece of property.  *Id*. at 1041.  He defaulted on all nine loans and the bank eventually foreclosed.  The foreclosure sale did not generate sufficient funds to repay the loans at issue, and the bank ended up losing hundreds of thousands of dollars.  *Id.*   The Ninth Circuit held that "'[I]n fraudulent loan application cases, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan.'" *Hicks*, at 1047, *citing United States v. Davoudi*, 172 F.3d 1130, 1135 (9th Cir. 1999).  Tying the determination to the time that the offense is discovered makes sense in light of the Sentencing Guidelines' requirement that the defendant be credited with the fair market value of any property returned before the offense was detected.  *See* U.S.S.G. § 2B1.1, n.3(E)(i).  *See United States v. Allen*, 88 F.3d 765, 770 (9th Cir. 1996)(in fraudulent loan application case, proper way of calculating loss was to take the gross loan value and deduct the proceeds realized from the repossession and resale of the property and the loan payments credited to principal made prior to default).

In giving a defendant credit for payments made before default, the Ninth Circuit

has held that any payments that are made towards interest cannot be considered as repayments made on the loan, and such payments are excluded from the loss calculation. *Allen*, *supra*, 88 F.3d at 770-771. *See Davoudi, supra,* 172 F.3d at 1135-1136 (upholding district court's decision not to credit defendant with interest payments made on fraudulently-obtained loan, citing its earlier decision in *Allen*).

**C.  The Upcoming Evidentiary Hearing on Loss**

In order to assist the Probation Officer in preparing the Presentence Report, the government provided information it had acquired from each lender regarding the loss that the lender sustained when the four loans defaulted.  The Court has scheduled an evidentiary hearing on August 5, 2010, so that the government may present the basis for its loss calculations.  In order to prepare for the hearing, the government has assembled records and conducted additional investigation in order to document as carefully as possible the losses sustained when the four loans went into default.  In order to assist the Court, the government provides below a summary of the information it intends to present at the hearing.

**1.  The Government's Witness at the Evidentiary Hearing**

As a preliminary matter, the government advises the Court that it intends to proceed by calling F.B.I. Special Agent Mandy Britton to testify at the hearing regarding documents she has received from the lenders and which she has reviewed.  Agent Britton will also testify about interviews she has conducted with employees of the victim lenders and about information she has received from lender employees.

Rule 1101(d)(3) of the Federal Rules of Evidence expressly provides that the rules of evidence do not apply to sentencing proceedings.  Years before Rule 1103(d)(3) was enacted, the Supreme Court held that courts may consider hearsay at sentencing if there are adequate indicia of reliability.  The Court held that proceeding in that manner did not violate a defendant's right to due process.  *Williams v. New York*, 337 U.S. 241, 246, 252 (1949).  The Court's discussion of the long-standing practice by which "a sentencing

1  judge could exercise a wide discretion in the sources and types of evidence" used to

2  determine the type and extent of punishment is codified in 18 U.S.C. § 3661, which

3  provides that "[n]o limitation shall be placed on the information concerning the

4  background, character, and conduct of a person convicted of an offense which a court of

5  the United States may receive and consider for the purpose of imposing an appropriate

6  sentence." *See Williams, supra,* at 246. *See also* U.S.S.G. § 6A1.3, Resolution of

7  Disputed Factors (Policy Statement)("In resolving any dispute concerning a factor

8  important to the sentencing determination, the court may consider relevant information

9  without regard to its admissibility under the rules of evidence applicable at trial, provided

10 that the information has sufficient indicia of reliability to support its probable accuracy.")

11        In *United States v. Littlesun,* 444 F.3d 1196, 1199-1200 (9th Cir. 2006), the Ninth

12 Circuit held that hearsay is admissible at sentencing even when the information being

13 related is testimonial.  Agreeing with all the other Circuit Courts which had addressed the

14 issue, the Ninth Circuit held that "the law on hearsay at sentencing is still what it was

15 before *Crawford* [citation omitted] so long as it is 'accompanied by some minimal indicia

16 of reliability.'" *Littlesun* at 1200 (quoting *United States v. Berry,* 258 F.3d 971, 976 (9th

17 Cir. 2001)).  In *Littlesun,* a Bureau of Indian Affairs agent testified at sentencing to what

18 the defendant's wife told the agent about the quantity of drugs that her husband sold.  *Id*.

19 at 1197.  The Ninth Circuit upheld the district court's reliance on that testimony – even

20 though the wife did not testify – in determining the drug quantity adjustment for

21 sentencing guidelines purposes.  *Id*. at 1197, 1201.

22        Similarly, in *United States v. Berry,* 258 F.3d 971, 975-76 (9th Cir. 2001), the

23 Court upheld the district court's reliance on the hearsay statements of the defendant's co-

24 conspirators in finding that the enhancement for leadership role was warranted.  In *Berry*,

25 the district court relied on statements that the co-conspirators made, as they were related

26 in the Presentence Report.  *Id*. at 975.  Although the district court did not articulate

27 findings as to the reliability of the information related in the PSR, the Ninth Circuit found

28

that the hearsay statements of the co-defendants "were sufficiently corroborated by each other to provide the minimal indicia of reliability necessary to qualify the statements for consideration by the district court during sentencing." *Id*. at 977. *See also United States v. Sustaita*, 1F.3d 950, 952-53 (9th Cir. 1993)(upholding the district court's reliance on the hearsay statements of agents, as related in the presentence report, regarding what co-conspirators had told them).

At the evidentiary hearing, Special Agent Britton will summarize past and recent interviews of lender employees and records obtained from the lenders.  Agent Britton will explain that the records were obtained from custodians of records and were accompanied by affidavits and declarations, or were sent directly to her by employees whom she recently interviewed.  The employees have stated that the records are records of the business.  The records, on their face, pertain to the loans at issue.  As such, the testimony and records that the government intends to present at the evidentiary hearing will meet the requisite indicia of reliability.

## 2.  Summary of the Evidence the Government Intends to Introduce

In light of what the Sentencing Guidelines and applicable case law require in order for the Court to determine the actual loss sustained by the lenders as a result of the fraudulent loans that Yeung and her co-conspirators obtained, the government intends to elicit testimony and introduce evidence that will address the salient points necessary for making the loss calculation.  That is, the government intends to focus on (1) establishing whether the loan went into default; (2) what happened to the collateral, that is, the property securing the deed of trust; (3) whether any funds were recouped as result from sale of the collateral; and (4) the unpaid principal on the loan at the time that the lender recouped funds.  The following is a summary of what the government anticipates the evidence will show in that regard.[1]

---

[1]  The information provided here is the information available to the government as of the filing of this Memorandum.  The government has provided discovery to the defense of all

1

### a. __The Dinh Lam Loan From Chase (261 San Fernando Way)__

2     Evidence introduced at trial established that on approximately January 8, 2007, a

3 sale transaction closed in which the buyer / borrower was Dinh Lam and the subject

4 property was 261 San Fernando Way in San Francisco. *See* Government's Exhibit 502-

5 22[2].  The purchase was funded by a first mortgage loan in the principal amount of

6 $1,732,500 from J.P. Morgan Chase Bank, and a second mortgage loan in the principal

7 amount of $467,500 from Cal State 9 Credit Union.  *Id.*  According to the Deed of Trust

8 for the first mortgage, Dinh Lam promised to pay the lender, J.P. Morgan Chase

9 (hereafter "Chase"), $1,732,500.  Exh. 1109.  The collateral for the loan was the property

10 at 261 San Fernando Way.  *Id.*  The Deed of Trust for the second mortgage was also

11 signed by Dinh Lam in favor of the lender, Cal State 9 Credit Union.  Exh. 1110.  Lam

12 promised to pay $467,500 and the collateral for this loan was also 261 San Fernando

13 Way. *Id.*

14     Documents obtained by grand jury subpoena from Chase over the course of the

15 investigation of this case include a letter dated April 2, 2007 to Dinh Lam at 261 San

16 Fernando Way advising him that he was in default on the loan, with a current payment of

17 $11,189.07 due.  Property records filed and recorded with the San Francisco County

18 Recorder's Office show that a Trustee's Sale (also known as a foreclosure sale) was held

19 on October 21, 2007.  As a result of that event, Chase Home Finance (a division of

20 Chase), the foreclosing beneficiary on the Deed of Trust, took title to the property.

21 Documents obtained from Chase show that at that time, the unpaid principal balance on

22

23

24

25

---

26 documents presently in its possession that confirm and/or relate to the information discussed
here.

27     [2] Unless otherwise indicated, all exhibits referred to hereafter were exhibits introduced
28 into evidence at trial by the government.

USA SUPP. SENTENCING
MEMO
CR 09-376 SI                              9

1    the loan was $1,732,500, which was the original principal amount on the loan.[3]

2          Documents obtained from Chase include an agreement, signed by Miu Wan Yeung

3    (which is an established alias for the defendant Judy Yeung) on October 12, 2007, as

4    occupant of 261 San Fernando Way, to vacate the property.  Yeung only agreed to do so

5    if the owner, Chase, would pay her $2,500 and allow her to live there rent-free until

6    November 18, 2007.   The records include a copy of a check made payable to Yeung from

7    the entity handling the property for Chase.  That entity then billed Chase for the $2,500.

8          Property records show that Chase Home Finance sold 261 San Fernando Way to a

9    third party, and the grant deed was recorded on February 27, 2008.  Records obtained

10   from First American Title Company, the title company that handled the escrow, show that

11   Chase sold the property to the third party for $1.5 million, and received net proceeds in

12   the amount of $1,343,955.32.  Escrow records show that Chase paid closing costs and

13   more than $26,575 in outstanding taxes due on the property.

14         The difference between the outstanding principal owed on the loan and the funds

15   that Chase received from sale of the collateral is $388,545.

16         **b.  <u>The Dinh Lam Loan from Cal State 9 CU (261 San Fernando Way)</u>**

17         As discussed above, the Lam purchase / Yeung re-finance of 261 San Fernando

18   Way was also funded by a second mortgage loan from Cal State 9 Credit Union.  Exh.

19   502-22.  According to the Deed of Trust for the second mortgage, Lam promised to pay

20   Cal State 9 Credit Union (hereafter "Cal State 9") $467,500.  Exh. 1110.  This loan was

21   also secured by the property at 261 San Fernando Way.  *Id.*

22

23   ─────────────────

24         [3] Some evidence was introduced at trial, through the testimony of financial analyst Philip
     Villanueva, who testified during the government's case in chief, that one payment in the amount
25   of $11,189 may have been made on the loan.  Given that, according to Chase, the principal
     amount of the loan was never reduced from the original principal, it appears that this payment,
26   was an interest payment.  This is consistent with the Truth in Lending Disclosure Statement for
     the loan, included in the loan records obtained from Chase by grand jury subpoena, which shows
27   that the first sixty payments, starting February 1, 2007, would be interest-only payments.  (Exh.
     500-16; not introduced into evidence at trial).
28

Documents obtained by grand jury subpoena from Cal State 9 show that only two payments were made on the loan, one by check on the account of Dinh Lam and one by check on the account of Miu Wan Yeung.  Cal State 9 records show that those payments were interest payments and did not reduce the principal.

According to legal officer Elaine Ledlove-Plant, who provided the documents pursuant to subpoena, and who is familiar with the documents and Cal State 9's operations, Cal State 9 closed and went into conservatorship in November 2007.  Ms. Ledlove-Plant recently reviewed records pertaining to the Lam loan and advised that Cal State 9 did not recover any funds when the first mortgage holder, Chase, sold the property.  Ledlove-Plant advised that Cal State 9 took a loss in the amount of the principal, $467,500, plus expenses incurred in trying to collect on the loan.

### c.  <u>The Ferrari Loans from Long Beach (1351 Third Street)</u>

The government introduced evidence at trial showing that on approximately January 5, 2006, a sale transaction closed in which the buyer / borrower was Kenneth Ferrari, the seller was Andy Louie, and the subject property was 1351 Third Street, Gilroy.  Exh. 301-1.  The purchase was funded by first and second mortgage loans from Long Beach Mortgage Company in the amounts of $664,000 and $166,000, respectively. *Id*.  Testimony at trial established that Long Beach Mortgage was a subsidiary of Washington Mutual Bank.  The Deeds of Trust for the two mortgage loans showed that, in each case, Long Beach Mortgage Company was the lender, the collateral was the property at 1351 Third Street, and the principal of the loans was $664,000 and $166,000, respectively.  Exhs.  300-18, 300-19.

Ken Ferrari and Alex Yee testified at trial that, to their knowledge, a few payments were made on the loans, and then no further payments were made.  Records obtained from Washington Mutual by grand jury subpoena during the investigation show four payments made on the first mortgage loan of $664,000.  A portion of each payment was credited to interest, and a portion to principal.  After the final payment was received, the

outstanding principal was $663,531.56.  Records pertaining to the second mortgage loan show three payments made, reducing the principal to $165,851.22.

Property records show that a Trustee's Sale for the property was held on December 4, 2006.  The foreclosing beneficiary was Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Trust 2006-2,[4] and after the foreclosure transaction took place, the foreclosing beneficiary took title to the property.

The Third Street property was then sold to a third party on or about March 28, 2008.  By Grant Deed recorded that date, Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Loan Trust 2006-2, granted the property to the third party.

According to records obtained from Chase, which acquired Washington Mutual / Long Beach Mortgage and its business records, the sale of the property closed on March 28, 2008; the sale price was $395,000; and the sale proceeds were $363,863.63.  The records show that the actual unpaid principal balance on the first mortgage loan at the time was $663,531.56.

A Chase employee has advised that the records showing the actual unpaid principal balance on the second mortgage loan have been purged.  However, as noted above, the payment records show that as of the time that payments on the loan stopped,

_____

[4] A review of publically-filed SEC documents establishes that on March 7, 2006, Long Beach Mortgage Company transferred a pool of loans, including the two Ferrari loans, to Long Beach Securities Corporation, a wholly-owned subsidiary of Long Beach Mortgage Company.  Long Beach Securities Corporation established Long Beach Mortgage Loan Trust 2006-2 (the "Trust"), which then acquired the mortgage pool.  According to the Trust's Prospectus (see page 7 of 191), the mortgage loans were acquired by the Trust at a value equal to the amount of the mortgage loans at the time of origination less any scheduled payments of principal on those loans.  The Trust then issued "certificates" to investors; the certificates represented a fractional interest in the pool of mortgage loans owned by the Trust.  Deutsche Bank was appointed as Trustee for the certificate holders, and in that capacity was given legal title to the mortgage loans owned by the Trust.  Under the Pooling and Servicing Agreement (also a publically-filed document), Deutsche Bank was responsible for pursuing foreclosure actions in the event that one of the pooled mortgages went into default.  Any funds recovered by Deutsche Bank would then have been remitted to the Trust, which in turn was owned by the certificate holders.

1  the outstanding principal balance was $165,851.22.  Therefore, the total unpaid balance

2  on the two loans was $829,382.78.

3   Deducting the net proceeds resulting from the sale of the collateral from the

4  outstanding principal balance, the loss was $465,519.

5  ### d.  The Lawrence Phung Loans from Silver State (7187 Pitlochry)

6  Evidence introduced at trial established that on approximately March 7, 2006, a

7  sale transaction closed in which the buyer / borrower was Lawrence Phung and the

8  subject property was 7187 Pitlochry Drive in Gilroy.  Exh. 401-1.  The $1.3 million

9  purchase was funded by first and second mortgage loans from Silver State Mortgage in

10 the amounts of $1,000,000 and $300,000, respectively.  *Id*.  The Deeds of Trust for the

11 two loans were signed by Lawrence Phung.  Exhs. 401-3, 401-12.  Phung promised to pay

12 the lender, Silver State Mortgage, the principal sums of $1,000,000 and $300,000, and the

13 collateral for the loans was the property at 7187 Pitlochry.

14 During the course of the investigation, the government learned that Silver State

15 Mortgage went out of business.  It obtained records pertaining to the loan from GMAC,

16 which serviced the loans for Silver State.   The documents provided by GMAC include

17 letters to Mr. Phung dated July 11, 2006; August 2, 2006; and September 1, 2006, stating

18 that he was in default on the loan.

19 When interviewed by the FBI in the course of the investigation, Mr. Phung stated

20 that he received a notice of default for Pitlochry Drive in approximately July 2006.  (FBI

21 302, 5/16 - 5/23/07).  He advised that when he received the monthly mortgage statements,

22 he provided them to Judy Yeung.  At trial, Mr. Phung testified to written contracts he had

23 with Judy Yeung in which she agreed to make the mortgage payments on the property.

24 During the interviews with the FBI, Mr. Phung said that he had no choice but to sell the

25 property and he subsequently sold the property in approximately October 2006 for

26 $1,200,000.

27 A Grant Deed recorded on October 31, 2006, shows that Lawrence Phung

28

transferred title to a third party for unspecified consideration.  The government is in the process of obtaining a copy of the escrow file from Chicago Title Company.  The settlement statement will show the sale price and how the proceeds from the sale were distributed.

GMAC serviced both loans for a period of time.  "Servicing" generally means that GMAC collected mortgage payments from the borrower, distributed them to the lender, and informed the lender of any problems in collection or default.  According to records maintained by GMAC, it transferred servicing of the first mortgage loan in April 2006.  At that time, the outstanding principal balance was $1,000,000.[5]  At the time that it transferred servicing, it was servicing the loan for an entity called Nomura Credit and Capital, Inc., thus indicating that Nomura was the owner of the $1,000,000 first mortgage loan at that time.

GMAC records show that it continued to act as servicer on the second mortgage loan of $300,000.  When payments stopped on the loan, the outstanding principal balance was $299,807.  GMAC records show that it was servicing the loan for Lasalle Bank, thus indicating that Lasalle Bank was the owner of the $300,000 second mortgage loan at that time.  GMAC records contain no information about how much Lasalle Bank purchased the loan for.  Lasalle Bank is no longer in business, and the government has not been able to locate records establishing Lasalle Bank's purchase price for the $300,000 loan.

GMAC records reflect the fact of the Phung sale of the property in October 2006, and that it was going to be a short sale.  That is, the funds realized from the sale would not cover the amount of outstanding mortgage loans.  GMAC records show that there were $89,938 in proceeds from the sale.  As discussed above, the escrow records will show how that figure was determined and how all of the proceeds from the sale were

---

[5]  Even if some payments were made on the Phung loan, they would not have reduced the principal on the $1 million loan.  The Note signed by Mr. Phung specified that the first sixty payments would be interest only.  (Government's Exhibit 400-3, admitted into evidence at trial).

distributed.

Based on information currently available, a reasonable estimate of the loss in connection with the Phung loan is the unpaid principal balance of $1,299,807 minus the sale price of $1,200,000, or $99,807.

**e. Total Loss**

The total loss sustained on the four loans is $1,421,371.

**D. Gain to Yeung As an Alternative Means**
**Of Calculating Loss and the Sentencing Guidelines**

In its Sentencing Memorandum, the defense claims that the government has failed to meet its burden of establishing the loss and states that "the gain to the defendant is the most appropriate measure of loss." Document 204, at 19. The defense then goes on to calculate the gain the Yeung as no more than $86,586.

Application Note 3(B) to Section 2B1.1 of the Guidelines provides that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." In this case, as will be fully demonstrated during the evidentiary hearing, there are losses that can be reasonably determined. Therefore, this Court need not turn to gain as a basis for determining the guideline range. So the record is clear, however, if the Court were to calculate gain to Yeung, it would be significantly greater than $86,586.

During his testimony at the close of the government's case, Financial Analyst Phillip Villanueva walked the Court and jury through title company documents, bank records, and certified copies of property records to show how Yeung benefitted financially from fraudulent loans secured by 261 San Fernando Way: (1) the fraudulent re-finance loan in the name of Kenneth Zhang in the amount of $1,365,000 from Washington Mutual Bank (WAMU); and (2) the fraudulent loans in the name of Dinh Lam in the amounts of $1,732,000 and $467,500 from Chase and Cal State 9 Credit Union, respectively. Mr. Villanueva's summary chart was introduced into evidence as Government's Exhibit 1028.

Based on documents introduced into evidence, Mr. Villanueva explained that when Yeung, using Zhang, obtained the $1,365,000 WAMU loan, the proceeds were distributed in a way that directly benefitted her.  Of the proceeds, $86,586 were wired directly into a Bank of America account that Yeung controlled.  Exhs. 101-6, 101-7, 101-9, 101-19, 1007, 1021.  Out of the proceeds, an additional $1,004,890 was disbursed to Baymark Financial in order to pay off a loan that Yeung owed to Baymark.  Exhs. 101-1, 101-27, 101-28.  Yeung had signed a note to Baymark and a Deed of Trust pledging 261 San Fernando Way as collateral.  Exhs. 101-27, 101-28.  Another $258,112 in proceeds from the Zhang / WAMU loan paid off a second debt that Yeung owed.  This was a $250,000 loan that Yeung obtained from a group of investors and which she secured with 261 San Fernando Way.  Exhs. 101-1, 101-3, 101-16, 101-29.  In addition, proceeds from the Zhang / WAMU loan were used to pay $10,085 in property taxes owing on 261 San Fernando Way.  Exh. 101-1.

Thus, there is no question that Yeung directly benefitted financially from the fraudulent Zhang loan.  The proceeds paid off $1,263,002 in Yeung's personal debts and $10,085 in taxes on her residence.  Plus, she pocketed the $86,586.  This total gain was $1,359,673.

Similarly, Yeung directly benefitted financially from the fraudulent loans obtained in Dinh Lam's name.  The loans from Chase and Cal State 9 totaled $2.2 million.  Phillip Villanueva testified that when those loans closed, $67,769 was wired into Yeung's Wells Fargo Bank accounts.  Yeung benefitted far beyond this amount in obtaining the Lam loans.  Just as with the Zhang / WAMU loan, a significant portion of the proceeds were used to pay off debts that Yeung personally owed.

The seller's closing statement for the Lam loans shows that $1,444,700 in proceeds went to pay off what was owing on the Zhang / WAMU loan secured by 261 San Fernando Way.  Because Yeung was not the debtor on the WAMU note, we do not argue that she derived a direct financial benefit from the payoff of the WAMU loan.

1   Nevertheless, she derived a personal benefit from the payoff of that loan.  Prior to Lam

2   obtaining his loans from Chase and Cal State 9, WAMU had filed foreclosure notices and

3   a notice of trustee's sale.  Exhs. 1111, 1112, 1113.  By paying off the WAMU loan,

4   Yeung avoided foreclosure and eviction.

5          The remaining Chase and Cal State 9 proceeds were distributed in a way that

6   directly benefitted Yeung financially.  Mr. Villanueva testified that $229,948 in proceeds

7   from the Lam loans were disbursed to pay off a debt that Yeung personally owed to

8   Nishen Fu and which was secured by a Deed of Trust pledging 261 San Fernando Way as

9   collateral.  Exhs. 502-18, 1108.  Only a month before the Lam loans closed, Fu had filed a

10  Notice of Default on the loan to Yeung.  Exh. 1115.

11         In addition, $331,401 in proceeds from the Lam loans were used to pay off a loan

12  that Yeung and Michael Farrell had obtained from Cal State 9 Credit Union in 2005.

13  Exh. 502-18.  Finally, the Lam loan proceeds were used to pay $17,367 in property taxes

14  owed on 261 San Fernando Way.  Once all these debts were paid off, the net proceeds of

15  $67,679 went into Yeung's bank accounts.

16         Again, it is clear that Yeung gained financially from the fraudulent Lam loans.

17  Her personal debts to Fu and Cal State 9 totaling $569,349 were paid off; $17,367 in

18  property taxes were paid; and $67,679 was deposited into her bank account.  This total of

19  $646,485 does not take into account the intangible benefit of avoiding foreclosure and

20  eviction from her home.

21         In sum, the evidence established that Yeung benefitted financially by just over $2

22  million from the fraudulent Zhang and Lam loans.

23  **E.   The Bureau of Prisons Can Provide Adequate Medical Care For Yeung**

24         As evidenced by the attached declaration, Yeung's medical records have been

25  reviewed by Dr. James Pelton, a board-certified internist who is the Western Regional

26  Medical Director for the Federal Bureau of Prisons ("BOP").  See Declaration of Dr.

27  Pelton, dated July 29, 2010 ("Pelton Decl.") at ¶ 1.  Dr. Pelton is responsible for

28

overseeing delivery of medical care in the region and advising other BOP physicians in the management of especially difficult or complicated cases.  He has reviewed the medical records provided by defense counsel, specifically  (1) seven pages of medical records from Kaiser Permanente reflecting lab results and radiology results from September 2009 and April 2010, as well as three letters from Drs. Margaret S. Lo, Lianghuey Leu and Ka Wai Tam, dated May 24, 2010, August 19, 2009 and December 30, 2009, respectively; (2) five pages of hand-written notes reflecting Yeung's treatment in October 1999 and (3) fifty pages of medical records from St. Francis Memorial Hospital.  Dr. Pelton was also advised that defense counsel has confirmed that Yeung's treating physicians do not believe that she currently requires surgery.  *Id.* ¶¶ 2-4.

Dr. Pelton's review of Yeung's medical records leads him to believe that Yeung has high blood pressure and an aortic aneurism.  An aortic aneurism is a general term for any swelling of the aorta, usually representing an underlying weakness in the wall of the aorta at that location.  Based on information in the medical records, Dr. Pelton's expertise as a doctor with knowledge of BOP medical facilities, as well as his understanding that Yeung's treating physicians do not believe that she currently requires surgery for her aortic aneurism, it is Dr. Pelton's opinion the BOP can provide appropriate medical care for Yeung through a likely designation to a Level II institution.  Dr. Pelton also believes that the BOP is currently housing inmates with medical conditions similar to those of Yeung.  *Id.* ¶ 5.

As Dr. Pelton's declaration explains, the BOP classifies its institutions' medical resources on a one to four (I - IV) scale.  Level I institutions house essentially healthy inmates.  Level II institutions accept inmates with chronic, but stable medical conditions. Level III institutions manage inmates with potentially unstable medical problems. Inmates assigned to a level III facility are considered medically complex outpatients that require at least monthly clinician evaluations and may have limitations in their ability to perform activities of daily living, but do not require daily nursing care.  Finally, the

BOP's six Federal Medical Centers (FMC) are all classified as level IV institutions. FMCs provide inpatient and outpatient medical, surgical and psychiatric services to inmates commensurate with services provided in the community.  Inmates assigned to level IV institutions suffer from conditions that require daily nursing care. Approximately 1% of the BOP's inmates are designated to an FMC for their medical condition.  In Yeung's specific case, it is Dr. Pelton's opinion, after review of her medical records, that her medical condition does not currently require treatment other than monitoring for symptoms and a CT scan every six months.  Yeung will therefore likely be designated to a Level II facility, such as the Federal Correctional Institution in Dublin, California.  All level II facilities are able to provide inmates with a heightened level of medical services, including access to specialists and specialized medical services in the local community.  Moreover, if at any time the facility's medical staff determine that Yeung's medical condition requires a higher level of care, the institution's Clinical Director will contact the BOP's Office of Medical Designation and Transportation (OMDT) to request that she be redesignated to a level III or IV facility.  *Id.* ¶¶ 6-9.


DATED: August 2, 2010          Respectfully submitted,

                               JOSEPH P. RUSSONIELLO
                               United States Attorney


                                    /s/
                               _____
                               SUSAN E. BADGER
                               JEFFREY RABKIN
                               Assistant United States Attorneys